UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                        :
WADE PARK LAND HOLDINGS, LLC et al,                                     :
                                                                        :
                                    Plaintiffs,                         :
                                                                        :
                                                                        :          21-cv-1657 (LJL)
                    -v-                                                  :
                                                                        :          OPINION AND ORDER
JONATHAN KALIKOW et al,                                                 :
                                                                        :
                                    Defendants.                         :
                                                                        :
-----------------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                 │
│ DATE FILED: 03/04/2022               │
└─────────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

        This case arises from the financing and development of two parcels of land outside

Dallas, Texas, known as Wade Park.  The case was originally filed as an adversary proceeding in

the United States Bankruptcy Court for the Northern District of Georgia.  The United States

District Court for the Northern District of Georgia issued an order withdrawing the reference to

the Bankruptcy Court and dismissed one of the defendants from the case.  The case was then

transferred to this Court.

        Defendants Jonathan Kalikow ("Kalikow"), WP Development Partners, LLC ("WP

Development Partners"), Gamma Lending Omega, LLC ("Gamma Lending Omega"), Gamma

Real Estate Capital, LLC ("Gamma Real Estate Capital"), and GRE WP, LLC ("GRE WP")

(collectively, "Defendants") move, pursuant to Federal Rules of Bankruptcy Procedure 7009 and

7012, which incorporate Federal Rules of Civil Procedure 9, 12(b)(1) and 12(b)(6) for adversary

proceedings, to dismiss the complaint against them.[1]  Dkt. No. 39.

---

[1] Because the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure at
issue are identical and no party identifies any difference in their application here, the Court need
not decide which rules apply.  At oral argument, Defendants explained that they originally
moved under the Federal Rules of Bankruptcy Procedure rather than the Federal Rules of Civil

Plaintiffs Wade Park Land, LLC ("WP Land"), Wade Park Land Holdings, LLC ("WPL Holdings"), and Thomas Family Trust (or "Trust") (collectively, "Plaintiffs") bring seventeen claims against Defendants in the operative first amended complaint.  Dkt. No. 5.  Plaintiffs allege that a temporary bridge loan from one of the Defendants devolved into a fraudulent scheme by Defendants to take control of Wade Park.  *Id.* ¶¶ 1–6.

For the following reasons, the motion to dismiss is granted.

## BACKGROUND

The Court accepts as true the well-pleaded allegations of the first amended complaint ("Complaint" or "Compl."), Dkt. No. 5, along with the documents which are incorporated by reference or of which the Court may take judicial notice.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

## I.    The Relevant Parties

Plaintiffs WP Land and WPL Holdings are each limited liability companies formed under the laws of Delaware with principal places of business in Newnan, Georgia.  Compl. ¶¶ 7–8.  Each was formed to hold title to a portion of the Wade Park development project located in Frisco, Texas, outside of Dallas, Texas, with WP Land holding title to the southern parcel of land and WPL Holdings holding title to the northern parcel of land.  *Id.*  Each is a debtor in the related bankruptcy case.  *Id.*  The remaining plaintiff, Thomas Family Trust, is an irrevocable trust created under the laws of Georgia and holds a membership interest in Wade Park Ventures, LLC ("WP Ventures").  *Id.* ¶ 9.  WP Ventures is a limited liability company that holds WP Land and WPL Holdings.  *Id.* ¶ 28.

---

Procedure because this case originated in Georgia and there was precedent in that court suggesting that the Federal Rules of Bankruptcy Procedure applied and that they simply did not change the reference to the rule after the case was transferred.

Plaintiff WP Land was managed by Stanley Thomas ("Thomas"), a commercial real-estate developer based in Newnan, Georgia, who specializes in the development of high-end retail and mixed-use commercial and residential centers.  *Id.* ¶¶ 25, 25.5.  Thomas also managed WP Ventures, Lebanon 390WR, LLC ("Lebanon 390WR"), and various other entities involved in the Wade Park project.  *Id.* ¶ 25.5.

Defendants WP Development Partners, Gamma Lending Omega, Gamma Real Estate Capital, and GRE WP are each limited liability companies formed under the laws of Delaware with principal places of business in New York.  *Id.* ¶¶ 11–14.  The Complaint refers to these four defendants collectively as the "Gamma Defendants."  *Id.* at 6 n.2.  Defendant Kalikow was an officer of each of the defendant entities and is alleged to have directed their actions.  *Id.* ¶ 10.

## II.    The Wade Park Project and the Loans from Bridge Capital and BAMCAP

The allegations in this case involve the financing for the Wade Park project.  The Wade Park project is located at the "$5 Billion Mile," a one-mile stretch of land in Frisco, Texas that is home to The Star (the headquarters and training center for the NFL's Dallas Cowboys), Toyota Stadium, and various high-end, mixed-use developments such as Frisco Station and The Gate.  *Id.* ¶¶ 32–33.  The Wade Park project was contemplated to involve the construction of two office towers (with over five million square feet of office space), one million square feet of high-end retail space, approximately 2,400 luxury residential housing units, and five hotels.  *Id.* ¶ 35.

Between 2012 and 2015, various entities associated with Thomas acquired the approximately 176 acres of land that would become Wade Park.  *Id.* ¶ 37.  The acquisitions were financed through funds held by the Thomas Family Trust, entities affiliated with Thomas, and purchase mortgages from Bridge Capital, LLC ("Bridge Capital") and BAMCAP Partners, LP ("BAMCAP").  *Id.* ¶¶ 30–31, 37.  The acquisition of the northern parcel was financed by Bridge Capital through Lebanon 390WR, an entity managed by Thomas that was the predecessor in title

to WPL Holdings.  *Id.* ¶ 29–30.  The acquisition of the southern parcel was financed by

BAMCAP through two loans totaling $48 million (the "BAMCAP Loans"); title to this parcel

was held by WP Land.  *Id.* ¶¶ 31, 38.  By the end of 2013, Thomas had engaged in

pre-development work for the Wade Park project, overseen the development of architectural and

other plans for the site, and begun efforts to lease commercial space on the northern parcel.  *Id.*

¶¶ 39–41.

By the spring of 2016, Lebanon 390WR owed approximately $45 million to Bridge

Capital for the loan used to acquire and construct the north property, and WP Land owed

approximately $48 million to BAMCAP for the loan used to acquire and construct the south

property.  *Id.* ¶ 43.  Both sets of loans were set to mature in early 2017.  *Id.* ¶ 44.  During this

time, Thomas sought additional financing for the project from other financial institutions (such

as JP Morgan, USAA, and others), which engaged in due diligence and considered whether to

provide large-scale loans and equity investments that would finance construction and pay off the

existing loans from Bridge Capital and BAMCAP.  *Id.* ¶¶ 44–46.  Bridge Capital, however, told

Thomas that it could not continue to extend the maturity date of its loans.  *Id.* ¶ 46.  As a result,

Thomas looked to obtain a bridge loan to pay back Bridge Capital and to provide construction

financing for a limited period of time while the other financial institutions completed their due

diligence.  *Id.*

## III.    Negotiating the Gamma Bridge Loan

Thomas met defendants Kalikow and Gamma Real Estate Capital in or around October

2016, after having been introduced by non-party John Porter ("Porter"), an executive with the

commercial real-estate firm CBRE Group, Inc.  *Id.* ¶¶ 27, 48–49.  After the October 2016

meeting, Thomas decided to move forward with a bridge loan from Gamma Real Estate Capital.

*Id.* ¶ 55.  On or about October 20, 2016, Thomas and Gamma Real Estate Capital executed a

term sheet stating that Gamma Real Estate Capital would lend a Thomas-affiliated entity a total of just over $196 million for Wade Park (the "Gamma Bridge Loan"). *Id.* ¶ 57. The term sheet envisioned an initial six-month loan term, along with four six-month extension rights that Thomas could trigger so long as the loan remained current and out of default. *Id.* ¶ 58. The term sheet envisioned a quick closing—sometime in November 2016. *Id.* ¶ 57.

In late November 2016, before the loan was made, Kalikow and Gamma Real Estate Capital changed the loan terms, reducing the amount Gamma Real Estate Capital was willing to loan from $196 million to $139 million. *Id.* ¶ 63. In addition, Kalikow demanded that, in exchange for the loan, Gamma Real Estate Capital be given a second lien on the south Wade Park property behind BAMCAP and that BAMCAP enter into an intercreditor agreement that would cross-collateralize and cross-default the BAMCAP Loans on the south property with the Gamma Bridge Loan. *Id.* ¶ 64. At the time, a month had passed since execution of the term sheet, and the Bridge Capital loan was about to mature again; Thomas wanted to avoid having to obtain—and pay another very large fee for—a further extension of that loan. *Id.* ¶ 66. In addition, the Wade Park project required an enormous financial investment from Thomas or Thomas-affiliated entities. *Id.* ¶ 67. Given indications from Kalikow and Gamma Real Estate Capital that due diligence was going well, Thomas had stopped discussions with other potential bridge lenders. *Id.* ¶ 66. Thomas accepted Kalikow's and Gamma Real Estate Capital's changed deal terms. *Id.* ¶ 69.

On or around December 2, 2016, Kalikow and Gamma Real Estate Capital demanded two additional changes before they provided a loan: (1) a further reduction of the loan amount to approximately $83 million; and (2) a proposal that Kalikow called "The Hammer." *Id.* ¶ 70. The Hammer is described in greater detail later in this Opinion. But, in essence, The Hammer

5

gave Kalikow and the Gamma Defendants a 75% interest in the Wade Park project through WP Ventures and provided they would retain that interest unless the Gamma Bridge Loan was repaid within sixty days of its maturity date. *Id.* ¶¶ 72–73. It thus provided additional security for the loan. Kalikow explained that they wanted an interest in Wade Park that was large enough and "painful enough" to deter Thomas from filing for bankruptcy. *Id.* ¶ 74. In response to concerns from Thomas and his team members about these changes, Kalikow provided assurances in a number of phone conversations on or about December 2, 2016 that he and Gamma Real Estate Capital did not want to own the Wade Park project. *Id.* ¶ 75. As to the reduced loan amount, while the original loan amount would have been sufficient for Thomas to repay Bridge Capital and to fund ongoing construction during the bridge period, the reduced amount was sufficient only to repay Bridge Capital. *Id.* ¶ 71.

Meanwhile, for a fee of approximately $1.25 million, Bridge Capital had agreed to extend the term of its loan to a date that would allow Thomas to close on the Gamma Bridge Loan and to use the proceeds to pay Bridge Capital. *Id.* ¶ 61. Thereafter, as Kalikow and Gamma Real Estate Capital demanded new terms for the Gamma Bridge Loan, Bridge Capital agreed to two more extensions and a new maturity date of on or around January 19, 2017. *Id.* ¶ 78. In total, Thomas or a Thomas-affiliated entity paid Bridge Capital over $6.6 million in extension fees. *Id.* ¶ 78.

## IV.   Executing the Gamma Bridge Loan's Construction Loan Agreement and WP Ventures' Limited Liability Company Agreement

On or around January 17, 2017, WP Land and WPL Holdings, as borrowers, executed the Construction Loan Agreement—the loan documents for the Gamma Bridge Loan with Gamma Real Estate Capital; the loan was guaranteed by Thomas. *Id.* ¶ 82; *see also* Dkt. No. 40-2, Ex. B. WP Land and WPL Holdings borrowed a total of $82,750,000 for an initial four-month term,

until May 17, 2017, which could be extended three times, each time for three months, at the option of the borrowers, provided that the loan was not in default and that the borrowers had paid into an interest reserve account the amount of interest that would be due for the ensuing three-month period.  Dkt. No. 40-2, Ex. B § 3.13–3.15.  WP Land and WPL Holdings agreed to pay interest at a rate of 13% if the loan was not in default and 21% if the loan was in default and to grant Gamma Real Estate Capital a first mortgage lien on the north Wade Park property, a second mortgage lien on the south Wade Park property, and second priority liens on other property held by Thomas-affiliated entities.  Compl. ¶ 82.

The borrowers represented that the BAMCAP Loan was in full force and effect and that there had been no default under it; Gamma Real Estate Capital retained the right to approve any modifications to the BAMCAP Loan encumbering the south Wade Park property, provided that it could not unreasonably withhold its consent to a modification if the modification did not materially increase the amount of the borrowers' obligation to BAMCAP.  *Id.*  The provision protected the lenders against the risk that the borrowers would take on additional obligations that would place the borrowers at further risk; at the same time, the term limited the flexibility of WP Land and WPL Holdings to negotiate with BAMCAP.  *Id.* ¶ 97.  Any modification that increased the amount of the borrowers' obligation, even if it was necessary to avoid a default on the BAMCAP Loan, would require the consent of Gamma Real Estate Capital.  *Id.*

Gamma Real Estate Capital was also entitled, upon the occurrence of an event of default, to take any number of actions including declaring the borrowers' obligations to be immediately due and payable and obtaining foreclosure of the security instrument encumbering the Wade Park property, and it would also have the right to cause construction of specified improvements

on the property in the name of and on behalf of WP Land and WPL Holdings.  Dkt. No. 40-2, Ex. B. § 9.2.

The Construction Loan Agreement has a choice-of-law provision.  *Id.* § 11.5.  Under it, matters of the construction, validity, and performance of the agreement and the other loan documents are governed by the law of the state of New York, and the borrowers waive any claim to assert that the law of any other jurisdiction governs the Construction Loan Agreement and the other loan documents.  *Id.*

To provide further security to Gamma Real Estate Capital, WP Land and WPL Holdings agreed to The Hammer, and WP Ventures was created to implement The Hammer.  In short, if the loan defaulted and remained in default, the lender would be protected by a 75% interest in the Wade Park properties which it would hold through a bankruptcy-remote entity.  WP Ventures was formed under a Limited Liability Company Agreement ("LLC Agreement") to hold the interests of WP Land and WPL Holdings in the Wade Park properties and to carry out the business of the acquisition and development of Wade Park.  Dkt. No. 40-2, Ex. A.  Thomas was made manager of WP Ventures.  Compl. ¶ 86.  An affiliate of Gamma Real Estate Capital named GRE WP would hold a 75% class B membership interest in WP Ventures, and the Thomas Family Trust would hold a 25% class A membership interest in WP Ventures; Thomas and the Trust would have sole authority and responsibility for the operations of the venture.  *Id.* ¶¶ 72, 82, 87.  To further protect the lender, the LLC Agreement provided that WP Ventures and its wholly owned subsidiaries WP Land and WPL Holdings did not have the power, authority, or capacity to enter transactions with any affiliate or related party of WP Ventures.  *Id.* ¶ 89.

As part of the transaction, Gamma Real Estate Capital assigned its interests in the Gamma Bridge Loan to defendant Gamma Lending Omega, and Lebanon 390WR assigned its interest in the north Wade Park property to WPL Holdings.  *Id.* ¶¶ 84–85.

In addition, as part of the closing of the Gamma Bridge Loan, Gamma Real Estate Capital entered into an intercreditor agreement with BAMCAP.  *Id.* ¶ 92.  The intercreditor agreement gave Gamma Real Estate Capital the option to purchase the BAMCAP Loan if WP Land (the borrower on the BAMCAP Loan) were to default on the BAMCAP Loan.  *Id.* ¶ 93.

## V.     Extensions of the Gamma Bridge Loan

The Gamma Bridge Loan was scheduled to mature on May 17, 2017.  *Id.* ¶ 109. Effective May 17, 2017, WP Land and WPL Holdings signed a Loan Modification Agreement, which extended the term of the Gamma Bridge Loan by an additional three months.  Dkt. No. 40-2, Ex. C.  Additionally, on or about August 1, 2017 and November 15, 2017, WP Land and WPL Holdings exercised their rights to further extend the term of the Gamma Bridge Loan. Compl. ¶ 109.  These extensions pushed the Gamma Bridge Loan's term out to approximately February 17, 2018.  *Id.*

## VI.    WP Land Defaults on the BAMCAP Loan and the Gamma Defendants Declare a Default on the Gamma Bridge Loan

The BAMCAP Loan to WP Land on the south Wade Park property was scheduled to mature in January 2018.  *Id.* ¶ 117.  In advance of that date, during the fall and into the winter of 2017, Thomas continued his efforts to secure a permanent financing partner for the Wade Park project but had not yet completed his negotiations.  *Id.* ¶¶ 111–115.  To permit Thomas additional time to obtain such a financing partner, Thomas and BAMCAP agreed that BAMCAP would provide WP Land a one-month extension in exchange for a fee of approximately $530,000 to be paid by Thomas or a Thomas-affiliated entity and to be capitalized into the BAMCAP

Loan, increasing the loan's $48 million principal amount by $530,000.  *Id.* ¶¶ 117–118.  Kalikow and the Gamma Defendants initially "indicated to Thomas that the Gamma Defendants would consent to the modification of the BAMCAP Loan."  *Id.* ¶ 120.  However, in late January 2018, as the BAMCAP Loan was maturing, the Gamma Defendants withheld consent to the proposed modification of the BAMCAP Loan, ultimately causing BAMCAP to declare a default by WP Land.  *Id.* ¶ 123, 128.  As a result of BAMCAP's declaration of default, the Gamma Defendants had the right under the terms of the Gamma Bridge Loan to declare their own default on the Gamma Bridge Loan.  *Id.* ¶ 129.  On or around January 26, 2018, the Gamma Defendants did just that, declaring WP Land and WPL Holdings to be in default on the Gamma Bridge Loan.  *Id.* ¶ 130.

## VII.    The First Three Forbearance Agreements with the Gamma Defendants

Following the Gamma Defendants' declarations of default, WP Land and WPL Holdings entered a series of forbearance agreements with the Gamma Defendants.  *Id.* ¶ 136.  The first such agreement was dated March 5, 2018; it contained WP Land and WPL Holding's acknowledgement that Gamma Lending Omega was entitled to exercise its foreclosure rights under the loan documents and reflected Gamma Lending Omega's agreement to forbear from exercising its rights and remedies under the loan documents and from conducting a nonjudicial foreclosure of the Wade Park property until April 10, 2018.  Dkt. No. 40-2, Ex. D.  The second forbearance agreement was dated April 26, 2018 and contained Gamma Lending Omega's agreement for forbear from exercising its rights until June 17, 2018.  *Id.*, Ex. E.  The third forbearance agreement was dated July 2, 2018 and extended Gamma Lending Omega's agreement to forbear from exercising its rights until August 31, 2018.  *Id.*, Ex. F.

WP Land and WPL Holdings paid a fee to Gamma Lending Omega in connection with each forbearance agreement.  Compl. ¶ 138.  WP Land and WPL Holdings also executed broad

releases in connection with the forbearance agreements.  Dkt. No. 40-2, Ex. D § 9; *id.*, Ex. E § 9; *id.*, Ex. F § 9.  Each agreement is governed by New York law.  *Id.*, Ex. D § 15; *id.*, Ex. E § 15; *id.*, Ex. F § 15.  At the same time, and as expressly permitted by the forbearance agreements, the Gamma Defendants began advertising foreclosure of the Wade Park properties.  Compl. ¶ 139; Dkt. No. 40-2, Exs. D, E, F.

## VIII.   Thomas's Efforts to Secure Financing to Pay the Gamma Bridge Loan

From January 2018 to early 2019, Thomas engaged in efforts to secure financing to pay the Gamma Bridge Loan.  Compl. ¶¶ 142–175.  Plaintiffs allege that Defendants interfered with each one of them.  *Id.*

Thomas, for example, intended to pay "a substantial portion of the Gamma Bridge Loan" by refinancing with Synovus Bank and pulling equity out of certain of his other properties.  *Id.* ¶ 145.  Synovus Bank had a long-standing relationship with Thomas and held mortgage loans on certain of Thomas's other properties, including a development in Newnan, Georgia called Ashley Park.  *Id.* ¶¶ 144–145.  After Thomas told Kalikow and the Gamma Defendants of those plans and that Synovus Bank had agreed to discount the loans for Thomas, the Gamma Defendants bought Thomas's loans from Synovus, becoming Thomas's obligor.  *Id.* ¶¶ 145–146.  Plaintiffs allege that the Gamma Defendants purchased the loans to prevent Thomas from refinancing them to pay the Gamma Bridge Loan.  *Id.* ¶¶ 144–147.

Thomas also tried to refinance properties he held directly or through affiliated entities in Orlando, Florida and in Franklin, Tennessee; if successful, the refinancing would have generated enough cash to pay the Gamma Bridge Loan.  *Id.* ¶¶ 148–150.  The properties were encumbered with loans from Ardent Financial.  *Id.* ¶ 148.  Before the refinancing negotiations concluded, Kalikow and the Gamma Defendants approached Thomas and offered to lend $148 million on just the Orlando property—enough to pay the Gamma Bridge Loan.  *Id.* ¶ 150.  Thomas signed a

letter of intent with the Gamma Defendants for a $148 million loan in May 2018, *id.*, and shared extensive confidential and proprietary information about the Orlando property with Kalikow and the Gamma Defendants, *id.* ¶ 152.  But then, in the summer of 2018, the Gamma Defendants purchased the loans from Ardent Financial that encumbered the Orlando and Franklin properties without disclosing this to Thomas or his team.  *Id.* ¶ 154.  They also withdrew the $148 million loan they had proposed to Thomas for that property.  *Id.*  They thus thwarted Thomas's efforts to pull equity out of either the Orlando or Franklin properties to pay the Gamma Bridge Loan.  *Id.* ¶ 155.

Thomas also attempted to secure financing from Bluebell International ("Bluebell").  *Id.* ¶ 156.  In or around September 2018, Thomas and Bluebell agreed on a term sheet for a $725 million loan for Wade Park.  *Id.* ¶ 157.  Thomas intended to use the loan proceeds to, among other things, pay the Gamma Bridge Loan and eliminate any interest of the Gamma Defendants in Wade Park, as well as to fund construction moving forward.  *Id.*  Kalikow and the Gamma Defendants initially made multiple statements to Thomas and members of his team encouraging pursuit of the Bluebell loan and stating that they believed it to be a viable refinancing option.  *Id.* ¶ 158.  But then, on or around December 27, 2018, Kalikow called Bluebell's principal, Rick Lee, and attacked him verbally, while telling him that the Gamma Defendants would not allow a loan from Bluebell to move forward.  *Id.* ¶ 159.  Following this call, and as a result of it, Thomas's potential loan from Bluebell fell apart.  *Id.* ¶¶ 160–161.

Finally, Thomas attempted to obtain financing from Columbia Pacific.  *Id.* ¶ 163.  In or around January 2019, a broker with whom Thomas worked, Jake Sharp, arranged a deal with Columbia Pacific that would involve Columbia Pacific both paying off the existing loans on the Wade Park properties and funding construction going forward.  *Id.* ¶ 164.  Kalikow and the

Gamma Defendants encouraged Thomas to pursue the Columbia Pacific deal and encouraged the broker to continue his efforts to bring the deal to a close.  *Id.* ¶¶ 166–167.  A meeting was arranged between Kalikow and the Columbia Pacific executives in January 2019.  *Id.* ¶¶ 168–169.  At the meeting, however, Kalikow yelled at the Columbia Pacific executives, told them that the Gamma Defendants would never agree to the terms Columbia Pacific had proposed, and stated that the Gamma Defendants would never agree to let WP Land and WPL Holdings refinance the Gamma Bridge Loan.  *Id.*  As a result, Columbia Pacific walked away from the deal.  *Id.* ¶ 174.  Plaintiffs allege that, but for Kalikow and the Gamma Defendants' interference, Columbia Pacific would have proceeded with a loan to WP Land and WPL Holdings and that the Gamma Bridge Loan would have been paid off.  *Id.* ¶ 175.

## IX.    Gamma Lending Omega Purchases the BAMCAP Loan and Agrees to Three Additional Forbearance Agreements

On or around July 30, 2018, Gamma Lending Omega purchased the BAMCAP Loan from BAMCAP; Gamma Lending Omega thus owned all of the loans encumbering the Wade Park properties.  *Id.* ¶ 176.

After Gamma Lending Omega purchased the BAMCAP Loan and through February 2019, Gamma Lending Omega entered three more forbearance agreements with WP Land and WPL Holdings, along with a deed-in-lieu-of-foreclosure agreement.  *Id.* ¶¶ 177–178.  As discussed, Gamma Lending Omega had previously entered into three forbearance agreements with WP Land and WPL Holdings.  On August 28, 2018, WP Land and WPL Holdings entered into a fourth forbearance agreement with Gamma Lending Omega.  Dkt. No. 40-3, Ex. G.  The agreement acknowledged the almost $75 million owed under the Gamma Bridge Loan and the over $56 million owed under the BAMCAP Loan, and contained Gamma Lending Omega's agreement to forbear from exercising its remedies under both loans until October 1, 2018.  *Id.*

The fifth forbearance agreement was dated October 1, 2018 and obligated Gamma Lending Omega to forbear from executing its remedies until December 28, 2018. *Id.*, Ex. H. The sixth forbearance agreement was dated December 31, 2018 and obligated Gamma Lending Omega to forbear from exercising its remedies under both loans and from conducting a nonjudicial foreclosure of the Wade Park property until February 4, 2019. *Id.*, Ex. I.

WP Land and WPL Holdings paid a fee to Gamma Lending Omega in connection with each of the six forbearance agreements. Compl. ¶ 138. In total, those fees for amounted to more than $38 million in cash and property. *Id.*

## X.    The Gamma Defendants Take Title to the Wade Park Property Under the Deed-in-Lieu Agreement

In early 2019, Kalikow and the Gamma Defendants demanded that Thomas, WP Land, and WPL Holdings enter a deed-in-lieu-of-foreclosure agreement pursuant to which WP Land and WPL Holdings would deliver deeds to the Wade Park properties to Gamma Lending Omega and Gamma Lending Omega would hold those deeds in escrow until WP Land and WPL Holdings paid the Gamma Bridge Loan and the BAMCAP Loan. Compl. ¶ 185. At the time, Thomas had been in discussions with Hines—one of the largest real-estate development firms in the world—to provide permanent financing for the Wade Park project. *Id.* ¶ 181. The Gamma Defendants told Thomas that they would give him time to "buy back" the properties by paying off the loans. *Id.* ¶ 186. Thomas demanded that Kalikow and the Gamma Defendants execute a written buy-back agreement, which Thomas could use to show potential financing partners that WP Land and WPL Holdings still had an enforceable interest in the Wade Park properties. *Id.* ¶ 188. Kalikow and the Gamma Defendants repeatedly assured Thomas that they would execute such a written buy-back agreement after execution of the deed-in-lieu agreement and that the buy-back period would be at least six months. *Id.* ¶ 189.

On or around February 4, 2019, WP Land, WPL Holdings, and the Thomas Family Trust entered the Deed-in-Lieu Agreement (or "DIL Agreement") with Gamma Lending Omega.  *Id.* ¶ 190; Dkt. No. 40-3, Ex. J.  The DIL Agreement recited WP Land and WPL Holdings' "desire to resolve their obligations to [Gamma Lending Omega]" under the Gamma Bridge Loan and the BAMCAP Loan.  Dkt. No. 40-3, Ex. J. at 3.  WP Land and WPL Holdings ratified and reaffirmed their unconditional liability for the indebtedness under the Gamma Bridge Loan and the BAMCAP Loan and the validity and enforceability of all liens and security interests.  *Id.* § 1.  WP Land and WPL Holdings agreed to transfer a deed to the Wade Park property to Gamma Lending Omega or an entity designated by it.  *Id.* § 3.  Gamma Lending Omega agreed, under certain specified conditions, to delay recording the deed to the Wade Park property for six weeks until March 13, 2019.  *Id.* § 7.  The agreement also contains a broad release of all claims except for "any claims for [Gamma Lending Omega's] fraud relating to this Agreement."  *Id.* § 6.

Under the DIL Agreement, the Gamma Defendants would hold the deeds in escrow provided that WP Land and WPL Holdings made certain payments.  Compl. ¶ 191.  WP Land and WPL Holdings made at least one such payment on or around February 5, 2019.  *Id.* However, WP Land and WPL Holdings were unable to make a subsequent payment, and, on or around February 21, 2019, Gamma Lending Omega released the deeds from escrow and recorded them in Texas.  *Id.* ¶ 192.

On or about March 6, 2019, i.e., four weeks after the DIL Agreement, the buy-back agreement was signed and provided for a six-week, rather than a six-month, buy-back period.  *Id.* ¶¶ 195–196.  The agreement was entered into by WP Development Partners, which had become

15

the owner of the Wade Park property, and Wade Park Frisco Holdings, LLC.[2]  The agreement

granted Wade Park Frisco Holdings, LLC an option to purchase the Wade Park property for a

period ending on or before April 15, 2019 for a purchase price of about $150 million.  Dkt. No.

40-3, Ex. K.

On or around April 15, 2019, the written buy-back agreement expired.  Compl. ¶ 198.

Thereafter, Kalikow and the Gamma Defendants told Thomas that he would have more time to

buy back the Wade Park properties but that the purchase would have to be made by someone

other than Thomas or a Thomas-affiliated entity.  *Id.* ¶¶ 198–199.  Thomas proposed that Hines

purchase the properties, and, in the summer of 2019, Hines and the Gamma Defendants

discussed a potential purchase of the Wade Park properties.  *Id.* ¶¶ 201–202.  However, the

Gamma Defendants rejected every proposal by Hines and told Hines that the Gamma Defendants

would not sell the properties to Hines if Thomas were involved in any way.  *Id.* ¶ 202.  Hines

rejected the demand and walked away from the deal.  *Id.* ¶ 203.

## XI.    Allegations Related to Blake Goodman and Sharing Trade Secrets

The Complaint also includes allegations about Blake Goodman ("Goodman"), who was

originally named as a defendant but was dismissed from the case in February 2021.  Goodman

was Executive Director of Real Estate Investments for Chick-fil-A, Inc., and a deputy for

Chick-fil-A chairman and chief executive officer Dan Cathy ("Cathy") with whom he worked on

real estate investments.  *Id.* ¶¶ 210–211, 213.  In or around March 2018, Cathy agreed to invest

$80 million in Wade Park and to invest in Thomas's other projects so long as Goodman was

given management responsibility for all of the projects.  *Id.* ¶¶ 212–213.  Cathy and Goodman

thus agreed with Thomas, WP Land, and WPL Holdings to form a joint venture to develop Wade

---

[2] The Complaint does not allege Plaintiffs' relationship with Wade Park Frisco Holdings, LLC,
but this entity appears to be a Thomas-affiliated entity.

Park, as well as Thomas's properties in Orlando, Tennessee, and Ashley Park. *Id.* ¶¶ 213–214.
In July 2018, Thomas, WP Land, WPL Holdings, Cathy, and Goodman executed a written
joint-venture agreement memorializing a portion of the joint-venture agreement that had been
reached in March. *Id.* ¶ 215. Through the joint venture, Cathy ultimately invested $10 million in
Wade Park. *Id.* ¶ 216.

  In connection with the joint-venture agreement, Cathy, Thomas, and other
Thomas-affiliated entities amended and restated the operating agreement for Fourth Quarter
Properties XLIX, LLC ("Fourth Quarter Properties"), which was the holding company for certain
portions of the Orlando project; under that agreement, Goodman became the manager of Fourth
Quarter Properties. *Id.* ¶ 217. As manager of Fourth Quarter Properties, Goodman demanded
and received access to extensive confidential and proprietary information and trade secrets about
Wade Park, the Orlando property, the Tennessee property, and Ashley Park, including, for each
project: plans for developing and leasing or otherwise monetizing the properties; financing
options; the identities of potential business partners and tenants; and internal financial analyses
and projections related to the properties. *Id.* ¶¶ 221–226, 231–234.

  Plaintiffs allege "on information and belief" that, during phone calls in the summer of
2018 and a meeting in the fall of 2018 with Kalikow and the Gamma Defendants, Goodman
shared the trade secrets he obtained as manager of Fourth Quarter Properties and which he had a
duty to keep confidential. *Id.* ¶¶ 237–239. Plaintiffs also allege that Kalikow and the Gamma
Defendants took action to ensure that Goodman would remain involved in the Wade Park
project, threatening, for example, to terminate the forbearance periods if Goodman did not
remain involved in the project and requiring that Thomas and Plaintiffs report to them about
Cathy's and Goodman's involvement and investment in Wade Park. *Id.* ¶ 240. Plaintiffs also

allege that Kalikow and the Gamma Defendants used the trade secrets to gain an unfair advantage against and leverage over Thomas and Plaintiffs including by: withdrawing the loan they had offered Thomas for the Orlando property; buying the existing loan on the Tennessee property from Ardent Financial; and buying at least one existing loan on Ashley Park.  *Id.* ¶¶ 242–245.

Plaintiffs allege "on information and belief" that Goodman eventually concluded that, with the Gamma Defendants' help, he had the opportunity to take all of the projects over for himself and began trying to get Thomas out of the projects entirely.  *Id.* ¶ 249.  In addition, beginning at least in the spring of 2018 and unbeknownst to Thomas and Plaintiffs, Goodman, Kalikow, and the Gamma Defendants discussed Goodman's possible purchase of Ashley Park from the Gamma Defendants if the Gamma Defendants obtained those properties from Thomas and Plaintiffs.  *Id.* ¶ 246.  Goodman also had discussions with various lenders on the Tennessee property about purchasing that property subject to the lenders' mortgages.  *Id.* ¶ 250.  Goodman also had conversations with Kalikow and the Gamma Defendants about purchasing Wade Park from the Gamma Defendants.  *Id.* ¶ 251.

## PROCEDURAL HISTORY

On August 27, 2020, Plaintiffs filed this action against Defendants—i.e., Kalikow, WP Development Partners, Gamma Lending Omega, Gamma Real Estate Capital, GRE WP—and against Goodman as an adversary proceeding in the United States Bankruptcy Court for the Northern District of Georgia, where WP Land and WPL Holdings had filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  *See In re Wade Park Land Holdings, LLC and Wade Park Land, LLC*, Ch. 11 Case No. 20-11192, Adv. No. 20-1030 (Bankr. N.D. Ga.).  On September 23, 2020, Plaintiffs moved to withdraw the reference to the Bankruptcy Court.  Dkt. No. 1; *see also Wade Park Land Holdings, LLC et al v. Kalikow et al*, 3:20-cv-176 (N.D.

18

Ga.).  Defendants and Goodman agreed that the reference should be withdrawn and the matter should be heard in the United States District Court.  Dkt. Nos. 1-4, 1-5.  On October 14, 2020, Judge Batten of the United States District Court for the Northern District of Georgia issued an order withdrawing the reference to the Bankruptcy Court.  Dkt. No. 4.

Plaintiffs filed their Complaint in the United States District Court for the Northern District of Georgia on October 16, 2020.  Dkt. No. 5.  The Complaint asserts eighteen causes of action:

- Count One: declaratory judgment that three forbearance agreements, the deed-in-lieu-of-foreclosure agreement, and the delivery of the Wade-Park-property deeds are each ultra vires and void as in violation of the WP Ventures operating agreement (against the Gamma Defendants);

- Count Two: participation in an enterprise in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c);

- Count Three: federal racketeering conspiracy in violation of RICO, 18 U.S.C. § 1962(d);

- Counts Four to Six: violations of the Georgia RICO statute, Ga. Code Ann. § 16-14-4(a), (b), (c);

- Count Seven: fraud (against Defendants);

- Count Eight: tortious interference with business relations (against Defendants);

- Count Nine: breach of contract (against Gamma Real Estate Capital and Gamma Lending Omega);

- Count Ten: unjust enrichment (against the Gamma Defendants);

- Count Eleven: usury (against Gamma Real Estate Capital and Gamma Lending Omega);

- Count Twelve: avoidance, preservation, and return of constructively fraudulent transfers under 11 U.S.C. §§ 548, 550, 551 (against Gamma Lending Omega and WP Development Partners);

- Count Thirteen: avoidance, preservation, and return of constructively voidable transfers under Georgia state law (against Gamma Lending Omega and WP Development Partners);

- Count Fourteen: breach of fiduciary duty (against Goodman);

- Count Fifteen: conspiracy to breach fiduciary duties;

- Count Sixteen: misappropriation of trade secrets;

- Count Seventeen: punitive damages; and

- Count Eighteen: attorney's fees.

The RICO counts and the counts concerning conspiracy to breach fiduciary duties, misappropriation of trade secrets, punitive damages, and attorneys' fees are alleged against Defendants and Goodman.

On November 13, 2020, three motions were filed: (1) Goodman's motion to dismiss the Complaint for failure to state a claim for relief, Dkt. No. 13; (2) a motion by Defendants (not including Goodman) to dismiss the Complaint for failure to state a claim for relief, Dkt. No. 16; and (3) a motion by the Defendants (not including Goodman) to transfer the case to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a) and the mandatory forum selection clause in WP Ventures' LLC Agreement, Dkt. No. 14.

On February 24, 2021, Judge Batten issued an order granting Goodman's motion to dismiss. *Wade Park Land Holdings, LLC v. Kalikow*, 522 F. Supp. 3d 1341 (N.D. Ga. 2021). The court held that Plaintiffs failed to allege that Goodman participated in a RICO enterprise. *Id.* at 1350–51. The Complaint did not contain "facts to plausibly support the inference that defendants were collectively trying to make money . . . by fraud, . . . as opposed to the obvious alternative explanation that they were simply trying to make money." *Id.* at 1351 (internal quotation marks omitted). "At best, [the allegations of the Complaint] describe an ambitious business model in which all Defendants aimed to achieve professional success through the acquisition of valuable real estate." *Id.* In addition, Plaintiffs failed to plausibly allege that Goodman engaged in a pattern of racketeering activity. *Id.* at 1352. The court noted that Plaintiffs alleged only closed-end continuity and held the allegations did "not constitute a

closed-ended pattern of racketeering," even if the acts of the enterprise over a period of thirty months were considered. *Id.* "Plaintiffs allege that Defendants engaged only in a single scheme—fraudulent acquisition of Wade Park—aimed at a singular victim—Thomas—through manipulation of a single loan—the Gamma Bridge loan." *Id.* The court also dismissed the RICO conspiracy claim because "Plaintiffs' allegations that Goodman conspired with the remaining Defendant to commit fraud are merely legal conclusions" and there was an "obvious alternative explanation for the factual allegations" of the Complaint—"namely, the business relationship among Goodman, Cathy, Thomas, and the remaining Defendants." *Id.* at 1354. The court dismissed the Georgia RICO violation and conspiracy claims because Plaintiffs did "not plausibly allege that Goodman shared trade secrets with the remaining Defendants." *Id.* at 1355. For the same reasons, the court dismissed the claim alleging misappropriation of trade secrets under the Georgia Trade Secrets Act. *Id.* at 1355–56. Finally, the court dismissed the breach of fiduciary duty claim against Goodman for failure to allege that Goodman owed fiduciary duties to Plaintiffs or that, if he owed such duties, he either breached them or conspired to breach them. *Id.* at 1356–57.

Judge Batten also granted the motion of Defendants (not including Goodman) to transfer the case. *Id.* at 1363. The case was transferred to the United States Court for the Southern District of New York on February 25, 2021. Dkt. No. 31. Before the transfer, Defendants' motion to dismiss was fully briefed. Upon transfer, Defendants argued that re-briefing or supplemental authority was required to address choice-of-law issues and Second Circuit precedent while Plaintiffs maintained that additional briefing was not necessary. Dkt. No. 35. The Court directed the parties to re-brief the motion. Dkt. Nos. 36–37.

On April 16, 2021, Defendants moved to dismiss the Complaint.  Dkt. No. 39.  Plaintiffs filed a memorandum of law in opposition on May 14, 2021.  Dkt. No. 46.  Defendants filed a reply memorandum of law in further support of the motion on June 4, 2021.  Dkt. No. 47.  The Court held oral argument on the motion on February 10, 2022.  Upon direction from the Court, the parties filed letters containing supplemental authority on February 17, 2022.  Dkt. Nos. 56–57.

## LEGAL STANDARD

Federal Rule of Bankruptcy Procedure 7012 incorporates Federal Rule of Civil Procedure 12(b)(6).  To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

Federal Rule of Bankruptcy Procedure 7009 incorporates Federal Rule of Civil Procedure 9(b).  Claims for fraud must be pleaded with particularity to satisfy the heighted pleading requirements of Rule 9(b).  Particularity "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted).  Although "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally," Fed R. Civ. P. 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  Plaintiffs may raise this inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* at 290–91.

## DISCUSSION

The Court first addresses Defendants' argument concerning the releases and then turns to each of Plaintiffs' claims in turn in the order in which they have been pleaded.  Because many of Plaintiffs' claims overlap, the Court's reasoning as to many of the claims will often apply to the other similar claims pleaded by Plaintiffs.

### I.    The Releases

Defendants argue that the Complaint must be dismissed pursuant to releases signed by Plaintiffs.  Plaintiffs WP Land and WPL Holdings signed the following eight agreements containing releases: (1) the May 17, 2017 Loan Modification Agreement; (2) the March 5, 2018 forbearance agreement; (3) the April 26, 2018 forbearance agreement; (4) the July 2, 2018 forbearance agreement; (5) the August 28, 2018 forbearance agreement; (6) the October 1, 2018

forbearance agreement; (7) the December 31, 2018 forbearance agreement; and (8) the February 4, 2019 DIL Agreement.  *See* Dkt. No. 40-2, Exs. C, D, E, F; Dkt. No. 40-3, Exs. G, H, I, J.  Of these agreements, plaintiff Thomas Family Trust also signed the last three forbearance agreements and the DIL Agreement.  *See* Dkt. No. 40-3, Exs. G, H, I, J.

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) (quoting *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 98 (1st Dep't 2006)).  "[A] release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made.'" *Id.*  A general release "prevents plaintiffs from . . . bringing an action for fraud based on misrepresentations predating it" in the absence of allegations that the release itself "was induced by a separate fraud." *Arfa v. Zamir*, 952 N.E.2d 1003, 1004 (N.Y. 2011).  In particular, "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release.  Were this not the case, no party could ever settle a fraud claim with any finality." *Centro Empresarial*, 952 N.E.2d at 1000 (citation omitted); *see also Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 190 (S.D.N.Y. 2008) (holding that "parties granting releases for fraud can only challenge the release for fraudulent inducement by pointing to 'a separate and distinct fraud from that contemplated by the agreement'" (quoting *DIRECTTV Group, Inc. v. Darlene Invs., LLC*, 2006 WL 2773024, at *4 (S.D.N.Y. Sept. 27, 2006))).

The Loan Modification Agreement, the forbearance agreements, and the DIL Agreement on their face contain broad releases.  *See Centro Empresarial*, 952 N.E.2d at 1000.  Under the Loan Modification Agreement, executed on May 17, 2017, WP Land and WPL Holdings granted

Gamma Lending Omega "a full, complete, and general release in favor of Lender Parties with respect to all Claims, including, without limitation, any claims, demands or causes of action based upon allegations of breach of fiduciary duty, . . . , economic coercion, usury, or any other theory, cause of action, occurrence, matter, or thing which might result in liability upon Lender Parties arising or occurring on or before the Effective Date."  Dkt. No. 40-2, Ex. C § 8. "Claims" is defined to include claims "of any and every nature whatsoever, known or unknown, . . . and whether or not the economic effects of such alleged matters arise or are discovered in the future."  *Id.*  Lender Parties is defined to include Gamma Lending Omega as well as "its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, members, managers, partners, employees, attorneys, and agents, past, present, and future."  *Id.*

The six forbearance agreements, executed between March 5, 2018 and December 31, 2018 by WP Land and WPL Holdings in favor of Gamma Lending Omega, likewise release Gamma Lending Omega and various related released parties "from all actions and causes of action . . . of any and every character, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or suffered to be done by any of the released parties prior to and including the date of execution . . . and in any way directly or indirectly arising out of or in any way connected to" the agreement, the loans, the loan documents, or the property.  Dkt. No. 40-2, Ex. D § 9; *see also id.*, Exs. E, F; Dkt. No. 40-3, Exs. G, H, I.  The released parties include Gamma Lending Omega as well as its "employees, agents, representative, consultants, attorneys, fiduciaries, servants, officers, directors, partners, predecessors, successors and assigns, subsidiary corporations, parent corporation, and related corporate divisions."  Dkt. No. 40-2, Ex. D § 9; *see also id.*, Exs. E, F; Dkt. No. 40-3, Exs. G, H, I.

The DIL Agreement, effective February 4, 2019 and executed by WP Land and WPL Holdings in favor of Gamma Lending Omega, contains, if anything, an even broader release in some respects.  Under the release, WP Land and WPL Holdings and their affiliated companies "forever" release Gamma Lending Omega and its affiliates "of and from any and all claims . . . and/or liability of any nature whatsoever, whether arising in law or in equity or otherwise, which they now have, ever had, or which they may have, whether known or unknown, foreseen or unforeseen, by reason of any cause, matter or thing whatsoever, arising from the beginning of the world until the Effective Date, arising out of or resulting from the Loans, the [Gamma Bridge] Loan Documents, the BAMCAP Loan Documents and the transactions contemplated thereby." Dkt. No. 40-3, Ex. J § 6.  The release also explicitly covered "any claims under any federal, state or local laws, any common law contract or tort claims now or hereafter recognized, any claim to invalidate or otherwise avoid the transactions contemplated herein, and all claims for counsel fees and costs."  *Id.*  There is a single exception.  The DIL Agreement states that "nothing contained in this paragraph shall be construed in release [Gamma Lending Omega] from any claims for [Gamma Lending Omega's] fraud relating to this Agreement."  *Id.*

Putting aside the DIL Agreement's exception for the moment, the Court concludes that each of these releases contains language that "indicates an intent to release defendants from fraud claims . . . unknown at the time of contract."  *Centro Empresarial*, 952 N.E.2d at 1000.  The references to known and unknown claims, to foreseen or unforeseen claims, and to claims which are contingent and which Plaintiffs "may have," combined with the absence of any language excluding fraud claims, plainly reflects the parties' intent that fraud claims would be included in the scope of the release.  The exception noted in the DIL Agreement further supports that fraud claims are included in the releases—except, of course, in the DIL Agreement, which explicitly

provides this exception and only to a limited extent.  The parties clearly knew how to create a fraud exception when they wanted to do so.

Setting aside the fraud exception in the DIL Agreement's release for the moment, the Court concludes that the broad releases encompass all of Plaintiffs' claims with the possible exception of Count One for declaratory judgment and Counts Twelve and Thirteen for fraudulent transfer.  Aside from these few claims, Plaintiffs' claims almost completely rely on allegations that precede at least one of the releases—the latest of which is the DIL Agreement, executed in February 2019—and the claims are connected to the loans, the property, or the related transactions.  *See, e.g.*, Dkt. No. 40-2, Ex. D § 9 (referring to claims "in any way directly or indirectly arising out of or in any way connected to this agreement, the loan, the loan documents or the property"); Dkt. No. 40-3, Ex. J § 6 (referring to claims "arising out of or resulting from the Loans, the GRE Loan Documents, the BAMCAP Loan Documents and the transactions contemplated thereby").

Plaintiffs, for example, bring claims under the federal RICO statute, alleging wire fraud and theft of trade secrets among the predicate acts of racketeering activity.  The allegations of wire fraud primarily span from December 2016 to the execution of the DIL Agreement, and the alleged theft of trade secrets occurred in the summer and fall of 2018.  The Georgia RICO claims are also premised on allegations of false representations spanning October 2016 to January 2019.  Accordingly, Count Two for violations of federal RICO, Count Three for conspiracy to violate federal RICO, and Counts Four, Five, and Six for violations of Georgia RICO were encompassed by the releases.  Similarly, related to the allegations regarding theft of trade secrets, Plaintiffs allege that, over the summer and fall of 2018, Defendants conspired to breach Goodman's fiduciary duty to maintain trade secrets (Counts Fourteen and Fifteen) and misappropriated trade

secrets under Georgia law (Count Sixteen).  These claims were also released by at least the December 31, 2018 forbearance agreement if not the subsequent DIL Agreement.

Additionally, Plaintiffs allege that Defendants engaged in fraud in entering into the Construction Loan Agreement in January 2017 (Count Seven), and Plaintiffs bring a claim for usury based on the Construction Loan Agreement and associated extension fees and forbearance fees (Count Eleven).  In the Complaint, Plaintiffs further allege that, in January 2018, the Gamma Defendants breached the Construction Loan Agreement by withholding consent to the modification of the BAMCAP Loan (Count Nine).  Plaintiffs also allege that, between January 2018 and January 2019, Defendants tortiously interfered with Plaintiffs' prospective business relationships by allegedly thwarting Thomas's efforts to secure alternative financing (Count Eight).  Of these claims, at least two of these claims were released by the March 5, 2018 forbearance agreements—if not the subsequent five forbearance agreements and the DIL Agreement—and all of these claims were released by at least one of the agreements.[3]

In short, all of Plaintiffs claims except for Counts One, Twelve, and Thirteen fall within the releases.  And among the released claims, only Plaintiffs' RICO claims and claims for tortious interference and usury could be said to have been released by the DIL Agreement and not a previous agreement.

---

[3] Count Ten for unjust enrichment alleges that the Gamma Defendants were enriched by the $76.6 million in cash and property and the ownership of the Wade Park properties.  To the extent this claim relies on the allegations of $76.6 million in cash and property, the claim was released. Because the parties have not specifically addressed whether this claim was released with respect to the allegations of ownership and because the Court rules on alternative grounds, the Court need not address this point.  Further, Count Seventeen for punitive damages and Count Eighteen for attorneys' fees under Georgia law rely on Plaintiffs' claims under Georgia law and were accordingly similarly released.

None of the claims released by the DIL Agreement (and not released by one of the previous agreements) fall within that release's fraud exception. The language of the release in the DIL Agreement is carefully drawn and limited. After describing the broad scope of the release, the DIL Agreement provides a limited exception for "any claims for [Gamma Lending Omega's] fraud relating to this Agreement." Dkt. No. 40-3, Ex. J § 6. To be sure, courts have interpreted the phrase "relating to" "as equivalent to the phrases 'in connection with' and 'associated with,' and synonymous with the phrases 'with respect to,' and 'with reference to,' and have held such phrases to be broader in scope than the term 'arising out of.'" *See Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001) (citations omitted). But as this language is couched within an exception, the fraud exception cannot be read so expansively to swallow the very broad release granted in the DIL Agreement. *See N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term."); *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of the contract meaningless.").

Here, the only claims under the DIL Agreement's release that have at least some allegations sounding in fraud are Plaintiffs' various RICO claims. And among those allegations sounding in fraud, only a handful of factual allegations could be said to "relate to" the DIL Agreement. For example, as part of Plaintiffs' RICO claims, Plaintiffs allege predicate acts of wire fraud including that Defendants allegedly falsely told Thomas that the deed-in-lieu agreement would not actually cause a transfer of the Wade Park deeds. Comp. ¶¶ 186, 267. But, even if this particular allegation sounds in fraud and relates to the DIL Agreement, the fraud

exception in the DIL Agreement's release concerns "any *claims* for [Gamma Lending Omega's] fraud relating to this Agreement." Dkt. No. 40-3, Ex. J. § 6 (emphasis added). And Plaintiffs' RICO claims cannot fairly be characterized to be claims for fraud relating to the DIL Agreement when the overwhelming thrust of the allegations concerns allegations of fraud released by the forbearance agreements. As a result, the RICO claims are not excluded from the release under the fraud exception.

Plaintiffs argue that the releases do not bar their claims. First, they argue the releases do not apply because the agreements within which they are contained are the product of inceptive fraud under Georgia law.[4] Dkt. No. 46 at 7. Second, they argue the claims did not accrue until after the effective date of the releases. *Id.* Third, they contend that the forbearance agreements and the DIL Agreement cannot bar Plaintiffs' claims because Plaintiffs have stated a claim for declaratory relief that the agreements are void. *Id.* at 7 n.4. Fourth, Plaintiffs at oral argument claimed that the DIL Agreement's integration clause revived claims previously released by the forbearance agreements. Transcript of February 10, 2022 Oral Argument ("Tr.") at 19:22 to 20:10.

The first argument does not withstand scrutiny. Under Georgia law, the doctrine of inceptive fraud provides that "when the failure to perform the promised act is coupled with the present intention not to perform, fraud, in the legal sense, is present . . . and is sufficient to support an action for cancellation of a written instrument." *Cowart v. Gay*, 157 S.E.2d 466, 468 (Ga. 1967). At the same time, however, "the mere failure to comply with a promise to perform

---

[4] Plaintiffs recognize that New York law does not recognize "inceptive fraud" but half-heartedly argue that the "result is the same under New York law." Dkt. No. 46 at 7 n.6. However, New York law requires evidence that the release itself was procured by a separate fraud, which is not alleged here.

an act in the future is not fraud in a legal sense." *Id.* "Actionable fraud . . . does not result from a mere failure to perform promises made.  Otherwise any breach of a contract would amount to fraud." *James v. Terex USA, LLC*, 2018 WL 6028705, at \*3 (S.D. Ga. Nov. 16, 2018) (internal quotation marks omitted) (quoting *Gibson Tech. Svcs, Inc. v. JPay, Inc.*, 755 S.E.2d 377, 379 (Ga. Ct. App. 2014)).

Plaintiffs do not make any well-pleaded allegations of fact plausibly supporting the notion that Defendants intended not to perform the Loan Modification Agreement, the forbearance agreements, or the DIL Agreement.  The Loan Modification Agreement obligated Gamma Lending Omega to give Plaintiffs more time to repay the Gamma Bridge Loan before Gamma Lending Omega exercised any of its remedies under the loan agreement.  There is no well-pleaded allegation that Gamma Lending Omega did not intend to comply with the Loan Modification Agreement at the time it agreed to it.  Nor is there any well-pleaded allegation that Gamma Lending Omega entered into the forbearance agreements with intent not to honor them.  Gamma Lending Omega, in fact, honored those agreements.  Under those agreements, it forbore from exercising its rights.  And, finally, Plaintiffs do not allege that Gamma Lending Omega entered into the DIL Agreement with intent not to honor it.  Plaintiffs object to the terms of the DIL Agreement, not with Gamma Lending Omega's satisfaction of those terms.  *See Futch v. Lowndes County*, 676 S.E.2d 892, 894–95 (Ga. Ct. App. 2009) (concluding that county's attempts to fulfill its promise precluded a finding that it made that promise with a present intent not to perform).

Plaintiffs' real complaint seems to be that Gamma Real Estate Capital and Gamma Lending Omega entered into the Construction Loan Agreement (the Gamma Bridge Loan documents) with an intent not to honor all of the terms of that agreement—particularly the terms

31

regarding modification of the BAMCAP Loan—and with an intent to use the agreement to take control of the Wade Park properties.  But that claim cannot invalidate the releases in the subsequent agreements.  Those releases covered any claims Plaintiffs would have based on the Construction Loan Agreement.  Indeed, at the time Plaintiffs signed the releases in the forbearance agreements, they were aware that Defendants would not agree to the BAMCAP Loan modification.

Moreover, as further explained below, that argument is a makeweight.  At the time Gamma Real Estate Capital made the Gamma Bridge Loan and at the time that loan was assigned to Gamma Lending Omega, Plaintiffs apparently were in good standing with the BAMCAP Loan.  There is no allegation that Plaintiffs had failed to make payments under that loan or would need a modification.  The claim that Defendants entered into the Construction Loan Agreement with intent not to honor it is sheer speculation not supported by any allegation of fact and based solely on the ground that Plaintiffs claim that Defendants later failed to honor the agreement; this is insufficient to support Plaintiffs' contention.  *See Pacrim Assocs. v. Turner Home Ent., Inc.*, 510 S.E.2d 52, 57 (Ga. App. Ct. 1998).  And the claim that Defendants entered into the Construction Loan Agreement with the intent not to be repaid on the loan but to use it to acquire the Wade Park properties is undermined by the factual allegations of the Complaint: Rather than exercise their rights of control—which they could have if their objective was to obtain ownership of Wade Park—Defendants continued to grant Plaintiffs further opportunities to pay the loan and retain control of Wade Park rather than simply foreclosing on the asset at first opportunity.

Thus, Plaintiffs do not allege any "subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been

acting in good faith." *Sims v. Natural Products of Georgia, LLC*, 785 S.E.2d 659, 662 (Ga. App. 2016). The conduct Plaintiffs cite to is consistent with the intent to perform.

Next, Plaintiffs argue that the effective dates of the releases preceded the accrual of Plaintiffs' claims. Plaintiffs contend that the releases bar only those claims that accrued after their effective date, that the latest effective date of any of the agreements is February 4, 2019, and that Plaintiffs' causes of action accrued after that date because it was only after that date that Defendants obtained title to Wade Park and Plaintiffs suffered injury. Dkt. No. 46 at 7–8 (citing *Charron v. Sallyport Glob. Holdings, Inc.*, 2014 WL 464649, at *4 (S.D.N.Y. Feb. 3, 2014), for the proposition that "agreement's release applied only to claims arising out of events preceding a closing and there were disputed facts about whether events occurred before or after the closing"). Defendants respond that the allegedly wrongful acts and injury pre-date at least one release. Dkt. No. 47 at 2. Defendants contend that the Complaint alleges injury in January 2018 and between June 2018 and January 2019 in the form of the costs incurred in connection with the forbearance agreements and DIL Agreement and the interest in the Wade Park property granted as a result of Defendants rejecting the BAMCAP Loan modification and preventing Plaintiffs from obtaining other financing. *Id.* at 2–3 (citing Compl. ¶¶ 123, 142–175). Defendants also argue that, except for Counts One, Twelve, and Thirteen, none of Plaintiffs' claims even refer to the transfer of title that occurred in February 2019 after the DIL Agreement. *Id.* at 2.

Contrary to Plaintiffs' argument, their claims did not accrue only when Defendants obtained title to Wade Park. As discussed *supra*, except for Counts One, Twelve, and Thirteen, Plaintiffs' claims allege injuries that precede at least one release. Further, Plaintiffs exchanged consideration with Defendants as part of each agreement containing a release. Under the DIL Agreement, for instance, Plaintiffs gave up their deeds to the Wade Park properties for

Defendants to hold in escrow until Plaintiffs paid the Gamma Bridge Loan and the BAMCAP

Loan.  It was at this moment that Plaintiffs lost their right to the deeds and were injured.  Even if

Defendants never recorded the deeds and instead kept the deeds in escrow indefinitely, Plaintiffs

would still be injured by the fact that they no longer held the deeds to the Wade Park properties.

In other words, the accrual of Plaintiffs' claims does not await Defendants' enjoyment of a right

that Defendants' obtained from Plaintiffs.  If Plaintiffs were defrauded into granting Defendants

an interest in Wade Park, they had the right to sue Defendants at least as soon as that right was

conveyed.  Accordingly, any rights that Plaintiffs had to sue Defendants for fraud were

effectively released in the forbearance agreements and the DIL Agreement.[5]

Plaintiffs' third argument is also unavailing.  As discussed *infra* Section II, Plaintiffs fail

to state a claim for declaratory relief that the later three forbearance agreements and the DIL

Agreement are ultra vires and void.

Finally, Plaintiffs at oral argument raised for the first time the argument that the DIL

Agreement's fraud exception also revives claims previously released by the earlier forbearance

agreements by way of the DIL Agreement's integration clause.  Tr. at 19:22 to 20:10.  The

integration clause in the DIL Agreement provides: "This Agreement, the GRE Loan Documents

and the BAMCAP Loan Documents constitute the entire understanding and agreement by and

between the parties with respect to their subject matter and the transactions contemplated

thereby, superseding all prior writings, discussions and understandings between the parties with

---

[5] Defendants also argue that the releases encompassed unaccrued claims.  Dkt. No. 47 at 3.
There is language in the releases suggesting that unaccrued claims are also included.  *See, e.g.*,
Dkt. No. 40-2, Ex. D § 9 (including claims "whether heretofore or hereinafter arising"); Dkt. No.
40-3, Ex. J. § 6 (including claims "which they now have, ever had, or which they may have").
But because the Court rules on other grounds, the Court need not address this argument.

respect thereto." Dkt. No. 40-3, Ex. J. § 14.[6]  Plaintiffs argue that, as a result of this language,

the prior releases in the forbearance agreements cease to exist and the released claims are

revived.  "[T]his argument was raised for the first time at oral argument and so was waived in

terms of this motion." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y.

2008); *see also Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) (rejecting

argument because it "is not made in any of Plaintiff's papers").

      Even if the Court were to consider this argument on the merits, Plaintiffs would not

prevail.  A release "is a discharge of an existing obligation or right of action" and "is a direct and

immediate destruction of a claim terminated by mutual agreement."  29 Williston on Contracts

§ 73:1 (4th ed.); *see also* Restatement (Second) of Contracts § 284 cmt. a (1981) (stating that a

release "must . . . take effect immediately or on the occurrence of a condition"); 13 Corbin on

Contracts § 67.9 (2021) ("A release is a writing manifesting an intention to discharge another

immediately, or upon the occurrence of a condition, from an existing or an asserted duty."); 66

Am. Jur. 2d Release § 1 ("The release is effective immediately upon the happening of an

occurrence or condition."); Restatement (First) of Contracts § 402 cmt. b (1932) ("A release is

not in terms promissory.  It purports to take effect immediately.").  In other words, "[a] release is

an executed agreement that requires no further performance, effecting an outright cancellation or

---

[6] In addition, Section 15 of the DIL Agreement is titled "Prior Agreements/Construction" and
provides:
> This Agreement shall be deemed a modification of the GRE Loan Documents and
> BAMCAP Loan Documents only to the extent that its terms are inconsistent with
> the GRE Loan Documents and BAMCAP Loan Documents, and all of their terms,
> conditions, representations, warranties, covenants and other undertakings, are
> hereby ratified and confirmed, and shall continue in full force and effect.  Any
> conflicts or inconsistencies between this Agreement and the other GRE Loan
> Documents or BAMCAP Loan Documents shall be governed by this Agreement.

*Id.* § 15.

discharge of the entire obligation."  76 C.J.S. Release § 1.  Notably, a release differs from a covenant not to sue:  "A purported release of a duty that does not yet exist . . . is not a release but a promise to discharge a duty in the future."  Restatement (Second) of Contracts § 284 cmt. a (1981).  "A purported release of a duty that is revived on the occurrence of a condition is not a release but a contract not to sue."  *Id.*

Here, the forbearance agreements contained broad releases, not covenants not to sue.  The releases took effect immediately, outright discharging the claims covered by the releases.  Had the forbearance agreements contained covenants not to sue, a subsequent agreement could have rescinded that contract and thereby revived the claims at issue.  *See* Restatement (First) of Contracts § 402 cmt. b (1932) ("Parties who have contracted that a future right shall be discharged may rescind that contract.").  But the forbearance agreements contained immediately effective releases, and the DIL Agreement's integration clause therefore cannot be read to revive the released claims.

For these reasons, the claims covered by the releases are dismissed.  But even if the claims were not released, the claims would fail for the following additional reasons.

## II.   Ultra Vires Transactions (Count One)

Plaintiffs allege in Count One that the latter three forbearance agreements from August, October, and December 2018; the DIL Agreement; and the delivery of the Wade Park property deeds are ultra vires and void transactions because they violate Section 2.4(d) of the WP Ventures' LLC Agreement.  Each of these transactions involved WP Land, WPL Holdings, and Gamma Lending Omega, among other entities.  *See* Dkt. No. 40-3, Exs. G, H, I, J; Compl. ¶ 334.

As relevant here, Section 2.4(d) of the WP Ventures LLC Agreement prevents WP Land and WPL Holdings, which are wholly owned subsidiaries of WP Ventures, from having the power to enter into transactions with any affiliate or related party of GRE WP, a member of WP

Ventures.  Compl. ¶ 89; Dkt. No. 40-2, Ex. A.  More specifically, Section 2.4(d) of the WP

Ventures LLC Agreement provides:

> Notwithstanding anything to the contrary set forth herein, in no event shall the Manager, the Company or any Subsidiary have the authority to enter into any engagement for services, transactions or agreement with any Member or Manager or any Affiliate or Related Party of a Member or Manager . . . , except for services agreements that are entered into upon terms and conditions that are commercially reasonable, fair and substantially similar to those that would be available on an arms-length basis with third parties other than any Member, Manager, Subsidiary or any Affiliate or Related Party of the foregoing; and provided, however, that the Initial Loan by the Initial Lender shall be deemed permitted under this section.

Dkt. No. 40-2, Ex. A § 2.4(d).  Plaintiffs allege that Gamma Lending Omega is an affiliate and

related party of member GRE WP, Compl. ¶ 336, and therefore that the specified transactions

concerning WP Land, WPL Holdings, and Gamma Lending Omega are ultra vires and void.

Defendants argue that Count One fails to state a claim for relief and should be dismissed.

The final part of Section 2.4(d) of the LLC Agreement states that "the Initial Loan by the Initial

Lender shall be deemed permitted under this section."  Dkt. No. 40-2, Ex. A § 2.4(d).  The Initial

Lender is defined as Gamma Real Estate Capital "together with its successors and/or assigns,"

and Initial Loan is defined to mean the "certain loan in the maximum principal amount of

$82,750,000 made by the Initial Lender to the Subsidiaries, which Initial Loan (as the same may

be amended, modified, supplemented from time to time) shall be secured by one or more deeds

of trust encumbering the Property."  *Id.* § 1.  In other words, the Initial Loan is the Gamma

Bridge Loan and is defined to include "as the same may be amended, modified, [or]

supplemented from time to time."  *Id.*  Thus, according to Defendants, the latter three

forbearance agreements and the DIL Agreement—which amend the Gamma Bridge Loan—are

permitted and exempted as a result of Section 2.4(d).

Case 1:21-cv-01657-LJL   Document 58   Filed 03/04/22   Page 38 of 90

Defendants also argue that, under Section 3.3, Thomas, who is the manager of WP Ventures, was authorized to enter into the agreements.  Section 3.3 is entitled "Limitations On General Power of the Manager" and states in pertinent part:

> Notwithstanding anything to the contrary in this Agreement, as long as any obligations owed under the Initial Loan . . . remain outstanding, the Manager shall have no authority to cause the Company or any Subsidiary to take any of the following actions without the written consent to the specific act by the Initial Lender (unless such act is expressly and specifically permitted under the Initial Loan Documents): . . .
>
> (v) Entering into any engagement for services, transaction or agreement with any Member or Manager or any Affiliate or Related Party of a Member or Manager . . .

*Id.* § 3.3.  Defendants read Section 3.3 to authorize Thomas as manager to enter into transactions with any affiliate or related party of member GRE WP with written consent of the Initial Lender. Initial Lender is defined as Gamma Real Estate Capital "together with its . . . assigns," *id.* § 1, and Gamma Real Estate Capital assigned the Gamma Bridge Loan to Gamma Lending Omega, Compl. ¶ 84.  Thus, Defendants argue that the Initial Lender—Gamma Lending Omega as assignee—consented to the transactions by signing the three forbearance agreements and the DIL Agreement.

Plaintiffs respond that the carveout to Section 2.4(d) does not apply because the forbearance agreements involve not only the Gamma Bridge Loan but also the BAMCAP Loan, and the BAMCAP Loan is not covered by the "Initial Loan" carveout.  Because Gamma Lending Omega acquired the BAMCAP Loan separately on July 30, 2018, Plaintiffs argue that the transactions at issue involved both the Gamma Bridge Loan and the BAMCAP Loan and are not affected by the "Initial Loan" carveout.  Plaintiffs offer no response to Defendants' argument premised on Section 3.3.

An act is ultra vires if it is "beyond the scope of power allowed or granted by a corporate charter or by law."  Black's Law Dictionary (11th ed. 2019).  The transactions at issue—the


three forbearance agreements, the DIL Agreement, and the delivery of the deeds—are not ultra vires because they are not beyond the power authorized by WP Ventures' LLC Agreement. Defendants focus on Section 3.3 of the LLC Agreement, which concerns *limitations* on the manager's power; but, before addressing limitations on the manager's power, the LLC Agreement first addresses the scope of the manager's power.  Section 3.1 of the LLC Agreement sets forth the manager's power over WP Ventures and provides:

> Except for and subject to the limitations set forth elsewhere in this Agreement (including, without limitation, Section 3.3 below), . . . the Manager shall have full charge of the management, conduct, and operation of the Company's business, within the confines of such business, and the Manager's decisions shall be binding on the Company, and, without limiting the generality of the foregoing, the Manager shall have the authority, power and discretion to manage and control the business, affairs and properties of the Company, to make decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, including, without limitation, the authority to: . . .
>
> (iii) Obtain, renew, refinance, discharge or otherwise modify any new or existing loan with respect to the Property, or obtain, renew, refinance, discharge or otherwise modify any other financing, and entering into or amending any loan document in connection with any such financing . . .

Dkt. No. 40-2, Ex. A § 3.1.  The manager's power is expansive and includes modifying existing loans and amending loan documents.

Section 3.3 provides that the manager shall have no authority to cause WP Land and WPL Holdings to enter into transactions with any affiliate or related party of GRE WP (such as Gamma Lending Omega), *provided that* the action is taken "without the written consent to the specific act by the Initial Lender."  *Id.* § 3.3.  In other words, if the manager has the written consent of the Initial Lender, Section 3.3 does not limit the manager's authority to enter into such transactions.  Because the LLC Agreement defines Initial Lender to include Gamma Lending Omega and because Gamma Lending Omega signed the forbearance agreements and the DIL Agreement, the manager had the written consent of the Initial Lender.  Thus, these transactions

are not ultra vires.  And because the delivery of the deeds occurred under the terms of the DIL

Agreement, it is not a separate ultra vires transaction.

Section 3.3 governs over Section 2.4(d).  "Well-settled rules of contract construction

require that a contract be construed as a whole, giving effect to the parties' intentions."  *DCV*

*Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).  "Specific language in a contract

controls over general language, and where specific and general provisions conflict, the specific

provision ordinarily qualifies the meaning of the general one."  *Id.*; *see also* 11 Williston on

Contracts § 32:10 (4th ed.) ("When general and specific clauses conflict, the specific clause

governs the meaning of the contract." (citing Restatement (Second) of Contracts § 203(c))).

Though Section 2.4(d) appears to broadly withhold authority to enter into transactions with

affiliate or related party entities, the more specific language of Section 3.3 provides an exception

to this general clause and governs the meaning of the LLC Agreement.

Furthermore, even if the more specific language of Section 3.3 did not control, Section

2.4(d) on its face would not lead to a different result.  Section 2.4(d) explicitly provides that "the

Initial Loan by the Initial Lender shall be deemed permitted under this section."  Dkt. No. 40-2,

Ex. A § 2.4(d).  Initial Loan is defined to be the Gamma Bridge Loan, including "as the same

may be amended, modified, [or] supplemented from time to time."  *Id.* § 1.  Even though the

forbearance agreements and the DIL Agreement also included terms affecting the BAMCAP

Loan, there is no question that those agreements amended, modified, or supplemented the

Gamma Bridge Loan.  The agreements therefore fall under the definition of Initial Loan and are

permitted under Section 2.4(d).

Finally, even if the transactions at issue were beyond the power authorized by the LLC

Agreement, they would be at most voidable—and subject to ratification—rather than void and

ultra vires.  Delaware courts have applied common law principles in the LLC context.[7]  "The

common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable

acts are acts falling within the power of a corporation, though not properly authorized, and are

subject to equitable defenses."  *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816–17

(Del. 2018); *see also Absalom Absalom Tr. v. St. Gervais LLC*, 2019 WL 2655787 (Del. Ch.

June 27, 2019).  In *CompoSecure, L.L.C. v. CardUX, LLC*, the Delaware Supreme Court held

that, "[o]rdinarily," a particular sales agreement "would be voidable for failure to comply with" a

provision of an LLC agreement.  206 A.3d at 817.  However, because "the plain language" of the

provision explicitly stated that such acts were "void and of no force or effect whatsoever,"

application of the provision "would trump the common law rule" and render the sales agreement

"void and incapable of being ratified."  *Id.*; *see also Absalom*, 2019 WL 2655787, at *3

(applying same rule where LLC agreement explicitly said that certain actions would be "null and

void").

      Here, assuming the transactions at issue were beyond the power authorized by the WP

Ventures' LLC Agreement, the transactions would be voidable under common law principles

because the LLC Agreement does not explicitly provide that such acts would be void.  *Cf.*

*Absalom*, 2019 WL 2655787, at *4 ("The reasoning in *CompoSecure*, however, mandates that

the contractual language—'void'—trumps the common law, rendering the assignment ineffective

and invulnerable to equitable defenses.").  Unlike the LLC agreements in *CompoSecure* and

---

[7] By contrast, for corporations, Delaware limits application of the ultra vires doctrine by statute to three specific circumstances.  *See* Del. Code Ann. tit. 8, § 124; *see also Obeid v. Mack*, 2016 WL 5719779, at *11 (S.D.N.Y. Sept. 30, 2016) ("Delaware law defines the *ultra vires* doctrine extremely narrowly, limiting its application to three circumstances outlined by statute . . . .").  This statute does not appear to apply to LLCs and no equivalent statute circumscribing the ultra vires doctrine to those three circumstances applies to LLCs.

*Absalom*, the WP Ventures' LLC Agreement nowhere provides that acts beyond the powers authorized by the agreement are void.  Thus, the transactions at issue were merely voidable and were ratified when Plaintiffs signed the agreements and accepted the benefits of those agreements.[8]  If this were not the case, Plaintiffs could simply enter into agreements beyond the authority provided under the LLC Agreement, enjoy the benefits of those agreements, and then subsequently disavow their obligations under those agreements for being ultra vires.

For these reasons, Count One is dismissed.[9]

### III.   Federal Rico Claim (Count Two)

Defendants move to dismiss Plaintiffs' substantive federal RICO claim under 18 U.S.C. § 1962(c) for failure to state a claim for relief and failure to plead the fraud elements with particularity.  Defendants argue that Plaintiffs fail to plausibly allege: a RICO enterprise; collection of an unlawful debt; a pattern of racketeering; and continuing criminal conduct.

---

[8] Further, since *CompoSecure* and *Absalom*, the Delaware General Assembly "has provided an alternative, statutory means of validating otherwise void acts."  *Sybiont.io, Inc.*, 2021 WL 3575709, at *43 n.25 (citing Del. Code Ann. tit. 6, § 18-106(e)); *see also* Delaware Bill Summary, 2021 Reg. Sess. S.B. 114 (June 30, 2021) ("This section amends Section 18-106 of the Act to add subsection (e) to provide a safe harbor procedure for ratifying acts or transactions that may be taken by or in respect of a limited liability company under the Act or a limited liability company agreement that are void or voidable and waiving failures to comply with requirements of a limited liability company agreement that make such acts and transactions void or voidable.  New subsection (e) is intended to provide a rule different from the rule applied in Composecure, L.L.C. v. Cardux, LLC, 206 A.3d 807 (Del. 2018), and Absalom Absalom Trust v. Saint Gervais LLC, 2019 WL 2655787 (Del. Ch. June 27, 2019), that acts or transactions determined to be void generally may not be ratified.").  The parties appear to dispute whether the new statutory provision applies here.  *See* Dkt. Nos. 56–57.  The Court need not decide this question because Plaintiffs' claim fails even if the statute does not apply.

[9] Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss all claims by the Thomas Family Trust except for Count One for lack of standing.  Dkt. No. 41 at 9–10.  Plaintiffs do not dispute that the Trust lacks standing except as to Count One.  Dkt. No. 46 at 8 n.7; Dkt. No. 47 at 3.  Accordingly, all of the Trust's claims except for Count One are dismissed without prejudice for lack of subject matter jurisdiction.

Section 1962(c) of Title 18 makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  To establish a claim for a civil violation of 18 U.S.C. § 1962(c) through a pattern of racketeering activity, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise; (3) through a pattern (4) of racketeering activity."  *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994) (internal quotation marks omitted).

### A.   RICO Enterprise

Plaintiffs fail to plead a RICO enterprise.  "[T]he RICO statute defines an 'enterprise' as 'includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *DeFalco v. Bernas*, 244 F.3d 286, 306–07 (2d Cir. 2001) (second alteration in original) (quoting 18 U.S.C. § 1961(4)).  The enterprise can be any "ongoing organization, formal or informal" that "function[s] as a continuing unit."  *United States v. Morales*, 185 F.3d 74, 80 (2d Cir. 1999) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  The Second Circuit has held that members of an association can form a RICO enterprise only if they "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (summary order) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)).  In other words, a RICO enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625 (2d Cir. 2020) (quoting *United States v. Boyle*, 556 U.S. 938, 946 (2009)).  "[C]onclusory naming of a string of

entities does not adequately allege an enterprise." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 175 (2d Cir. 2004) (internal quotation marks omitted).

Plaintiffs allege that the RICO enterprise consists of Kalikow, Goodman, and each of the Gamma Defendants whom, they claim, "formed an association in fact . . . with the purpose [of] enriching themselves and defrauding Plaintiffs by taking Wade Park from Thomas and Plaintiffs." Compl. ¶ 252.  According to Plaintiffs, Gamma Real Estate Capital made the loan to WP Land and WPL Holdings with the intent ultimately to take control of Wade Park and enlisted Kalikow, WP Development Partners, Gamma Lending Omega, GRE WP, and Goodman in that effort.  But the allegations of the Complaint do not "plausibly support the inference that the defendants were collectively trying to make money . . . by fraud, . . . as opposed to the obvious alternative explanation, that they were simply trying to make money." *Wade Park Land Holdings*, 522 F. Supp. 3d at 1351.  Accepting the allegations of the Complaint as true, Gamma Real Estate Capital agreed to make a multi-million dollar bridge loan for a real estate venture that was having difficulty securing a long-term loan, insisted on terms that would protect itself against a default, and then assigned that loan to Gamma Lending Omega.  When Plaintiffs were unable or unwilling to pay back the loan, Gamma Lending Omega then agreed for months, through numerous agreements, to forbear from exercising the remedies granted it under the original loan documents.  Ultimately, the Gamma Defendants decided that they would wait no longer, but, even then, they agreed to put the deeds to which they had a right in escrow rather than taking title immediately.  They thereafter took actions they had a right to take in order to protect the asset in which they now had an interest.  And when Plaintiffs still failed to pay, they took title—as the loan documents gave them a right to do.  Judge Batten correctly concluded that "[t]hese allegations do not show a RICO enterprise." *Id.*  "At best, they describe an ambitious

model in which all Defendants aimed to achieve professional success through the acquisition of valuable real estate." *Id.*

Assuming *arguendo* Plaintiffs have pleaded the existence of a common purpose to engage in fraudulent conduct, Plaintiffs still fail to plead a RICO enterprise because they do not plead relationships to assert that Defendants and Goodman as a group formed an ongoing organization. *See Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 439 (S.D.N.Y. 2019) (holding that RICO enterprise was not plausibly alleged where plaintiff's "allegations provide no basis to infer either that the alleged [enterprise] members formed an ongoing organization or that the defendants formed a coherent entity that was separate and apart from the predicate acts that allegedly comprise the alleged fraudulent scheme"); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (holding that plaintiff did not allege a RICO enterprise where "[p]laintiff [did] not specif[y] how all defendants, including various borrowers, joined together as a group to perpetuate the frauds alleged in the Amended Complaint"). Plaintiffs claim that they allege each defendant's role in the enterprise, Dkt. No. 46 at 12–14, but the allegations to which they point merely describe separate actions involving various pairs of defendants. For example, Plaintiffs highlight allegations that Gamma Real Estate Capital required Plaintiffs to form WP Ventures and give GRE WP a 75% interest; that Gamma Real Estate Capital assigned its interests in the Gamma Bridge Loan to Gamma Lending Omega; that Gamma Lending Omega ultimately directed that Wade Park be transferred to WP Development Partners; and that Goodman shared trade secrets with Kalikow. *Id.* at 13–14. Plaintiffs argue in conclusory fashion that these allegations plausibly plead an enterprise despite the members of the alleged enterprise "not having any apparent connection to most of the other defendants." *Democratic Nat'l Comm.*, 392 F. Supp. 3d

at 439.  The Complaint also fails to include any "information on the group's organization."  *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 360 (S.D.N.Y. 2014).  The conclusory nature of the allegations is further evidenced by the significant portions of the Complaint that allege conduct on behalf of "Gamma Defendants" collectively without specifying each of the entities' respective roles in the enterprise.  *See id.* (holding RICO enterprise insufficiently pleaded where plaintiffs "have failed to provide any information whatsoever regarding the Defendants' respective roles in the enterprise" and where "[e]ach allegation of purported conduct set out in the complaint is attributed to 'Defendants' as a group").

Plaintiffs have thus failed to plead a RICO enterprise.  And "[t]he heart of any civil RICO claim is the enterprise."  *Id.* at 359 (quoting *D. Penguin Bros. v. City Nat'l Bank*, 2014 WL 982859, at *4 (S.D.N.Y. Mar. 11), *aff'd*, 587 F. App'x 663 (2d Cir. Oct. 16, 2014)).  "There can be no RICO violation without one."  *Id.*

### B.    Unlawful Debt Collection

Plaintiffs also fail to plausibly allege the collection of an unlawful debt.  Plaintiffs allege both that the Gamma Bridge Loan was an unlawful debt within the meaning of 18 U.S.C. § 1961(6), *see* Compl. ¶ 257, and that Defendants and Goodman agreed to, conducted, and participated in the conduct of the alleged enterprise through the collection of unlawful debt, *id.* ¶ 345.

Defendants argue that the RICO claim for collection of unlawful debt should be dismissed for two independent reasons: (1) the Complaint does not allege that Defendants were in the business of lending money at usurious rates and only alleges a single loan, Dkt. No. 41 at 14; and (2) the rate of interest in the Construction Loan Agreement was not usurious, *id.* at 14–15.

46

Section 1962(c) of Title 18 makes it unlawful to conduct or participate in the conduct of the affairs of an enterprise through the "collection of unlawful debt." 18 U.S.C. § 1962(c). As relevant here, "unlawful debt" is defined by RICO to include a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury" and "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal Law, where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6).

"In order to state a RICO claim based on the collection of an unlawful debt, a plaintiff must allege that (1) 'the debt was unenforceable in whole or in part because of state or federal laws relating to usury,' (2) 'the debt was incurred in connection with "the business of lending money . . . at a [usurious] rate,"' and (3) 'the usurious rate was at least twice the enforceable rate.'" *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018) (summary order) (alteration in original) (quoting *Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985)). "The first part of § 1961(6) requires that 'unlawful debt' either (1) be incurred or contracted in some form of illegal gambling activity or (2) be unenforceable by virtue of state or federal usury laws. The second part—subsection (B)—further narrows the definition, requiring, *inter alia*, that the 'unlawful debt' be incurred in connection with an illegal 'business.'" *United States v. Persico*, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011).

"RICO offenses may be predicated on a single instance of collection of an unlawful debt . . . ." *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020). At the same time, however, the statute does not reach the collection of a loan that is made occasionally and not as part of the "business of lending money" at a usurious rate. *See Malvar Egerique v. Chowaiki*,

2020 WL 1974228, at *19 (S.D.N.Y. Apr. 24, 2020), *vacated in part for other reasons sub nom. Weiss v. David Benrimon Fine Art LLC,* 2021 WL 6128437 (2d Cir. Dec. 28, 2021).  "The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability [was] an explicit recognition of the evils of loan sharking . . . ."  *Durante*, 755 F.2d at 250.  To that end, the statute requires "that the loan have been incurred in connection with 'the business of' making usurious loans" and excludes from the definition of unlawful debt the "occasional usurious transactions by one not in the business of loan sharking."  *Id.* at 250.

Plaintiffs' claim that Defendants violated Section 1962(c) through the collection of unlawful debt fails both because the Complaint lacks allegations the Gamma Bridge Loan was made by Defendants in connection with the business of lending money at a usurious rate and because it lacks any well-pleaded allegations that the Gamma Bridge Loan was unenforceable under any relevant state or federal law related to usury.  Plaintiff cites paragraphs 257 to 261 of the Complaint as support for the proposition that Defendants "were in the business of lending money."  Dkt. No. 46 at 15.  The only potentially relevant paragraph is paragraph 259 which alleges in conclusory fashion that "Defendants Kalikow and the Gamma Defendants were in the business of lending money."  Compl. ¶ 259.  Given the formulaic nature of that allegation, bereft of any factual content, it is not sufficient to state a claim for relief.  *See Twombly*, 550 U.S. at 555 (stating that "a formulaic recitation of the elements of a cause of action will not do").  In addition to the conclusory nature of the allegation, it fails to claim that Defendants were in the business of lending money at usurious rates or that the Gamma Bridge Loan was made in connection with such business.  The allegation thus is insufficient for that additional reason.  "[T]here is no indication that Congress was taking aim at legitimate banking institutions";

Congress excluded from "the scope of the statute [the] occasional usurious transactions by one not in the business of loan sharking." *Durante*, 755 F.2d at 250.

The Complaint also lacks any well-pleaded allegation that the Gamma Bridge Loan was usurious or that it was unenforceable because of laws related to usury. Plaintiff does not dispute, and therefore abandons, the Complaint's claim that the Gamma Bridge Loan was usurious or unenforceable as a result of usury under New York law. *See* Compl. ¶ 414 (citing N.Y. Penal Law § 190.40). New York General Obligations Law § 5-501(6)(b) provides: "No law regulating the maximum rate of interest which may be charged, taken or received, including section 190.40 and section 190.42 of the penal law, shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more." N.Y. Gen. Oblig. Law § 5-501(6)(b). The Gamma Bridge Loan in the amount of $93 million clearly is excluded by this provision from the scope of New York Penal Law § 190.40. *See NML Cap. v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010) ("The usury laws are expressly inapplicable where the sum involved is equal to or greater than $2.5 million and, therefore, do not apply to the facts of this case.").

Plaintiffs argue instead that New York law is not applicable because it would conflict with the law of Georgia where Plaintiffs reside and where the contract was located and the law of Texas where the property at issue is located. Dkt. No. 46 at 15 n.12, 47. But Plaintiffs fail to demonstrate in any respect either how the Gamma Bridge Loan was usurious under the laws of those states, *see MMA Cap. Corp. v. ALR Oglethorpe, LLC*, 785 S.E.2d 38 (Ga. Ct. App. 2016) (holding that Georgia usury law does not apply to a loan of $250,000 or more documented by written contract), or, more pertinently, that the laws of New York would give way to the law of Texas or Georgia, *see Truist Bank v. Nephserv, LLC*, 2021 WL 164444, at *6 (N.D. Tex. Jan. 13, 2021) (rejecting usury claims under Texas law because "New York law applies because the

parties chose it as the governing law" and "Texas favors the enforcement of choice-of-law provisions" including "in usury claims").

Plaintiffs have thus failed to allege the collection of an unlawful debt.

### C.      Pattern of Racketeering Activity

Plaintiffs similarly fail to allege a pattern of racketeering activity.  To establish a "pattern of racketeering activity," a plaintiff must plead "at least two acts of racketeering activity" committed in a ten-year period.  18 U.S.C. § 1961(5).  RICO defines racketeering activity to mean "any act which is indictable" under the provisions listed in 18 U.S.C. § 1961(1)(B), including as relevant here 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1832 (theft of trade secrets), and 18 U.S.C. § 1956 (laundering of monetary instruments).  To establish a pattern of racketeering activity, Plaintiffs allege that Defendants committed the predicate acts of wire fraud, theft of trade secrets, and money laundering.  Compl. ¶¶ 262–315.  The Court addresses the alleged predicate acts in turn.

### 1.      Wire Fraud

Plaintiffs fail to adequately allege the predicate acts of wire fraud.  "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires."  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (quoting *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).  "A scheme to defraud is a plan to deprive a person of something of value by trick, deceit, chicane or overreaching."  *Id.* (internal quotation marks omitted).  "To make out such a scheme, a plaintiff must provide proof of a material misrepresentation."  *Id.*  "Given the routine use of mail and wire communications in business operations, . . . 'RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'"  *Crawford v. Franklin Credit Mgmt.*

*Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).  The elements of mail and wire fraud must be pleaded with particularity under Federal Rule of Civil Procedure 9(b).  *See* Fed. R. Civ. P. 9(b); *Benedict v. Amaducci*, 1995 WL 413206, at *6 (S.D.N.Y. July 12, 1995) ("Where, as here, plaintiffs' RICO claims rely in part on mail and/or wire as alleged predicate offenses, Rule 9(b)'s heighted pleading requirements also apply.").

Plaintiffs' allegations of a pattern of fraudulent acts are classic fraud-by-hindsight.  *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  Plaintiffs reason that, because Defendants obtained both forbearance fees and the rights to Wade Park as a result of Plaintiffs' default on the loan, Defendants always intended to deprive Plaintiffs of their interest in Wade Park and did so by fraud.  However, the conclusion does not follow from the premise.  Stripped of hyperbole, there is very little to Plaintiffs' allegations.

Plaintiffs allege as predicate acts of wire fraud that (a) on or around December 2, 2016, Kalikow and the Gamma Defendants "falsely" stated to Thomas and others that they did not want to own the Wade Park project, Compl. ¶ 265; (b) in January 2019, Kalikow participated in a series of interstate phone calls with Thomas, non-party Jake Sharp, and executives from Columbia Pacific in which he made "false statements" that the Gamma Defendants were willing to agree to a loan proposal made by Columbia Pacific and that they thought the deal would work to pay the Gamma Bridge Loan, *id.* ¶¶ 167, 266; (c) Kalikow and the Gamma Defendants made multiple statements to Thomas and members of Thomas's team and to Plaintiffs encouraging the Bluebell loan and stating that the Gamma Defendants believed the loan to be a viable refinancing option, *id.* ¶ 158; (d) "Kalikow and the Gamma Defendants expressed their support for a deal with Hines," *id.* ¶ 183; (e) "Kalikow and the Gamma Defendants . . . told Thomas that the

deed-in-lieu agreement would not actually cause a transfer of the Wade Park deeds to Gamma"
and that they "would give Thomas time to 'buy back' the properties by paying off the loans," *id.*
¶ 186, and repeatedly assured Thomas "that the buy-back period would be at least six months,"
*id.* ¶ 189, and later told Thomas that they would give him whatever time he needed to buy the
property back and would have more time to buy back the Wade Park properties, *id.* ¶¶ 194, 198.

There are numerous problems with these allegations.  First, with the single possible
exception of the December 2, 2016 conversation, Plaintiffs fail to plead fraud with particularity.
*See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll
allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of
Federal Rule of Civil Procedure 9(b).").  "Allegations of predicate mail and wire fraud acts
'should state the contents of the communications, who was involved, [and] where and when they
took place, and [should] explain why they were fraudulent.'"  *Spool v. World Child Int'l
Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alteration in original) (quoting *Mills v.
Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).  "[P]laintiffs must do more than say
that the statements . . . were false and misleading; they must demonstrate with specificity why
and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Cambridge
Capital LLC v. Ruby Has LLC*, 2021 WL 4481183, at *26 (S.D.N.Y. Sept. 30, 2021); *Coppelson
v. Serhant*, 2021 WL 148088, at *6–8 (S.D.N.Y. Jan. 15, 2021); *In re Nokia Oyj (Nokia Corp.)
Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006) ("Under the pleading requirements, a
complaint must explain, with adequate specificity, why the alleged false or misleading
statements were actually false or misleading when made.").

More fundamentally, for all of the alleged misrepresentations, Plaintiffs fail to plead facts
that demonstrate that the statements were false when made.  Plaintiffs would have the Court

accept as plausible the notion that Kalikow and the Gamma Defendants were lying when they told Thomas in December 2016 that they did not want to own the Wade Park project because, ultimately, in April 2019, the Gamma Defendants took title to the Wade Park properties.  But, if Defendants had wanted to take title to the Wade Park properties, they would have had ample opportunity prior to April 2019 to do so.  The original Gamma Bridge Loan was scheduled to expire in May 2017.  With the extensions requested by Plaintiffs, it expired in February 2018.  If Defendants had wanted to take the Wade Park property, they could have foreclosed on the property when Plaintiffs went into default on the loan and in February 2018 after the term of the loan expired.  Absent an agreement by Defendants to the contrary, the ability of WP Land, WPL Holdings, and the Thomas Family Trust to buy out Defendants' interests in WP Ventures would have expired.  But Defendants did not foreclose on the Wade Park project.  Instead, they agreed to forbear from exercising their rights—not once but several times, including in August 2018, October 2018, and December 2018.  Compl. ¶ 178.  Even then, when Plaintiffs were unable to retire the loan as of February 2019, Defendants did not foreclose on the Wade Park property as they had a right to under the loan agreement and related documents.  Rather, they agreed to place the deeds in escrow and to grant WP Land and WPL Holdings still more time to satisfy their obligations to Defendants and to be able to retain the deeds.  It was only after Plaintiffs still were not able to pay that in April 2019 Defendants registered title to the Wade Park properties.  And even then, Defendants' conduct was inconsistent with the allegation that Defendants wanted to own the Wade Park project.  According to Plaintiffs, Defendants were interested in selling the Wade Park properties to Hines in the summer of 2019—immediately after they obtained title—but only on the condition that Thomas not be involved.  *Id.* ¶ 202.  In short, Plaintiffs' allegations of fact are utterly inconsistent with the conclusory assertion that, in December 2016 when the

Gamma Defendants first agreed to the bridge loan, they secretly intended Plaintiffs not to repay it and to take title to the Wade Park properties themselves.

Plaintiffs' allegations with respect to the remaining predicate acts suffer from similar flaws.  Plaintiffs allege that Kalikow committed fraud when in December 2018 and January 2019, he indicated that the Gamma Defendants were willing to agree to a loan proposal made by Columbia Partners and encouraged Thomas to pursue the Columbia Pacific deal.  Plaintiffs claim that, in a January 2019 meeting, Kalikow yelled at the Columbia Pacific executives, said that the Gamma Defendants would never agree to the terms Columbia Pacific had proposed, and said that the Gamma Defendants would never agree to let WP Land and WPL Holdings refinance the Gamma Bridge Loan.  Compl. ¶ 171.  But Plaintiffs' allegations are entirely implausible.  The Gamma Defendants did not have a consent right with respect to the Thomas's efforts to obtain financing to pay off the loans on the Wade Park properties.  The Gamma Defendants did not need to "let" him borrow.  He had the unilateral right to borrow without their consent. Moreover, assuming that Columbia Pacific would not ask for concessions from the Gamma Defendants (which Columbia Pacific as a more junior lender would have had an interest in doing) the loan would have been in the Gamma Defendants' interest.  Had it been made at the time and made without concessions, the Gamma Defendants would have been repaid on the Gamma Bridge Loan.  They would not have had to agree to the extensions in August 2018, October 2018, and December 2018, and the DIL Agreement.  Thus, absent more facts, the allegation that "Kalikow and the Gamma Defendants told Mr. Sharp that they would agree to the terms proposed by Columbia Pacific," *id.* ¶ 167, even if Kalikow later said he would never agree to the terms Columbia Pacific had proposed, *id.* ¶ 171, does not support a fraud claim that Kalikow lied to Defendants in January 2019.

The next two allegations relate to alleged statements made by Kalikow and the Gamma Defendants with respect to other financing options being pursued by Thomas—the Gamma Defendants encouraged the Bluebell loan and stated that they believed the loan to be a viable refinancing option, *id.* ¶ 158; and "Kalikow and the Gamma Defendants expressed their support for a deal with Hines," *id.* ¶ 183.  Plaintiffs' claim that Kalikow engaged in fraud by encouraging the Bluebell loan is based on the fact that, after allegedly encouraging the loan, Kalikow called Bluebell's principal and verbally attacked him and Bluebell, stating that the Gamma Defendants would not allow the loan from Bluebell to move forward.  That allegation falls short because Plaintiffs do not allege what Kalikow said to Thomas that was false or why it was false.  Absent any such allegations, the Complaint does not state a claim with respect to statements regarding Bluebell.

Plaintiffs allege that Kalikow and Thomas spoke almost daily in January and February 2019 about Thomas's financing efforts for Wade Park and that Kalikow and the Gamma Defendants expressed their support for a deal with Hines.  *Id.* ¶¶ 182–183.  Ultimately, when the last forbearance agreement had expired, and in the summer of 2019 Hines and the Gamma Defendants discussed a potential purchase of the Wade Park properties from Defendants, the Gamma Defendants rejected every proposal by Hines and told Hines that the Gamma Defendants would not sell the properties to Hines if Thomas were involved in any way.  *Id.* ¶ 202.  Leaving aside the complete lack of particularity with respect to the statements regarding "support" or whether they could support a fraud claim, the fact that the Gamma Defendants in the summer of 2019 rejected every proposal then put forward by Hines hardly suggests that they were not being honest when in the winter of 2018–2019 they expressed support for Thomas doing a deal with Hines.  Facts had changed between January 2019 and the summer of 2019.  In January 2019, the

deeds were in escrow; Thomas still had the right to buy them back.  By the summer of 2019, the

deeds were registered to Defendants.  That Defendants chose not to sell to Thomas or anyone

involved with Thomas in the summer of 2019 says nothing about its intent in January 2019.

Plaintiffs have therefore failed to allege the predicate acts of wire fraud.

## 2.   Theft of Trade Secrets

Plaintiffs similarly fail to sufficiently allege the RICO predicate of theft of trade secrets

in violation of 18 U.S.C. § 1832.[10]  Plaintiffs allege that they disclosed trade secrets to Goodman

who allegedly had a duty to maintain the confidentiality of the trade secrets due to his fiduciary

obligations to WP Land, WPL Holdings, and Thomas.  Compl. ¶¶ 275, 284, 293, 302.  They

allege that Goodman conveyed the trade secrets to Defendants without authorization and that

Defendants received them while knowing that Goodman was under a fiduciary duty to maintain

the confidentiality of the trade secrets.  *Id.* ¶¶ 276–277, 285–286, 294–295, 303–304.  Plaintiffs

allege that, after learning the trade secrets, Defendants withdrew a loan they had offered Thomas

for the Orlando property and bought existing loans on several properties.  *Id.* ¶¶ 243–245.

---

[10] 18 U.S.C. § 1832 applies:

> Whoever, with the intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy . . . .

18 U.S.C. § 1832(a).

Among other arguments, Defendants urge the Court to follow Judge Batten's decision and his reasoning in concluding that Plaintiffs have not plausibly alleged that Goodman owed Plaintiffs any fiduciary duty or that he shared trade secrets with Defendants.  They argue that the reasoning applies and is equally dispositive here.  They also argue that Plaintiffs do not allege facts to support that Defendants knew Goodman had confidential information about Wade Park or a fiduciary duty to WP Land and WPL Holdings.  Dkt. No. 41 at 18–19.  Plaintiffs respond that Judge Batten "focused solely on whether Goodman committed the predicate act of theft of trade secrets, not whether the Gamma Defendants did."  Dkt. No. 46 at 19.  Plaintiffs also argue that Defendants admitted that Goodman was the manager of Fourth Quarter Properties and that Goodman's fiduciary duties arose from this role and Goodman's role as a participant in the joint venture.  *Id.* at 20.

The Court agrees with Judge Batten's well-reasoned opinion that Plaintiffs have not sufficiently pleaded that Goodman shared trade secrets with Defendants.  *Wade Park Land Holdings, LLC*, 522 F. Supp. 3d at 1355 ("[T]o state a claim for relief, Plaintiffs must do more than baldly allege that Goodman must have shared trade secrets because the Gamma Defendants acquired knowledge of the information.").  Plaintiffs' allegations regarding Defendants' theft of trade secrets relies on the allegations of Goodman's theft of trade secrets.  Plaintiffs allege that the information Defendants received were trade secrets Goodman had stolen from them.  Accordingly, Plaintiffs' allegations regarding Defendants must necessarily fail.

Further, for the reasons discussed *infra* Section XIII, even assuming that Defendants had pleaded that Goodman acquired trade secrets, Plaintiffs have not alleged facts to support that Defendants knew that Goodman acquired trade secrets under circumstances giving rise to a duty to maintain their secrecy or to limit their use.

Plaintiffs have therefore not adequately alleged the RICO predicate of theft of trade secrets.

### 3.      Money Laundering

Plaintiffs lastly allege that Defendants committed the predicate act of money laundering in violation of 18 U.S.C. § 1956 and that they obtained proceeds from illegal activity by reason of their alleged wire fraud and theft of trade secrets.  Compl. ¶¶ 306–307.  These allegations rely on the allegations of wire fraud and theft of trade secrets.  Because Plaintiffs have not adequately pleaded wire fraud and theft of trade secrets, their allegations regarding money laundering cannot succeed.

* * *

For these reasons, Plaintiffs have failed to plead a pattern of racketeering activity to support their RICO claim.

### D.      Continuing Criminal Conduct

Finally, Plaintiffs' allegations fail to satisfy the continuity requirement of Section 1962(c).  A plaintiff must plead that the predicate acts by the defendant are "related, *and that they amount to or pose a threat of continued criminal activity.*"  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  The continuity necessary to prove a pattern can be either closed-ended continuity or open-ended continuity.  *See id.* at 241.  Closed-ended continuity is satisfied by evidence of "a series of related predicates extending over a substantial period of time."  *Id.* at 242.  The Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999); *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (same); *One World, LLC v. Onoufriadis*, 2021 WL 4452070, at *2 (2d Cir. Sept. 29, 2021) (summary order) (same).  Although the two-year time frame is not "a

58

bright-line requirement," the Second Circuit has stated "it will be rare that conduct persisting for a shorter period of time [will] establish[] closed-ended continuity, particularly where . . . the activities alleged involved only a handful of participants and do not involve a complex, multifaceted conspiracy." *Spool*, 520 F.3d at 184 (cleaned up).  The Circuit has held that "a focused and cohesive effort by a handful of people, using corporations they controlled, to obtain money from [a single victim] over a period of far less than two years, under false pretenses," did not satisfy the continuity element.  *One World*, 2021 WL 4452070, at *2.  In short, to satisfy closed-ended continuity, the plaintiff must establish "a series of related predicate acts extending over a substantial period of time."  *Cofacredit*, 187 F.3d at 242.

Plaintiffs argue that their allegations establish closed-ended continuity because they allege a scheme that lasted over thirty months, from October 2016 when Kalikow and Thomas first met until April 2019 after Gamma Lending Omega registered title to the Wade Park property, and because it involved more than just taking the Wade Park property through the Gamma Bridge Loan and involved obtaining title to property in Texas, ownership of loans on property in Georgia, Florida, and Tennessee, and possession of Plaintiffs' valuable trade secrets. Dkt. No. 46 at 21–22.

The allegations fail to establish closed-ended continuity.  Plaintiffs' Complaint alleges a single victim with a single objective—to obtain ownership of the Wade Park properties, over a defined period of time.  The alleged scheme begins with the purported misrepresentation that Defendants were extending the Gamma Bridge Loan to Plaintiffs for the purpose of receiving interest and principal at the end of the loan (and not for the purpose of obtaining title to the Wade Park property) and ends with Defendants obtaining title to that property.  Although Plaintiffs allege that, in the course of trying to obtain the property, Defendants interfered with Plaintiffs'

attempts to obtaining alternative financing, that interference allegedly was made in service of the same ultimate objective—to obtain the Wade Park property. *See One World*, 2021 WL 4452070, at *2 (holding that there was no closed-ended continuity when scheme was a "focused and cohesive effort by a handful of people" to achieve a single objective). The allegations lack the "number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes" that are the hallmark of a pattern of racketeering activity and that is necessary to make out a Section 1962(c) RICO claim. *Cofacredit*, 187 F.3d at 242.

Plaintiffs primarily argue that they have satisfied closed-ended continuity because, by their calculation, the scheme lasted thirty months until Gamma Lending Omega registered title to the Wade Park property. They argue that they have alleged a scheme that began as early as October 2016 and continued until at least April 2019. Compl. ¶¶ 49, 198; Dkt. No. 46 at 21. The Second Circuit has held, however, that "[t]he relevant period [for measuring closed-ended continuity] . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184; *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995). Moreover, where the alleged pattern of racketeering activity is based on claims of mail fraud or wire fraud, only those predicate acts that are pleaded with the requisite particularity count for the start of the period. *See Spool*, 520 F.3d at 184–85.

Plaintiffs would start the time period for continuity with the October 2016 pre-meeting between Thomas and Porter where Porter said that Kalikow could be trusted and the later in-person meeting where, in Kalikow's presence, Porter stated that Porter, Kalikow, and the Gamma Defendants were partners. Compl. ¶¶ 50–52. But there is no allegation that Porter's

statement to Thomas was false or misleading or that it constituted a predicate act of mail fraud or wire fraud.  *See id.* ¶¶ 262–269.

The December 2016 conversations between Kalikow and members of his team where Kalikow allegedly stated that he and Gamma Real Estate Capital did not want to own the Wade Park project also cannot start the clock for the RICO pattern of racketeering.  The allegation that Kalikow's statement was "knowingly false" is wholly conclusory and does not satisfy Rule 9(b).  *See Spool*, 520 F.3d at 184–85.

At most, the Complaint alleges predicate acts occurring from January 2018 when Gamma Lending Omega refused to consent to the BAMCAP Loan modification, Compl. ¶ 123, to April 2019.  But leaving aside the other defects in the pleading of that incident, there was only less than a year and a half between that act and Gamma Lending Omega's registration of title to the Wade Park properties.

There is also a certain irony to Plaintiffs' argument.  The Gamma Bridge Loan had a three-month term.  Having been signed in January 2017, it expired in April 2017.  Plaintiffs could have terminated the "scheme" at that point simply by paying off the loan.  It is only as a result of Plaintiffs' requests for extensions that the relationship lasted beyond that date.  And the declaration of default was made in January 2018.  At that point, Gamma Lending Omega had done all that would have been necessarily for it to accomplish its allegedly unlawful goal—if that was its goal—of obtaining the Wade Park properties.  It is only as a result of Plaintiffs' requests for forbearance and agreements with Defendants that Defendants would forbear from executing their remedies that Gamma Lending Omega did not register title to the Wade Park properties earlier.  "[A]n 'inherently terminable' scheme does not imply a threat of continued racketeering activity."  *Cofacredit*, 187 F.3d at 244.

Plaintiffs' allegations fail to meet the continuity requirement to plead a RICO violation.

## IV.    Conspiracy to Violate RICO (Count Three)

In this Circuit, when the allegations of a complaint fail to establish a substantive RICO violation, they also do not establish a RICO conspiracy claim.  *See Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 626 (2d Cir. 2020) (summary order); *Johnson v. Nextel Commc'ns, Inc.*, 763 F. App'x 53, 56 (2d Cir. 2019) (summary order).  Count Three is therefore dismissed.

## V.    Georgia RICO Claims (Counts Four to Six)

Counts Four to Six allege violations of Georgia RICO.  More specifically, Count Four alleges a violation of Ga. Code Ann. § 16-14-4(b); Count Five alleges a violation of Ga. Code Ann. § 16-14-4(a); and Count Six alleges a violation of Ga. Code Ann. § 16-14-4(c).  Plaintiffs fail to state claims under Georgia RICO, and Counts Four to Six must be dismissed.

Count Four is dismissed because Plaintiffs have failed to plead the existence of an enterprise.  Section 16-14-4(b) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."  Ga. Code Ann. § 16-14-4(b).  "The federal and Georgia RICO acts are '"essentially identical," meaning failure to state a claim under the federal act warrants dismissal under the Georgia act.'"  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1221 (11th Cir. 2020) (quoting *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1342 (11th Cir. 2017)).  Section 16-14-4(b) is "[t]he Georgia provision analogous to § 1962(c)" and "*does* require proof of an enterprise."  *Id.*  As explained *supra* Section III.A, Plaintiffs have failed to plead the existence of a RICO enterprise; therefore, Count Four under Section 16-14-4(b) of Georgia RICO must be dismissed.  *See id.* (holding that plaintiff "has failed to state a claim under § 16-14-4(b) for the same reason she has failed to state a claim under § 1962(c): she failed to plausibly plead the existence of an enterprise"); *see also Lechter v. Aprio, LLP*, 2021 WL

4564816, at *22 (N.D. Ga. Sept. 30, 2021) ("To the extent Plaintiffs rely on subsection (b),

Plaintiffs claims fail for the same reason as their Federal RICO claims—Plaintiffs cannot

establish that the alleged pattern of racketeering activity was carried out as part of an

'enterprise.'").

Plaintiffs also fail to plead a violation of Section 16-14-4(a) in Count Five.  "Section

16-14-4(a) makes it illegal 'for any person, through a pattern of racketeering activity or proceeds

derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any

enterprise, real property, or personal property of any nature, including money.'"  *Doe #1 v. Red*

*Roof Inns, Inc.*, 21 F.4th 714, 728 (11th Cir. 2021) (quoting Ga. Code Ann. § 16-14-4(a)).  "A

'pattern of racketeering activity' means '[e]ngaging in at least two acts of racketeering activity in

furtherance of one or more incidents, schemes, or transactions that have the same or similar

intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by

distinguishing characteristics.'"  *Id.* (alteration in original) (quoting Ga. Code Ann.

§ 16-14-3(4)(A)).  "A 'racketeering activity' is the commission, attempted commission,

solicitation, coercion, or intimidation of another 'to commit any crime which is chargeable by

indictment under' Georgia law."  *Id.* (quoting Ga. Code. Ann. § 16-14-3(5)(A)).  Unlike

subsection (a), this part of the Georgia RICO statute "does not require proof of an enterprise."

*Cisneros*, 972 F.3d at 1221.  "To establish a violation under subsection (a), unlike a Federal

RICO claim or a Georgia RICO claim under subsection (b), all Plaintiffs have to show is 'proof

that the defendant committed predicate offenses . . . at least twice.'"  *Lechter*, 2021 WL

4564816, at *22 (quoting *Cobb Cnty. v. Jones Grp., P.L.C.*, 460 S.E.2d 516, 521 (Ga. Ct. App.

1995)).

To the extent Plaintiffs rely on the same allegations as for their federal RICO claim, Plaintiffs have failed to plead a pattern of racketeering activity as explained *supra* Section III.C. Plaintiffs also allege two additional predicate acts under Georgia RICO.  Compl. ¶ 359.  First, Plaintiffs allege that Kalikow and the Gamma Defendants committed fraud in connection with the purchase of a security in violation of the Georgia Uniform Securities Act, Ga. Code Ann. § 10-5-50.  They allege that Kalikow and the Gamma Defendants made the following misstatements or omissions in connection with GRE WP's purchase of a 75% membership interest in WP Ventures: (1) in or around October 2016, Kalikow and the Gamma Defendants failed to disavow John Porter's statement that they were partners on a development project; (2) on or around December 2, 2016, Kalikow and the Gamma Defendants stated that they did not want to own the Wade Park project; (3) on or around January 17, 2017, the Gamma Defendants told Plaintiffs that they intended to not unreasonably withhold consent to modify the BAMCAP loan; and (4) in January 2019, Kalikow made false statements about the Gamma Defendants' willingness to agree to a loan proposal by Columbia Pacific.  Compl. ¶ 318.  The second additional predicate alleged by Plaintiffs is theft by deception in violation of Ga. Code. Ann. § 16-8-3.  Compl. ¶ 321.  Plaintiff allege that Defendants obtained cash, personal property, and real estate valued in excess of $76.6 million and real property at Wade Park valued in excess of $550 million and that Defendants did so by making the false representations describe above as well as others.  *Id.* ¶¶ 323–324.  These additional allegations, however, are insufficient to state a Georgia RICO claim.  For the same reasons discussed elsewhere in this Opinion, Plaintiffs do not satisfy Rule 9(b)'s requirement to plead fraud with particularity with respect to the two additional predicates.  Plaintiffs therefore fail to plead a violation of Georgia RICO, Ga. Code Ann. § 16-14-4(a), and Count Five must be dismissed.

Section 16-14-4(c) makes it illegal for any person to conspire or endeavor to violate Sections 16-14-4(a) and 16-14-4(b).  *See* Ga. Code Ann. § 16-14-4(c).  Because Plaintiffs have failed to plead a substantive claim under Georgia RICO, they cannot establish a conspiracy claim.  *See Doe #1*, 21 F.4th at 728 ("Because those allegations are insufficient to plausibly allege any RICO violation, the district court also correctly dismissed the [plaintiffs'] conspiracy counts."); *C.C. v. H.K. Grp. of Co.*, 2022 WL 467813, at *5 (N.D. Ga. Feb. 9, 2022).  Count Six is therefore also dismissed.

## VI.    Fraud Claim (Count Seven)

Count Seven alleges that, in January 2017, Defendants fraudulently induced Plaintiffs to enter into the Construction Loan Agreement by making the representation in the Construction Loan Agreement itself that Defendants would not unreasonably withhold consent to a modification of the BAMCAP Loan when they did not intend to comply with that contractual obligation.  Compl. ¶¶ 99, 372–385.

The parties dispute whether New York law or Georgia law applies to Plaintiffs' fraud claim, but they agree that New York's choice-of-law rules govern.  Dkt. No. 46 at 25; Dkt. No. 47 at 13.  The Court, however, need not decide which state's law applies because the result would be the same under either jurisdiction's law.  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) ("[A] court need not decide issues whose resolution it has determined can have no possible effect on the ultimate disposition of the case.").

Defendants argue that Plaintiffs' fraud claim fails under New York law.  Dkt. No. 41 at 23–27.  Plaintiffs do not dispute that their fraud claim fails under New York law and instead argue that Georgia law applies.  Dkt. No. 46 at 24–29.  The Court therefore deems Plaintiffs' fraud claim under New York law abandoned.  *See Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 584 n.12 (S.D.N.Y. 2021) ("Federal courts have the discretion to deem a claim

abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim." (quoting *Estate of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 423 (S.D.N.Y. 2017))).

However, even if the claim were not deemed abandoned, Plaintiffs' fraud claim would fail under New York law.  The elements of a claim of fraud under New York law are: "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff, and damages."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009).  "'[I]t is well-established that misrepresentations of a future intent to perform under a contract' are not sufficient to plead fraudulent inducement" under New York law.  *Caro Cap., LLC v. Koch*, 2021 WL 1595843, at *12 (S.D.N.Y. Apr. 23, 2021) (alteration in original) (quoting *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017)); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("[A]llegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim." (alteration in original) (quoting *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995))).

Here, the alleged misrepresentation is that Defendants represented they would adhere to the contract term providing that they would not unreasonably withhold consent to modify the BAMCAP Loan.  Such a misrepresentation of a future intent to perform under a contract is insufficient to state a fraud claim under New York law.  In other words, Plaintiffs' claim fails under New York law because Count Seven is a contract claim masquerading as a fraud claim. *See Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) ("[U]nder New York law, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise

promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." (internal quotation marks omitted)).

Plaintiffs' fraud claim also fails under Georgia law.  Plaintiffs argue that the law of Georgia applies and that, under the law of Georgia, Defendants can commit fraud by entering into a contract with no intention of performing.  Dkt. No. 46 at 25–29.  "To succeed on a fraud claim in Georgia, the plaintiff must prove five elements: '(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.'"  *Tischer v. Bank of Am. Corp.*, 2014 WL 11822767, at *2 (N.D. Ga. Feb. 19, 2014) (quoting *Lehman v. Keller*, 677 S.E.2d 415, 417 (Ga. Ct. App. 2009)).  "The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future.  Nor does actionable fraud result from a mere failure to perform promises made.  Otherwise any breach of a contract would amount to fraud."  *J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell*, 644 S.E.2d 440, 447 (Ga. App. Ct. 2007).  "However, an exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place."  *Id.* at 448 (alteration adopted and internal quotation marks omitted); *see also Pacrim Assocs. v. Turner Home Ent., Inc.*, 510 S.E.2d 52, 57 (Ga. App. Ct. 1998) ("An exception to this general rule exists where the promisor knows, at the time of the misrepresentation, that the future event will not take place.").  In other words, as discussed earlier in this Opinion, "[t]o establish a claim for fraud in the inducement, or inceptive fraud to enter into a contract, a plaintiff must prove both that the defendant failed to perform a promised act and that the defendant had no intention of performing when the promise was made."  *Nash v. Roberts Ridge Funding, LLC*, 699 S.E.2d 100, 102 (Ga. App. Ct. 2010); *see also Batchelor v. Tucker*, 362 S.E.2d 493, 495 (Ga. App. Ct.

1987) ("When failure to perform a promised act is coupled with evidence that the promisor made the promise with the intention not to perform, inceptive fraud is shown.").

Among other arguments, Defendants argue that Plaintiffs fail to state a fraud claim under Georgia law because they have not pleaded facts to support a strong inference of fraudulent intent and instead merely rely on the conclusory allegation that Defendants did not intend to honor the promise not to unreasonably withhold consent to modify the BAMCAP Loan when they entered into the Construction Loan Agreement.  Dkt. No. 47 at 14–15.  Plaintiffs respond that, under Georgia law, "[f]raudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith."  Dkt. No. 46 at 28 (quoting *BTL COM Ltd. v. Vachon*, 628 S.E.2d 690, 697 (Ga. App. Ct. 2006)).  Plaintiffs contend that they have pleaded facts demonstrating how the Gamma Defendants' later conduct evidences fraudulent intent.  *Id.* (citing Compl. ¶¶ 117–126).

The only factual support for Plaintiffs' fraud claim, however, is that, one year after Plaintiffs entered the Construction Loan Agreement with defendant Gamma Real Estate Capital, Gamma Lending Omega withheld consent to modify the BAMCAP Loan.  In other words, the only factual support for this claim in the Complaint comes from the subsequent failure to give consent to modify the BAMCAP Loan.  *See* Compl. ¶ 123 ("[I]n late January 2018, the Gamma Defendants withheld consent to the proposed modification of the BAMCAP Loan.").  Such allegations concerning the failure to comply with a promise, however, are insufficient to state a fraud claim.  *See Pacrim Assocs.*, 510 S.E.2d at 57 (holding, on summary judgment, that "plaintiffs only point to evidence showing that *subsequent* to the parties' oral agreement, Turner employees, specifically Isaacson, did not intend to comply with the promise" and that, "while

68

such evidence might support a claim for breach of contract, it does not show that Turner did not intend to comply with the agreement *at the time the promise was made*").  And, as described *infra* Section VIII, Defendants' conduct was not "unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith."  *BTL COM Ltd.*, 628 S.E.2d at 697.  The remaining allegations amount to "labels and conclusions" or "naked assertion[s]" devoid of further factual enhancement.  *Twombly*, 550 U.S. at 555, 557; *see* Compl. ¶ 124 ("The Gamma Defendants acted unreasonably in withholding consent."); *id.* ¶ 125 ("The Gamma Defendants knew that it was unreasonable to withhold consent to the proposed modification of the BAMCAP Loan."); *see also id.* ¶ 378 ("Gamma Real Estate Capital's representation in the loan agreement for the Gamma Bridge Loan that it would not unreasonably withhold consent to a modification of the BAMCAP loan was false."); *id.* ¶ 379 ("At the time Gamma Real Estate Capital made the representation in the loan agreement, it knew the representation to be false."); *id.* ¶ 380 ("At the time Gamma Real Estate Capital made the representation in the loan agreement, it had no intention of complying with its promise not to unreasonably withhold consent to a modification of the BAMCAP Loan.").  Contrary to Plaintiffs' argument, the Complaint is devoid of any facts to support that there existed a present intent not to grant consent when the parties entered into the Construction Loan Agreement. Accordingly, Plaintiffs fail to state a fraud claim under Georgia law.  *See Partner Servs., Inc. v. Avanade, Inc.*, 2013 WL 12180442, at *7 (N.D. Ga. Aug. 26, 2013) (holding that fraudulent inducement claim could not be sustained where "Plaintiff has failed to allege facts to support a plausible inference that, at the time of contracting, Avanade had no intention of performing its services in a good and workmanlike manner [i.e., a promise as to future performance]").

Defendants also argue that Plaintiffs fail to state a claim because Defendants had no obligation to not unreasonably withhold consent to a modification.  Dkt. No. 47 at 15–16.  For the reasons given *infra* Section VIII, the Court agrees.  For this additional reason, Plaintiffs fail to state a fraud claim under Georgia law.

## VII.    Tortious Interference with Prospective Economic Relations (Count Eight)

In Count Eight, Plaintiffs allege that Kalikow and the Gamma Defendants engaged in tortious interference with Thomas's prospective contracts for financing and business relationships with various non-party lenders, including Bluebell International, Columbia Pacific and others.  Compl. ¶¶ 388–389.  Plaintiffs allege that, to interfere with Thomas's efforts to obtain financing, *id.* ¶ 143, Kalikow and the Gamma Defendants (a) "bought Thomas's loans from Synovus," *id.* ¶ 146; (b) "purchased the loans from Ardent Financial that encumbered the Orlando and Tennessee properties," *id.* ¶ 154; (c) in December 2018, verbally attacked Rick Lee of Bluebell International and told him that "the Gamma Defendants would not allow a loan from Bluebell to move forward," *id.* ¶ 159; (d) in January 2019, "yelled at the Columbia Pacific executives" and told them that "the Gamma Defendants would never agree to the terms Columbia Pacific had proposed[] and . . . would never agree to let Wade Park Land and Wade Park Land Holdings refinance the Gamma Bridge Loan," *id.* ¶ 171.

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)); *see also Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003);

*Cambridge Cap.*, 2021 WL 4481183, at *34; *Goldman v. Reddington*, 417 F. Supp. 3d 163, 176–77 (E.D.N.Y. 2019) (same); *Leadsinger, Inc. v. Cole*, 2006 WL 2320544, at *11 (S.D.N.Y. 2006) (same).

Plaintiffs do not allege that the purchase of the loans from Synovus Bank and Ardent Financial or the alleged interference with Bluebell International and Columbia Pacific were motivated solely by malice. A motive of "normal economic self-interest" is inconsistent with the sole purpose of inflicting intentional harm. *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). Although Plaintiffs assert that Defendants' purchase of the loans was motivated by an intent to interfere with Plaintiffs' efforts to obtain financing, Compl. ¶¶ 147, 155, they do not allege facts in support of that assertion. Kalikow and the Gamma Defendants are alleged to have already extended significant credit to Plaintiffs. Moreover, at the time of the alleged interference, Gamma Lending Omega had already declared an event of default. If they desired to obtain the Wade Park properties, they did not need to interfere with Thomas's efforts to obtain financing. They could simply have declined to grant a forbearance. There is no basis from the Complaint to believe that Defendants acted from malice much less solely from malice.

The same is true with respect to the alleged interference with Bluebell and Columbia Pacific. Plaintiffs' claims with respect to Bluebell and Columbia Pacific turn on the allegations that Kalikow yelled at the two potential financiers and said that he and the Gamma Defendants would never agree to loans from the two entities. But under the Construction Loan Agreement, Plaintiffs did not require Defendants' consent to have the loan repaid by another lender, and Defendants would only need to negotiate with the other lenders if, for instance, they asked for concessions in satisfying the loan. Further, at the time of the alleged conversations, Gamma Lending Omega had an interest in Plaintiffs' ability to obtain financing; the Gamma Bridge Loan

was in default and Plaintiffs owed Gamma Lending Omega tens of millions of dollars.  In addition, Kalikow and the Gamma Defendants had purchased other loans pursuant to which Thomas was obligated.  They had a "normal economic self-interest" and "legitimate economic self-interest" in the terms under which Bluebell and Columbia Pacific would extend credit and an interest in protecting their own position as lenders to Wade Park.  Those terms would affect their ability to be repaid by the Plaintiffs and the economic risk in their loans.  Accordingly, the claim that Defendants told Bluebell and Columbia Pacific that they would not accept their terms and the related conduct cannot support the allegation that Defendants were motivated solely out of malice.

Plaintiffs also have no well-pleaded allegations that Defendants used dishonest, unfair, or improper means.  The law of New York draws a distinction between interference with actual and enforceable contractual relations on the one hand and prospective economic relationships on the other.  "In a contract interference case," it is sufficient that the plaintiff "show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages."  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).  By contrast, where the plaintiff does not have an existing contract but only a prospective contract, it is not sufficient that the plaintiff show "intentional and improper procuring of a breach."  In the absence of evidence that the defendant acted solely out of malice, the plaintiff must allege "wrongful means."  "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort."  *Carvel Corp.*, 818 N.E.2d at 1103.  "'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980) (citation omitted); *see Carvel Corp.*, 818 N.E.2d at 1104; *Hassan v. Deutsche Bank A.G.*, 515 F. Supp.2d 426, 430 (S.D.N.Y. 2007).

Plaintiffs have not alleged wrongful means in connection with the acquisition of the Synovus Bank and Ardent Financial loans.  There is nothing "wrongful" or "culpable" about one obligee selling a loan to another who wants to purchase the obligation.  There also is nothing "wrongful" or "culpable" within the meaning of the case law with Kalikow's conversations with Bluebell International and Columbia Pacific.  It was not wrong or illegal for Kalikow or the Gamma Defendants to have conversations and negotiations with each of the two potential lenders themselves, and without Plaintiffs' participation.  The forbearance agreements expressly authorized Gamma Lending Omega to speak to and negotiate with "any potential or prospective lender, investor or other capital provider" with or without the participation of WP Land and WPL Holdings.  *See* Dkt. No. 40-2, Ex. D, E, F § 13; Dkt. No. 40-3, Ex. G, H, I § 13.  It also was not "wrongful" or "culpable" for Kalikow to have used sharp language with each of Bluebell and Columbia Pacific—to have "insult[ed]" Rick Lee and Bluebell and called Lee a "thief" and a "scumbag," Compl. ¶ 159, and to have "yelled" at the Columbia Pacific executives and tell them that the Gamma Defendants would not agree to let WP Land and WPL Holdings refinance the Gamma Bridge Loan, *id.* ¶ 171.  The forbearance agreements gave Gamma Lending Omega the right to negotiate with Bluebell and Columbia Pacific.  There are different ways of getting to yes.  Some use kindness; others use aggressive language; and some sometimes combine the two.  Kalikow's alleged conduct toward Lee and the Columbia Pacific Executives may have been "discourteous and conduct to which [they] could take legitimate offense." *Hassan*, 515 F. Supp. 2d at 432.  But that does not make it "wrongful" or "culpable" conduct or "egregious

wrongdoing" sufficient to make out a claim of tortious interference with a prospective economic relationship. *Id.* at 433. There is no allegation that Kalikow combined his insults with an economic threat directed at the third party or that he engaged in fraud or made a misrepresentation.

For these reasons, Plaintiffs have failed to plead a tortious interference claim.

## VIII.   Breach of Contract (Count Nine)

In Count Nine, Plaintiffs allege that defendants Gamma Real Estate Capital and Gamma Lending Omega breached the Construction Loan Agreement by unreasonably withholding consent to a modification of the BAMCAP Loan. Gamma Real Estate Capital was a signatory to the loan agreement for the Gamma Bridge Loan. It assigned its rights and delegated its duties to Gamma Lending Omega. Compl. ¶¶ 396–397. According to the Complaint's allegations, in January 2018, when Thomas had not completed his negotiations with various potential permanent financing partners, Thomas and BAMCAP agreed to a one-month extension of the maturity date of the BAMCAP Loan. *Id.* ¶ 117. According to the proposed arrangement, Thomas (or a Thomas-affiliated entity) agreed to pay BAMCAP an approximately $530,000 extension fee which would be capitalized into the BAMCAP Loan, increasing the loan's principal amount. *Id.* ¶ 118. In essence, WP Land agreed, in exchange for the extension, to an increase in the loan of $530,000. *Id.* In January 2018, the Gamma Defendants withheld consent to the modification of the BAMCAP Loan and to the increase in indebtedness. *Id.* ¶ 123. As a result, BAMCAP declared a default by Wade Park Land. *Id.* ¶ 128. As a further result, and as a consequence of BAMCAP's declaration of default, the Gamma Defendants declared their own default on the Gamma Bridge Loan. *Id.* ¶ 129. Plaintiffs allege that the Gamma Defendants' refusal to provide consent was unreasonable because the extension fee was only approximately 1% of the principal amount of the BAMCAP Loan. *Id.* ¶¶ 118–119.

Defendants argue that the claim should be dismissed.  According to Defendants, they had no obligation to agree to WP Land's agreement with BAMCAP to assume additional indebtedness in connection with the BAMCAP Loan.  They also argue that the Complaint's allegations do not make out a claim they acted unreasonably.

The claim turns upon the language of the loan agreement.  Section 6.19 of the Construction Loan Agreement provides:

> Any amendment, modification or termination of the documents evidencing the WPL Loan, the Synovus Loan or the FQP96 Loan shall require the prior written consent of Lender; provided that Lender shall not unreasonably withhold its consent to an amendment to the documents evidencing the WPL Loan, the Synovus Loan or the FQP96 Loan provided that such amendment does not materially increase the applicable Loan Party's obligations or materially decrease the applicable Loan Party's rights under the documents evidencing the WPL Loan, the Synovus Loan or the FQP96 Loan, as applicable.[11]

Dkt. No. 40-2, Ex. B § 6.19.  Section 8.2 provides:  "Borrower shall not, without the prior consent of Lender, incur any Indebtedness other than (a) the Loan, and (b) customary trade debt, account payables, financing for equipment, supplies and personal property or leasing commissions in the ordinary course of business of owning and operating the Property . . . ."  *Id.*

---

[11] The WPL Loan is defined to be "the loan evidenced by that certain Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement, dated as of November 2, 2015, by Wade Park Land, LLC to Steven Cramer, as trustee for the benefit of BAMCAP Partners LP, recorded November 3, 2015 in the real property records of Collin County, Texas as Document No. 20151103001393420 and that certain Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement, dated as of May 27, 2016, by Wade Park Land, LLC to Steven Cramer, as trustee for the benefit of BAMCAP Partners LP, recorded May 31, 2016 in the real property records of Collin County, Texas as Document No. 20160531000667120."  Dkt. No. 40-2, Ex. B § 1.1.  The Synovus Loan is defined to be "the loan evidenced by that certain Restructuring Agreement Dated as of July 1, 2013 among Fourth Quarter Properties II, Inc., Stanley E. Thomas, FQP93 Guarantor, the other parties that are signatories thereto, and Synovus Bank, as amended."  *Id.*  The FQP96 Loan is defined to be "the loan evidenced by that certain Deed of Trust, Security Agreement and Fixture Filing dated as of October 31, 2013, by Fourth Quarter Properties 96, LLC for the benefit of Paramont Capital, LLC, as amended."  *Id.*

§ 8.2.  The Construction Loan Agreement is governed by the law of the state of New York.  *Id.*
§ 11.5.[12]

Under New York law "there are four elements to a breach of contract claim: '(1) the
existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach
of contract by the defendant, and (4) damages.'"  *Mancuso v. L'Oreal USA, Inc.*, 2021 WL
1240328, at *3 (S.D.N.Y. Apr. 2, 2021) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio
Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)); *see also Harsco Corp. v. Segui*,
91 F.3d 337, 348 (2d Cir. 1996).  Under familiar principles of New York contract law, a court
"interprets the agreement as a whole, applying plain meaning to all of its language, attempting to
effectuate the commercial understanding of the parties, and avoiding interpretations that would
render language surplusage or the promises contained in the agreement illusory."  *Town &
Country Linen Corp. v. Ingenious Designs LLC*, 2021 WL 3727801, at *39 (S.D.N.Y. Aug. 23,
2021) (collecting cases).  Under those rules, the contract is to be read as a whole, giving its
language its ordinary meaning and striving to give meaning to each word of the agreement.
Where there is tension between provisions, the more specific governs over the general.  *See DBT
Gmbh v. J.L. Min. Co.*, 544 F. Supp. 2d 364, 378 (S.D.N.Y. 2008) (stating that where "there was
an inconsistency between a specific provision and a general provision of a contract . . . , the
specific provision controls" (quoting *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690
(N.Y. 1956))).  The drafter's decision to include a modifier in one provision and not in another is
presumed to be knowing and intentional.  *See KLS Diversified Master Fund, L.P. v. McDevitt*,

---

[12] The Construction Loan Agreement states that New York law "shall govern the construction,
validity and enforceability of all loan documents and all of the obligations arising hereunder or
thereunder" and that the Borrower "unconditionally and irrevocably waives any claim to assert
that the law of any other jurisdiction governs."  *Id.* § 11.5.

507 F. Supp. 3d 508, 542 (S.D.N.Y. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, when a term is expressly included in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional . . . .").

Applying those principles, the more specific language of Section 8.2 governs over the general language of Section 6.19 and relieves Defendants of any need to show that their refusal to give consent was reasonable.  The language of Section 8.2 is specific and carefully drawn with respect to additional debt.  Borrower shall not "incur any Indebtedness" other than the Loan or customary trade debt.  Dkt. No. 40-2, Ex. B § 8.2.  Indebtedness, in turn, is defined by the Construction Loan Agreement to include "all obligations of such Person for borrowed money" and "all obligations . . . evidenced by . . . notes or other similar interests," *id.* § 1.1, and the Loan refers to the Gamma Bridge Loan in the amount of $82,750,000, *id.* at 1.

By contrast, the language of Section 6.19 is more general.  It refers generally to "[a]ny amendment, modification, or termination of the documents evidencing" the BAMCAP Loan, and not specifically to the incursion of additional debt.  If, for example, Thomas had agreed to an extension of the BAMCAP Loan in exchange for a cash payment from him or from any of the borrowers, that agreement would have fallen within the terms of Section 6.19.  Defendants could have denied consent to the amendment only if the refusal to provide consent was reasonable.  So too with any number of other potential amendments of the BAMCAP Loan that could have extended or accelerated payment dates.  But when Thomas and BAMCAP agreed that the extension fee would not be paid in cash but would essentially be loaned by BAMCAP and made part of Plaintiffs' increased indebtedness to BAMCAP, that is when the parties fell outside the

ambit of Section 6.19 and fell within the ambit of Section 8.2.  That is when Plaintiffs incurred indebtedness without obtaining Defendants' consent.

The drafters of the Construction Loan Agreement knew how to refer to the BAMCAP Loan when they wanted to.  They could, for example, have made the incursion of debt under the BAMCAP Loan an exclusion under Section 8.2 as they did with respect to the Gamma Bridge Loan and customary trade debt.  Or they could have added the qualifier "reasonable" to Section 8.2 as they did with respect to Section 6.19.  They did not do so.  The Court assumes that those decisions were knowing.  *See KLS Diversified Master Fund*, 507 F. Supp. 3d at 542; *Dunn Auto Parts, Inc. v. Wells*, 155 N.Y.S.3d 507, 510 (4th Dep't 2021) ("Based on the maxim expressio unius est exclusio alterius, which applies to contracts as well as statutes, where a document describes the particular situations in which it is to apply, an irrefutable inference must be drawn that what is omitted or what is not included was intended to be omitted and excluded." (cleaned up)); *cf. Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("[I]f parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission.").

Moreover, even if Gamma Lending Omega's denial of consent had to be reasonable, Plaintiffs have adduced no facts to demonstrate that it was unreasonable.  According to Plaintiff, Gamma Lending Omega was required to consent to the extension and capitalization of the $530,000 because that sum was only a small percentage of the BAMCAP Loan.  But that percentage represented incremental risk to Gamma Lending Omega.  The BAMCAP Loan was senior to the Gamma Bridge Loan.  The Gamma Bridge Loan could not be paid until WP Land's obligations to BAMCAP were satisfied and every dollar in incremental debt WP Land incurred in respect to BAMCAP was one less dollar available to pay Gamma Lending Omega.  Thus, not

only did WP Land's request for an extension of the BAMCAP Loan signal that WP Land would be unable to pay even BAMCAP, but WP Land's apparent inability to pay even the $530,000 in cash and its need to borrow that sum from BAMCAP demonstrated that, unless circumstances changed, WP Land was even less likely to be able to satisfy its obligations to Gamma Lending Omega.  In these circumstances, Plaintiffs have not demonstrated that it was unreasonable for Gamma Lending Omega to deny consent to the increase in indebtedness and to declare a default in order to protect itself and the over $82 million it had loaned under the Construction Loan Agreement.  For this additional reason, Plaintiff's claim for breach of contract claim fails.

## IX.    Unjust Enrichment (Count Ten)

Count Ten alleges, in the alternative, unjust enrichment against the Gamma Defendants. Plaintiffs allege that the Gamma Defendants were enriched by the $76.6 million in cash and property they paid the Gamma Defendants in interest payments and for forbearance fees, Compl. ¶ 403, and by the ownership of the Wade Park properties, which are valued at over $550 million, *id.* ¶ 404.

In order to state a claim for unjust enrichment under New York law, a party must allege that: "(1) the other party was enriched; (2) at that party's expense; and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotation marks omitted and alteration adopted).  "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."  *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks omitted).  "Unjust enrichment claims are available 'only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the

defendant to the plaintiff,' such as when 'the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.'" *In re Columbia Tuition Refund Action*, 2021 WL 790638, at *9 (S.D.N.Y. Feb. 26, 2021) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012)).

Existence of a valid contract precludes a claim for unjust enrichment. *See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987))); *Caro Cap., LLC v. Koch*, 2021 WL 2075481, at *1 (S.D.N.Y. May 24, 2021); *Ainero Concrete Co. v. N.Y.C. Constr. Auth.*, 308 F. Supp. 2d 164, 179 (S.D.N.Y. 2003). "[O]nly 'where there is a bona fide dispute concerning . . . whether the contract covers the dispute in issue'" may the quasi-contract claim be pleaded in the alternative. *Nahabedian v. Intercloud Sys.*, Inc., 2016 WL 155084, at *4 (S.D.N.Y. Jan. 12, 2016).[13]

The unjust enrichment claim must be dismissed for at least two independent reasons. First, the monies that Plaintiffs allege unjustly enriched Defendants were paid pursuant to contract. The interest payments were made pursuant to the Construction Loan Agreement. The forbearance fees were paid pursuant to the forbearance agreements. The foreclosure on the Wade Park properties was made pursuant to the Construction Loan Agreement and the DIL Agreement. As Plaintiffs acknowledge in the Complaint, an unjust enrichment claim lies "in the event that the Court concludes no contract existed." Compl. at 104 n.7. It is not a substitute for

---

[13] Plaintiffs argue that Georgia law applies, but they do not identify any relevant difference between New York law and Georgia law. Dkt. No. 46 at 36 & n.34.

a contract claim where the contract exists, but it has not been breached. "Where a contract exists between the parties, a claim for unjust enrichment does not lie." *Coppelson v. Serhant*, 2021 WL 148088, at *9 (S.D.N.Y. Jan. 15, 2021).

Second, Plaintiffs have not shown that "it is against equity and good conscience to permit [Defendants] to retain what is sought to be recovered." *Mandarin Trading*, 944 N.E.2d at 1110. The $76.6 million in cash and property obtained by the Gamma Defendants were paid by the Plaintiffs in interest for monies that Gamma Real Estate Capital loaned Plaintiffs and in forbearance fees for extensions that Gamma Lending Omega granted Plaintiffs on the exercise of Gamma Lending Omega's rights under those agreements. For reasons stated elsewhere in this Opinion, those sums were not usurious or otherwise wrongful. And the property upon which Defendants foreclosed was property that Plaintiffs placed as security. If Plaintiffs lost the interest and fees they paid and the property which served as security for the loan, that is because they agreed to those terms with Defendants and then failed to perform their end of the bargain. There is nothing against equity and good conscience about those results.[14]

## X.      Usury (Count Eleven)

Count Eleven, which alleges that the Gamma Bridge Loan was usurious, fails to state a claim for relief for reasons discussed in Section III.B, *supra*, of this Opinion.

---

[14] In their papers and at argument, Plaintiffs also asserted that the Wade Park property is now worth over $550 million, far in excess of the loan amount extended by the Gamma Defendants. As Defendants noted at argument, however, this valuation is wholly implausible and inconsistent with Plaintiffs' other allegations that they were not able to find other lenders to assume the loan. Tr. at 42:24 to 44:9; *see also* Dkt. No. 41 at 31 n.19 (challenging the accuracy of the valuation). In the end, however, for reasons stated above in the text, the Court need not resolve the issue of the disputed valuation on this motion.

### XI.      Fraudulent Transfer (Counts Twelve and Thirteen)

Counts Twelve and Thirteen allege that the transfer of Wade Park to Gamma Lending Omega and WP Development Partners was constructively fraudulent under 11 U.S.C. §§ 544, 548, 550 and 551 and Georgia law, Ga. Code Ann., 18-2-70, because it left Plaintiffs with no assets and because Plaintiffs did not get reasonably equivalent value in exchange.

To state a claim, a plaintiff must allege that (1) "the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer" and (2) "the debtor received less than 'a reasonably equivalent value in exchange for such transfer.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 190 (2d Cir. 2020) (quoting 11 U.S.C. § 548(a)(1)(B)).   "The analysis of alleged fraudulent transfers under [Georgia] law and bankruptcy law is substantially the same." *In re Think Retail Sols., LLC*, 2019 WL 2912717, at *11 (Bankr. N.D. Ga. July 5, 2019).

The Complaint alleges that the transfers left WP Land and WPL Holdings insolvent because they were left without assets "to satisfy their respective remaining obligations and debts to their other creditors," Compl. ¶ 424, and with "unreasonably small capital," *id.* ¶ 425.  In particular, Plaintiffs point to paragraphs 7, 8 and 419 of the Complaint for the proposition that the "nearly sole asset" of WP Land and WPL Holdings was the Wade Park property and point to paragraphs 4, 42, 67, 108, and 206 for the proposition that the Plaintiffs had "substantial intercompany loans and continued third-party liabilities for property construction and development." Dkt. No. 46 at 38.  They point to paragraphs 424 and 432 for the proposition that when the interest in the Wade Park property was transferred, they were became insolvent and unable to repay any of their remaining creditors.  *Id.*  But these paragraphs do not state that the only asset WP Land and WPL Holdings held at the time of the transfer was the Wade Park property.  The most that they state is that WP Land and WPL Holdings were formed to hold title to the Wade Park development project.  Compl. ¶¶ 7–8.  The Complaint also does not allege

facts to support that Plaintiffs were left with insufficient capital to pay the remaining debtors

after the transfer of the Wade Park properties.  The paragraphs they point to allege at most that

Thomas and his entities "pumped enormous amounts of money into the acquisition and

development of Wade Park," *id.* ¶ 4, but they do not allege that, after these monies were invested

(and specifically at the time of the transfer), WP Land and WPL Holdings owed debts either to

Thomas or to the Thomas-related entities or to any "remaining creditors."  Indeed, as noted

elsewhere in this Opinion, under the WP Ventures LLC Agreement and the Construction Loan

Agreement, WP Land and WPL Holdings were prevented from assuming additional debt other

than to customary trade creditors and under the construction loan.  Thus, the allegation that the

transfer of the Wade Park properties to Defendants left Plaintiffs unable to satisfy their

remaining obligations and debts to their other creditors, *id.* ¶¶ 424, 432, is wholly conclusory.

Rule 8 of the Federal Rules of Civil Procedure requires the pleader to offer more than

"labels and conclusions" or a "formulaic recitation of the elements of a cause of action."

*Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678.  Thus, in order to plead a claim of

constructive fraud, a plaintiff must allege more than just that the debtor became insolvent at the

time of the transfer or, as a result of the transfer, was unable to pay its remaining creditors.

Plaintiff must plead *facts* that, if proven, would show that the plaintiff was insolvent at the time

of the transfer.  *See In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019) ("The Trustee

presented no allegations regarding the value of Cyr's debt relative to the value of Cyr's assets at

the time the transfers were made.  As such, . . . the Trustee has failed to properly plead

insolvency for purposes of a constructively fraudulent transfer claim."); *In re CRC Parent Corp.*,

2013 WL 781603, at *5 (Bankr. D. Del. Mar. 1, 2013) (granting motion to dismiss where "the

Complaint merely provides a near-verbatim recitation of the statutory elements of section 548

without providing any facts to support the Trustee's assertion that the Debtors were insolvent or became insolvent as a result of the transfers"); *In re Crucible Materials Corp.*, 2012 WL 5360945, at *7 (Bankr. D. Del. Oct. 31, 2012) (dismissing complaint where it did not allege any underlying facts to support conclusions that payments were made when Plaintiff was insolvent); *In re Global Link Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing constructive fraud count where it "simply alleges the statutory elements of a constructive fraud action under section 548(a)(1)(B)").[15]  The Complaint fails to satisfy those standards.  The Court need not on this motion determine whether a complaint that alleges constructive fraud must allege the precise value of assets and precise amount of debt.  There is law to the effect that a more liberal standard applies.  *See, e.g.*, *In re Zohar III, Corp.*, 631 B.R. 133, 173 (Bankr. D. Del. 2021) ("Insolvency is a fact-intensive inquiry and precise calculations are not needed for [the motion-to-dismiss] stage.").  Yet the Complaint here does not allege any facts with respect to the value of Plaintiffs' assets at the time of the transfer or the amount of debts or any other facts that if proved would show that at the relevant time Plaintiffs were insolvent.

Even if Plaintiffs had adequately pleaded that they were insolvent at the time of the transfer, the Complaint fails to allege that the transfer was for other than reasonably equivalent value.  "[M]any cases under the Bankruptcy Code have . . . held that securing an antecedent debt is not, as a matter of law, a constructive fraudulent conveyance."  *In re Pfeifer*, 2013 WL 3828509, at *3 (Bankr. S.D.N.Y. July 23, 2013); *see also In re Jessup & Lamont, Inc.*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. Mar. 26, 2014) ("Ordinarily collateralization of a legitimate debt is

---

[15] Even before *Twombly* and *Iqbal*, courts required a plaintiff seeking to plead a claim for actual or constructive fraudulent transfer to do more than "parrot the statute."  *In re O.P.M. Leasing Servs., Inc.*, 32 B.R. 199, 204 (Bankr. S.D.N.Y. 1983) (dismissing complaint with leave to replead).

not a fraudulent conveyance."); *In re AppliedTheory Corp.*, 330 B.R. 362, 363 (S.D.N.Y. Sep. 21, 2005); *In re M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002). In particular, "there is no support for the . . . argument that the amount of collateral given must be proportionate to the amount of debt secured, as the grant of collateral does not expand the amount of a creditor's debt and only prioritizes the payment of the debt from specific assets." *In re Pfeifer*, 2013 WL 3828509, at *4. Similarly, "courts find fair consideration where, in exchange for the grant of collateral, a debtor obtains maturity date extensions." *Id.* at *5.

Finally, to the extent that Plaintiffs make conclusory allegations that the deeds for the Wade Park properties were conveyed for other than reasonable equivalent value, those conclusory allegations are undermined by the more specific statements from the Affidavit and Estoppel Certificate of WP Land and WPL Holdings that they were "solvent and ha[d] no other creditors whose rights would be prejudiced by [the] conveyance [of the deeds to Gamma Lending Omega]." Dkt. No. 40-3, Ex. M.[16] Plaintiffs suggest in their briefing, without quite saying, that the statement in the Estoppel Certificate is false and that "Defendants had knowledge of the true state of facts regarding insolvency and value," Dkt. No. 46 at 39-40, and that Defendants may have "insisted on the Certificate, regardless of its accuracy, knowing full well of

---

[16] Plaintiffs argue that the Affidavit and Estoppel Certificate is not incorporated by reference and not cognizable on the motion to dismiss. But the DIL Agreement which is expressly referenced in the Complaint and upon which Plaintiffs rely attaches the form Affidavit and Estoppel Certificate as an exhibit, *see* Dkt. No. 40-3, Ex. J § 3(a), and required Plaintiff to deliver the executed and notarized Affidavit and Estoppel Certificate with the execution of the DIL Agreement. Plaintiffs affirmatively allege that they signed the DIL Agreement and delivered the deeds to Gamma Lending Omega as required by the DIL Agreement, and there is no dispute as to the authenticity of the Affidavit and Estoppel Certificate attached to Defendants' papers. Under these circumstances, Plaintiffs cannot cherry pick the parts of the DIL Agreement they rely upon, and the Affidavit and Estoppel Certificate is incorporated by reference. *See Bongiorno v. Baquet*, 2021 WL 4311169, at *10–11 (S.D.N.Y. Sept. 20, 2021).

their avoidance exposure," *id.* at 40 n.38.  Suffice it to say, however, such allegation appears nowhere in the Complaint.

## XII.    Conspiracy to Breach Fiduciary Duty (Count Fifteen)

Count Fifteen alleges that the Defendants conspired with Goodman in the "summer" and "fall of 2018" to breach the fiduciary duties he allegedly owed to Plaintiffs.  Compl. ¶¶ 237–239; *see also id.* 442–452.

Under New York law, "an allegation of conspiracy can . . . connect nonactors, who otherwise might escape liability, with the acts of their co-conspirators."  *Senior Health Ins. Co. of Penn. v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 531 (S.D.N.Y. 2018) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 452 N.Y.S.2d 80, 93–94 (2d Dep't 1982), *aff'd*, 451 N.E.2d 459 (N.Y. 1983)).  "Where there is an underlying tort, the elements of civil conspiracy are: (1) the corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage."  *Id.* (quoting *Pope v. Rice*, 2005 WL 613085, at *13 (S.D.N.Y. Mar. 14, 2005)).  Where the underlying tort is breach of fiduciary duty, "all members of the alleged conspiracy must independently owe a fiduciary duty to the plaintiff."  *Id.* (quoting *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 611 (S.D.N.Y. 2011)).

Defendants' motion to dismiss the conspiracy claim must be dismissed because Plaintiffs have not pleaded the underlying tort of breach of fiduciary duty.  *See Kirsch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy."); *Marino*, 810 F. Supp. 2d at 610 ("Claims of civil conspiracy which do not allege, or which insufficiently allege, an underlying tort must be dismissed for failure to state a claim under Rule 12(b)(6).").  The only person alleged to owe fiduciary duties was Goodman.  Before this case was transferred to this Court, Judge Batten held on these pleadings that Plaintiffs failed

to state a claim for breach of fiduciary duty against Goodman both because he did not owe Plaintiffs a fiduciary duty and because he neither breached nor conspired to breach a fiduciary duty. *See Wade Park Land Holdings, LLC v. Kalikow*, 522 F. Supp. 3d 1341, 1356–57 (N.D. Ga. 2021). Judge Batten's opinion is cogent and well-reasoned. The Court agrees with it. For reasons stated by Judge Batten, there is no claim for breach of fiduciary duty against Goodman and therefore, on these pleadings, there can be no claim for conspiracy to breach a fiduciary duty against the remaining Defendants.

## XIII.   Georgia Trade Secrets Act (Count Sixteen)

Count Sixteen alleges that Defendants violated the Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-760, by misappropriating confidential information related to Wade Park ("Wade Park Trade Secrets"). Compl. ¶¶ 453–465. Plaintiffs claim that Goodman conveyed the Wade Park Trade Secrets to Defendants in the "summer" and "fall of 2018." *Id.* ¶¶ 237–239.

Defendants make several arguments in support of dismissal. They argue that Plaintiffs lack standing because they do not allege that they had an interest in any secrets regarding the properties other than Wade Park—which are the only secrets they allege that Defendants used. Dkt. No. 41 at 38. They also argue that Plaintiffs fail to state a claim for relief because (1) the Complaint fails plausibly to allege that any disclosure occurred; (2) there is no well-pleaded factual allegation that Defendants knew or had reason to know that Goodman acquired Plaintiffs' secrets "under circumstances giving rise to a duty to maintain their secrecy or to limit their use"; and (4) the Complaint also does not allege that the alleged trade secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy. *Id.* at 38–39.

"To prove a claim for misappropriation of trade secrets under the [Georgia Trade Secrets Act], a plaintiff must show that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.'" *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1366

(11th Cir. 2021) (quoting *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290–91 (11th Cir. 2003)).  Under the statute, the definition of misappropriation includes "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Ga. Code Ann. § 10-1-761(2)(B); *see also AcryliCon USA*, 985 F.3d at 1366.  Further, a trade secret is defined to include information that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Ga. Code Ann. § 10-1-761(4)(B).

The Court agrees with Judge Batten that Plaintiffs have failed to plausibly allege that Goodman disclosed trade secrets to Defendants.  *See Wade Park Land Holdings*, 522 F. Supp. 3d at 1355.  Plaintiffs allege "on information and belief" that, on calls between Goodman and Kalikow during the summer of 2018, Goodman shared the trade secrets with Kalikow and the Gamma Defendants, Compl. ¶ 238, and that, during a meeting in the fall of 2018, Goodman again shared the trade secrets with Kalikow and the Gamma Defendants, *id.* ¶ 239.  Such allegations, however, are insufficient to state a claim for misappropriation.  Plaintiffs appear to base these allegations on the claims that Goodman had access to the trade secrets; that neither Thomas, WP Land, nor WPL Holdings shared these trade secrets with Kalikow or the Gamma Defendants; and that Kalikow and the Gamma Defendants learned these trade secrets.  *Id.* ¶¶ 230–234, 236, 241.  But these facts do not make the inference of Goodman's culpability plausible.  *See Wade Park Land Holdings*, 522 F. Supp. 3d at 1355 ("[T]o state a claim for relief, Plaintiffs must do more than baldly allege that Goodman must have shared trade secrets because the Gamma Defendants acquired knowledge of the information.").  And this inference is further undermined because the Complaint does not contain factual allegations supporting that Kalikow

and the Gamma Defendants acquired any trade secrets—aside from the insufficient allegations that Goodman must have been the conduit for sharing them. *See, e.g.*, Compl. ¶ 241 ("Kalikow and the Gamma Defendants learned these Trade Secrets from Goodman.").  Plaintiffs' claim for misappropriation of trade secrets under the Georgia Trade Secrets Act must thus be dismissed.

Another reason for dismissal is that Plaintiffs fail to allege facts to support that Defendants knew or had reason to know that Goodman acquired Plaintiffs' trade secrets under circumstances giving rise to a duty to maintain their secrecy or to limit their use.  Plaintiffs argue that they sufficiently stated a claim because they allege that Goodman had a duty to maintain secrecy under the joint venture, which was formed to develop Wade Park, and that Defendants knew about the joint venture.  Dkt. No. 46 at 33–34; *see also* Compl. ¶¶ 218, 235.  But the allegations in the Complaint to which Plaintiffs point do not sustain their argument.  Paragraph 218 alleges that "[a]s a participant in the joint venture . . . , Goodman owed fiduciary duties to Thomas, Wade Park Land, Wade Park Land Holdings, and other Thomas-affiliated entities" and that these fiduciary duties included "a duty of loyalty and a duty to maintain the confidentiality" of the trade secrets.  Compl. ¶ 218.  But, as discussed *supra* Section XII, the pleadings are insufficient to state that Goodman owed Plaintiffs a fiduciary duty.  And paragraph 235 alleges in conclusory fashion that "Kalikow and the Gamma Defendants knew of the joint venture between Thomas, Cathy, Goodman, Wade Park Land, and Wade Park Land Holdings."  *Id.* ¶ 235.  Putting aside these conclusory allegations, there are no factual allegations in the Complaint to support Defendants' knowledge of Goodman's duty to maintain the secrecy of the information.  Thus, Plaintiffs have failed to allege that Defendants knew or had reason to know that Goodman acquired Plaintiffs' trade secrets under circumstances giving rise to a duty to maintain their secrecy or to limit their use and have failed to state a claim.

**XIV.   Punitive Damages and Attorneys' Fees (Counts Seventeen and Eighteen)**

Count Seventeen seeks punitive damages pursuant to Ga. Code Ann. § 51-12-5.1 and

Count Eighteen seeks attorneys' fees pursuant to Ga. Code Ann. § 13-6-11.  Plaintiffs fail to

state a claim for relief under Georgia law.  It follows that they are not entitled to punitive

damages or attorneys' fees.

**CONCLUSION**

The motion to dismiss is GRANTED, and the Complaint is dismissed with prejudice.[17]

The Clerk of Court is respectfully directed to close Dkt. No. 39 and to close the case.


SO ORDERED.


Dated: March 4, 2022
       New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[17] Plaintiffs request leave to amend their Complaint, Dkt. No. 46 at 1 n.1, but they identify no additional facts or legal theories that they might assert if given the opportunity to replead.  For this reason and because the Court concludes that any amendment would be futile, the Complaint is dismissed with prejudice.