UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/23/2023
```

------------------------------------------------------------------------X
:
WADE PARK LAND HOLDINGS, LLC et al.,                :
:
Plaintiffs,                :
:
-v-                :                21-cv-1657 (LJL)
:
:                OPINION AND ORDER
JONATHAN KALIKOW et al.,                :
:
Defendants.                :
:
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On March 4, 2022, this Court issued an Order and Opinion granting Defendants'[1] motion

to dismiss Plaintiffs'[2] first amended complaint ("FAC") in its entirety.  Dkt. No. 58 ("March

2022 Opinion").  The Court subsequently granted Plaintiffs' motion to alter the judgment,

allowing Plaintiffs to replead their two claims for fraudulent transfer under federal law and

Georgia law.  Dkt. No. 74.  Plaintiffs timely filed their second amended complaint ("SAC"), Dkt.

No. 75, and Defendants filed a renewed motion to dismiss the SAC, Dkt. No. 82.  Plaintiffs

subsequently filed a motion to retransfer the case back to the United States District Court for the

Northern District of Georgia.  Dkt. No. 88.

For the following reasons, the Court denies the motion to transfer and grants the motion

to dismiss the SAC with prejudice.

---

[1] Defendants are defined as Jonathan Kalikow ("Kalikow"), WP Development Partners, LLC,
Gamma Lending Omega, LLC ("Gamma Lending Omega"), Gamma Real Estate Capital, LLC
("Gamma Real Estate Capital"), and GRE WP, LLC.  Defendants, excluding Kalikow, are
referred to as the "Gamma Defendants."
[2] Plaintiffs are defined as Wade Park Land Holdings, LLC ("WPL Holdings"), Wade Park Land,
LLC ("WP Land"), and the Thomas Family Trust ("Trust").

## BACKGROUND

Familiarity with the facts is presumed.  For the purposes of these motions, the Court accepts as true the well-pleaded allegations of the SAC.  The Court first describes the relevant and unchanged allegations from the SAC before describing its newly pleaded allegations.

## I.      Background

Plaintiffs allege that a temporary bridge loan from one of the Defendants, Gamma Real Estate Capital, devolved into a fraudulent scheme by Defendants to take control of two parcels of land located outside of Dallas, Texas known as "Wade Park."  Dkt. No. 75 ¶¶ 1, 2.

Between 2012 and 2015, various entities associated with real estate developer Stanley Thomas acquired approximately 176 acres of land comprising Wade Park, which was eventually divided into northern and southern properties.  *Id*. ¶¶ 37, 38.  Thomas envisioned that the Wade Park project would entail eventual construction of office towers, retail space, residential housing units, and hotels.  *Id*. ¶ 35.  Two Thomas-affiliated entities held title to the land:  Plaintiff WP Land held title to the southern parcel of Wade Park and plaintiff WPL Holdings held title to the northern parcel.  *Id*. ¶¶ 7–8.  The acquisitions were financed through funds held by the Trust, Thomas-affiliated entities, and purchase mortgages from Bridge Capital, LLC ("Bridge Capital") and BAMCAP Partners, LP ("BAMCAP").  *Id.* ¶¶ 30–31, 37.  By the spring of 2016, Lebanon 390WR, an entity affiliated with Thomas, owed approximately $45 million to Bridge Capital for the loan used to acquire and construct the northern parcel of Wade Park, and WP Land owed approximately $48 million to BAMCAP for the loan used to acquire and construct the southern parcel of Wade Park.  *Id.* ¶ 43.  Both sets of loans were set to mature in early 2017.  *Id.* ¶ 44. During this time, Thomas sought additional financing for the project from other financial institutions (including JP Morgan, USAA, and others).  *Id.* ¶¶ 44–46.  Bridge Capital (but not BAMCAP), however, told Thomas that it could not extend the maturity date of its loans, and

Thomas thus sought to obtain a bridge loan to pay back Bridge Capital and finance construction while the financial institutions completed their due diligence.  *Id.* ¶ 46.

Eventually, Thomas met defendants Kalikow and Gamma Real Estate Capital in or around October 2016 and secured a bridge loan from them.  *Id.* ¶¶ 27, 48–50.  Following a series of negotiations, WP Land and WPL Holdings executed a loan agreement with Gamma Real Estate Capital on or around January 17, 2017, which included, *inter alia*, the following terms: The total amount of the loan was for approximately $83 million, which was insufficient for WP Land and WPL Holdings to both pay off the Bridge Capital loans and to fund construction.  *Id.* ¶ 71.  The initial four-month term of the loan could be extended three times, each time for three months, at the option of the borrowers, provided that the loan was not in default and that the borrowers had paid into an interest reserve account the amount of interest due for the ensuing three-month period.  Dkt. No. 83-2, Ex. B §§ 3.13–3.15.  Gamma Real Estate Capital was given a second priority lien on the southern Wade Park parcel behind BAMCAP, and BAMCAP entered into an intercreditor agreement cross-collateralizing and cross-defaulting the BAMCAP loans on the southern parcel with the Gamma Bridge Loan.[3]  Dkt. No. 75 ¶ 64.  Pursuant to the terms of the intercreditor agreement, Gamma Real Estate Capital had the option to purchase the BAMCAP loans if WP Land defaulted on the BAMCAP loans.  *Id.* ¶ 93.  WP Land and WPL Holdings also agreed to grant Gamma Real Estate Capital a first mortgage lien on the northern Wade Park parcel.  *Id.* ¶ 82.  Finally, the agreement included a term that Kalikow called "The Hammer."  *Id.*  The Hammer gave Kalikow and the Gamma Defendants a 75% interest in the

---

[3] The Gamma Bridge Loan is defined as the "executed a term sheet stating that Gamma Real Estate Capital would lend a Thomas-affiliated entity a total of just over $196,000,000 for Wade Park." Dkt. No. 75 ¶ 57.  That term sheet was later reduced following negotiations to $82,750,000.  *Id.* ¶¶ 70, 83.

Wade Park project through WP Ventures, a bankruptcy-remote entity, and provided that they would retain that interest unless the Gamma Bridge Loan was repaid within sixty days of its maturity date.  *Id.* ¶¶ 72–73.  The Trust held the remaining 25% interest.  *Id.* ¶ 82.

Under the loan agreement, Gamma Real Estate Capital also retained the right to approve any modifications to the BAMCAP loans encumbering the southern Wade Park parcel, provided that it could not unreasonably withhold its consent to a modification if the modification did not materially increase the amount of the borrowers' obligation to BAMCAP.  *Id.*  Modifications that increased the amount of the borrower's obligation to BAMCAP, which would thereby increase BAMCAP's interest in the property at the expense of Gamma Real Estate Capital, would thus require the consent of Gamma Real Estate Capital, even if the modifications were necessary to avoid a default on the BAMCAP loans.  *Id.* ¶¶ 82, 97.  Upon the occurrence of an event of default, Gamma Real Estate Capital was entitled to take a number of actions, including declaring the borrowers' obligations to be immediately due and payable and obtaining foreclosure of the security instrument encumbering the Wade Park property.  Dkt. No. 83-2, Ex. B. § 9.2.  As a part of this transaction, Gamma Real Estate Capital assigned all its interests in the Gamma Bridge Loan to Gamma Lending Omega.  Dkt. No. 75 ¶ 84.

The Gamma Bridge Loan was scheduled to mature on May 17, 2017.  *Id.* ¶ 109.  WP Land and WPL Holdings signed a loan modification agreement on May 17, 2017, extending the term of the Gamma Bridge Loan by an additional three months, Dkt. No. 83-2, Ex. C, and then extended the term of the loan again on or about August 1, 2017, and once more on November 15, 2017, pushing Gamma Bridge Loan's term out to approximately February 17, 2018, Dkt. No. 75 ¶ 109.  Thomas continued his efforts to secure a permanent financing partner for the Wade Park project during this time, but he was unable to complete negotiations.  *Id.* ¶¶ 111–15.

On or around January 26, 2018, the Gamma Defendants declared WP Land and WPL Holdings to be in default on the Gamma Bridge Loan after Plaintiffs proposed a modification and extension of the BAMCAP loans and the Gamma Defendants declined to consent.  *Id*. ¶¶ 128–30.  The proposed modification and extension would have given Thomas a one-month extension to repay BAMCAP in exchange for a fee of approximately $530,000 that would be capitalized into the BAMCAP loans; in effect Defendants would be further subordinated to BAMCAP by $530,000.  *Id*. ¶¶ 117–18.  Following the Gamma Defendants' declarations of default, WP Land and WPL Holdings entered a total of six forbearance agreements with the Gamma Defendants.  *Id.* ¶ 136.  Each agreement gave WP Land and WPL Holdings additional time to pay off their debt to the Gamma Defendants.  The first such agreement was dated March 5, 2018.  It contained WP Land and WPL Holding's acknowledgement that Gamma Lending Omega was entitled to exercise its foreclosure rights under the loan documents and reflected Gamma Lending Omega's agreement to forbear from exercising its rights and remedies under the loan documents and from conducting a nonjudicial foreclosure of the Wade Park property until April 10, 2018.  Dkt. No. 84-3.  The second forbearance agreement was dated April 26, 2018, and extended the forbearance terms until June 17, 2018.  Dkt. No. 84-4.  The third forbearance agreement was dated July 2, 2018, and again extended the forbearance terms, this time until August 31, 2018.  Dkt. No. 84-5.  WP Land and WPL Holdings paid a fee to Gamma Lending Omega and executed broad releases in connection with each forbearance agreement. Dkt. Nos. 84-3, 84-4, 84-5.  The Gamma Defendants also began advertising foreclosure of the Wade Park properties at this time, as permitted by those forbearance agreements.  Dkt. No. 75 ¶ 139.

During July 2018, Gamma Lending Omega purchased the BAMCAP loans, which meant that Gamma Lending Omega owned all of the loans encumbering the Wade Park properties.  *Id.* ¶ 176.  Gamma Lending Omega then entered into three additional forbearance agreements with Plaintiffs on August 28, 2018, October 1, 2018, and December 31, 2018, each giving WP Land and WPL Holdings additional time to secure financing to satisfy their obligation to Gamma Lending Omega.  Dkt. No. 83-3, Exs. G, H, I.  WP Land and WPL Holdings paid fees to Gamma Lending Omega totaling approximately $38 million in connection with all of the forbearance agreements.  Dkt. No. 75 ¶ 138.  The sixth and final forbearance agreement obligated Gamma Lending Omega to forbear from exercising its remedies and conducting a nonjudicial foreclosure of the Wade Park property until February 4, 2019.  Dkt. No. 83-3, Ex. I.

From January 2018 to January 2019, Thomas also engaged in efforts to secure financing to pay the Gamma Bridge Loan, but he was unable to do so.  *Id.* ¶¶ 142–75.  Plaintiffs allege that during that period, Defendants interfered with Thomas's efforts to obtain financing from prospective funders Synovus Bank, Ardent Financial, Bluebell International, and Columbia Pacific.  *Id.*  After Defendants learned that Synovus held mortgage loans on certain of Thomas's other properties, and that Thomas intended to pay a substantial portion of the Gamma Bridge Loan by pulling equity out of those properties through refinancing with Synovus, Defendants purchased the loans from Synovus allegedly to prevent Thomas from doing so.  *Id.* ¶¶ 145–47. In the summer of 2018, Defendants also purchased loans from Ardent Financial that had been secured by Tennessee and Florida properties owned by Thomas or Thomas-affiliated entities, which prevented Thomas from refinancing with Ardent Financial and pulling equity out of those properties.  *Id.* ¶¶ 148–55.  In late December 2018, Kalikow called the principal of Bluebell International, insulted him and said that Defendants would not allow Bluebell to loan

$725 million to Thomas for Wade Park.  *Id.* ¶¶ 157–59.  In January 2019, after having encouraged Thomas to pursue a deal to obtain financing from Columbia Pacific, Kalikow called into a conference call with Columbia Pacific, "yelled at the Columbia Pacific executives" and "said that the Gamma Defendants would never agree to the terms Columbia Pacific had proposed."  *Id.* ¶¶ 166–68, 171.  All of this alleged interference occurred before the expiration of the sixth forbearance agreement.

On or around February 4, 2019, the date of expiration of the sixth forbearance agreement, Gamma Lending Omega entered into a Deed-in-Lieu Agreement ("DIL Agreement") with WP Land, WPL Holdings, and the Trust.  *Id.* ¶ 190.  WP Land and WPL Holdings agreed to transfer deeds to the Wade Park property to Gamma Lending Omega or an entity designated by it.  Dkt. No. 83-3, Ex. J § 3.  Upon recording of the deed, Gamma Lending Omega executed a broad release for any causes of action and any debt arising from the Gamma Bridge Loans and the BAMCAP loans.  *Id.* § 5.  The DIL Agreement provided approximately $140.1 million in total debt relief for Plaintiffs.  Dkt. No. 75 ¶ 345.  Gamma Lending Omega also agreed, under certain specified conditions, to delay recording the deeds to the Wade Park property for six weeks until March 13, 2019.  Dkt. No. 83-3, Ex. J § 7.  The DIL Agreement also required WP Land and WPL Holdings to deliver an Affidavit and Estoppel Certificate to Defendants.  *Id.* § 3(a).  WPL Holdings and WP Land swore in that Estoppel Certificate, dated March 1, 2019, that "the consideration [for the deeds] represents the fair market value of the property so deeded" and "irrevocably waive[d] any claim or right they may have to challenge the adequacy of such consideration."  Dkt. No. 83-3, Ex. M.  Under the DIL Agreement, the Gamma Defendants would hold the deeds in escrow, provided that WP Land and WPL Holdings made certain periodic payments.  Dkt. No. 75 ¶ 191.  The effect of the DIL Agreement was to give WP Land

and WPL Holdings additional time to find a lender who would extend financing for the Wade

Park properties.  However, WP Land and WPL Holdings failed to find such a lender, and then

failed to make its periodic payments, and so on or around February 21, 2019, Gamma Lending

Omega released the deeds from escrow and recorded them in Texas.  *Id.* ¶ 192.

Throughout this period from January 2019, Kalikow, the Gamma Defendants, and

Thomas discussed a buy-back agreement.  *Id*. ¶ 194.  On or about March 6, 2019, *i.e.*, four weeks

after the DIL Agreement, the parties signed a buy-back agreement that provided for a six-week

buy-back period, giving WP Land and WPL Holdings additional time to purchase the properties.

*Id.* ¶¶ 195–96.  The agreement granted Wade Park Frisco Holdings, LLC an option to purchase

the Wade Park property for a period ending on or before April 15, 2019, for a purchase price of

about $150 million.  Dkt. No. 83-3, Ex. K.  On or around April 15, 2019, the written buy-back

agreement expired.  Dkt. No. 75 ¶ 198.  Following the expiration of the buy-back agreement,

Kalikow and the Gamma Defendants told Thomas that he would have more time to buy back the

Wade Park properties, but that the purchase would have to be made by someone other than

Thomas or a Thomas-affiliated entity.  *Id.* ¶¶ 198–99.  Thomas proposed that Hines—one of the

largest real-estate development firms in the world—purchase the properties, but the Gamma

Defendants rejected every proposal by Hines and told Hines that the Gamma Defendants would

not sell the properties to Hines if Thomas were involved in any way.  *Id*. ¶ 202.  Hines rejected

the demand and walked away from the deal.  *Id*. ¶ 203.

## II.    The Second Amended Complaint

The SAC retains all the previously described allegations from the FAC.  The SAC,

however, includes a new section titled "ADDITIONAL ALLEGATIONS" intended to remedy

the deficiencies in the FAC as to the fraudulent transfer claims.  The FAC had alleged that

"[a]ppraisals of the land itself show a value in excess of $550 million," Dkt. No. 5 ¶ 36, and the

SAC likewise newly alleges that "independent appraiser BBG, Inc. appraised the as-is market value of the Wade Park properties as of October 18, 2018 at $565 million," Dkt. No. 75 ¶ 327.

Plaintiffs also attach one exhibit to the SAC. That exhibit is a cover letter from Jay Ramos, a general appraiser at BBG, Inc. ("BBG"), dated January 2, 2019, concerning a "value opinion" on the Wade Park property. Dkt. No. 75-1. The cover letter introduces an appraisal report describing the valuation of the "Land & Intangibles." *Id.* The cover letter states that the report was "prepared for Churchill Commercial Capital (client), and their successors and/or assigns, and is intended only for its specified use." *Id.* The letter further states that the "appraisal report that follows sets forth the identification of the property, the assumptions and limiting conditions, pertinent facts about the area and subject property, comparable market data, the results of the investigation, and the reasoning leading to the conclusions set forth," but the cover letter itself does not describe those factors. *Id.* The cover letter also states that the report conforms with various professional standards concerning appraisal. *Id.* Finally, the cover letter indicates the "value opinion" that the "'As Is' Land & Intangibles" fee simple market value is $565 million as of October 15, 2018, and that "a sale of the subject property at the above-stated opinion of market value would have required an exposure time of approximately 6 months." *Id.*

The exhibit does not include the report itself. Plaintiffs, however, attach the report in a declaration of Thomas with their opposition brief to the motion to dismiss. Dkt. No. 87.

The SAC also alleges that "the Gamma Defendants obtained an independent appraisal from Sage Group . . . of the as-is market value of the Wade Park properties as of November 10, 2016. Sage Group appraised the Wade Park properties' market value at $466.8 million" (the "2016 Appraisal"). Dkt No. 75 ¶ 338. The SAC then asserts that "[b]etween the date of the 2016 Appraisal and the date of the transfer in February 2019, improvements with a market value

in excess of $70 million were made to the Wade Park properties." *Id.* ¶ 339.  Plaintiffs do not attach the Sage Group appraisal report to the SAC.  Defendants, however, attach the report to a declaration accompanying their motion to dismiss.  Dkt. No. 83-4.

The SAC also newly alleges the assets and liabilities of WP Land and WPL Holdings before and after Gamma Lending Omega recorded the deeds on February 21, 2019.  The SAC alleges that WP Land had assets in excess of $204 million before the transfer and $19.81 in assets afterwards, Dkt. No. 75¶¶ 330–31, and liabilities of approximately $76 million before the transfer and over $16 million afterwards, *id.* ¶¶ 332–33.  WPL Holdings had assets in excess of $361 million before the deeds transfer and $85.24 in assets afterwards, *id.* ¶¶ 334–35, and liabilities of approximately $139 million before the transfer and $59 million afterwards, *id.* ¶¶ 336–37.  The SAC alleges that much of the post-transfer debt was owed to Fourth Quarter Properties 100 and Universal City Property Management III.  *Id.* ¶¶ 333, 337.

Finally, the SAC asserts that the forbearance agreements, the DIL Agreement, and the buy-back agreement did not result in Plaintiffs receiving reasonably equivalent value for the Wade Park properties.  *Id.* ¶ 344.  It alleges that the DIL Agreement only allowed forbearance with additional consideration, *id.* ¶ 346; that the forbearance agreements did not have value because Defendants allegedly lied to Plaintiffs about their willingness to refinance the BAMCAP loans and interfered with efforts to obtain refinancing, *id.* ¶¶ 348–49; and that the buy-back agreement did not provide value because Defendants intentionally prevented Plaintiffs from securing refinancing during the buy-back period, *id.* ¶ 351.[4]  The SAC, citing Section 6.19 of the

---

[4] For clarification, Plaintiffs do not allege in the SAC that the fees paid for the forbearance agreements were voidable transfers.  Instead, Counts 12 and 13 rely entirely on the transfer of the deeds to Defendants that occurred specifically on February 21, 2019.  *See* Dkt. No. 75 ¶¶ 459, 471.  The Court need not assess the value provided by these forbearance agreements, as the value provided by the DIL Agreement alone suffices to show reasonable equivalent value.

Gamma construction loan agreement, again alleges that Plaintiffs had to obtain consent from Gamma Real Estate Capital to "get the Gamma Defendants out of Wade Park by refinancing both the Gamma Bridge Loan and the BAMCAP Loan." *Id.* ¶ 354.

## PROCEDURAL HISTORY

Plaintiffs first initiated this action against Defendants (and Blake Goodman) on August 27, 2020, as an adversary proceeding in the United States Bankruptcy Court for the Northern District of Georgia, where WP Land and WPL Holdings had filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *See In re Wade Park Land Holdings, LLC and Wade Park Land, LLC*, No. 20-11192, Dkt. Nos. 1, 11 (Bankr. N.D. Ga. Aug. 27, 2020).  On September 23, 2020, however, Plaintiffs moved to withdraw the reference to the Bankruptcy Court.  Dkt. No. 1.  Defendants and Goodman agreed that the reference should be withdrawn and the matter should be heard in the United States District Court.  Dkt. Nos. 1-4, 1-5 ¶ 3.  On October 14, 2020, the Honorable Judge Timothy C. Batten of the United States District Court for the Northern District of Georgia issued an order withdrawing the reference to the Bankruptcy Court.  Dkt. No. 4.

On November 13, 2020, three motions were filed in the Georgia court.  Individual defendant Goodman moved to dismiss the complaint for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 13.  In addition, the Defendants (excluding Goodman) moved to dismiss the complaint for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 16, and for the case to be transferred to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a) and the mandatory forum selection clause in WP Ventures' LLC Agreement, Dkt. No. 14.

On February 24, 2021, Judge Batten issued an order on those motions.  Dkt. No. 24.  The court granted the motion to dismiss filed by defendant Goodman and granted the motion to transfer the case as against the other Defendants to this Court.  *See generally Wade Park Land Holdings, LLC v. Kalikow*, 522 F. Supp. 3d 1341 (N.D. Ga. 2021).  The Georgia court dismissed the claims against Goodman in their entirety.  *Id.* at 1357.  The court also granted Defendants' motion to transfer.  *Id.* at 1363.  The court ruled that a forum selection clause in the LLC Agreement of WP Ventures was mandatory.  *Id.* at 1359–60.  The court also ruled that the mandatory forum selection clause bound all Plaintiffs, could be enforced by all Defendants, and applied to all of Plaintiffs' claims.  *Id.* at 1361.  Of note, the court also specifically rejected the argument that the case should be maintained in the Northern District of Georgia because it was tied to an ongoing bankruptcy proceeding.  *Id.* at 1362–63.  The court acknowledged that "public policy favors 'maintaining the venue of an adversary proceeding where the bankruptcy [proceeding] is pending,'" but it held that where the "adversary proceeding involves primarily non-core claims, the forum-selection clause need not be abandoned."  *Id.* at 1362 (quoting *In re Bavaria Yachts USA, LLLP*, 575 B.R. 540, 558 (Bankr. N.D. Ga. 2017)).  Plaintiffs had previously represented to the court in connection with their motion to withdraw the reference that "nearly all" the claims alleged by them were non-core and that the dispute "primarily" concerned non-core claims.  *Id.* at 1363.  The court had agreed and granted the motion to withdraw the reference.  Dkt. No. 4.  It therefore held that Plaintiffs had not demonstrated that public interest factors "overwhelmingly" disfavored a transfer.  *Id.*  The court did not rule on Defendants' motion to dismiss the complaint for failure to state a claim for relief.

The case was transferred to this Court on February 25, 2021.  Dkt. No. 31.  As a result, Defendants' motion to dismiss was also transferred to this Court.  Dkt. Nos. 16, 17, 20, 28.  The

Court ordered the parties to re-brief the motion to dismiss with the law applicable in this Circuit. Dkt. Nos. 36, 38.  On April 16, 2021, Defendants filed their motion to dismiss the Complaint. Dkt. No. 39.  By opinion and order of March 4, 2022, the Court granted the motion to dismiss and dismissed all claims against Defendants with prejudice.  Dkt. No. 58.  Plaintiffs moved for an order amending the judgment and permitting them to file a second amended complaint containing more specifically pled allegations for fraudulent transfer and fraudulent inducement. Dkt. Nos. 67, 69.  The Court granted that motion in part and denied it in part on July 6, 2022, permitting Plaintiffs leave to replead their claims for fraudulent transfer as alleged in Counts Twelve and Thirteen but denying the motion to the extent it sought to replead the claim for fraudulent inducement.  Dkt. No. 74.

Plaintiffs filed the SAC on July 13, 2022.  Dkt. No. 75.  Defendants filed their renewed motion to dismiss on August 10, 2022.  Dkt. Nos. 82, 85.  Plaintiffs filed their opposition brief on September 7, 2022, Dkt. No. 86, along with a motion to transfer the case back to the Northern District of Georgia, Dkt. Nos. 88, 89.  Defendants filed their reply brief in support of the motion to dismiss on September 21, 2022, Dkt. No. 92, and their opposition brief to Plaintiffs' motion to transfer on October 10, 2022, Dkt. No. 94.  Plaintiffs filed their reply brief in support of their motion to transfer on October 24, 2022.  Dkt. No. 95.

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate

question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a

plausible claim for relief will . . . be a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility

requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal

evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v.*

*Siracusano*, 563 U.S. 27, 46 (2011).[5]

## DISCUSSION

The Court first addresses Plaintiffs' motion to transfer the case, pursuant to 28 U.S.C.

§ 1404(a), to the United States District Court for the Northern District of Georgia.  Dkt. No. 88.

The Court then addresses whether to grant Defendants' motion to dismiss.  Dkt. No. 82.

## I.     Motion to Transfer

Plaintiffs argue that the case should be transferred back to the United States District

Court for the Northern District of Georgia because the reasons for its transfer to this Court no

longer apply.  The Georgia court transferred the case because of the forum selection clause.

*Wade Park Land Holdings, LLC*, 522 F. Supp. 3d at 1360–63.  Plaintiffs argue that the forum

---

[5] Granting leave to amend a complaint does not indicate that the Court has already decided that the SAC states a claim.  "Leave to amend may properly be denied if the amendment would be futile, as when the proposed new pleading fails to state a claim on which relief can be granted." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  But the corollary is not necessarily true—that if amendment is not futile, the plaintiff has stated a claim.  Although a court is permitted to deny an amendment on grounds of futility, the Federal Rules of Civil Procedure do not prevent a court from allowing the amendment subject to the right of Defendants to move to dismiss, and thus permitting more fulsome briefing on whether the amendment states a claim for relief.

selection clause does not bind debtors-in-possession, such as Plaintiffs here, and does not encompass avoidance claims, which arise by statute and not from the agreement that contains the forum selection clause.  *Id.* at 1, 4–6.  Because the Court has dismissed all claims other than those which seek avoidance, Plaintiffs argue that the case should be transferred back to Georgia. *Id.* at 2.

Section 1404(a) of Title 28 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  The Court has the power to retransfer the case back to the District from which the case was transferred.  *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 3115486, at *2 (S.D.N.Y. July 21, 2021) (citing *Caribbean Wholesales & Serv. Corp. v. US JVC Corp.*, 1996 WL 140251, at *4 (S.D.N.Y. Mar. 27, 1996)).  However, the fact that the Court has such power does not suggest that it should exercise that power.

"Federal courts routinely apply law-of-the-case principles to transfer decisions of coordinate courts."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). "Under law of the case principles, courts should be loathe to revisit prior decisions of a coordinate court unless there are extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."  *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 2016 WL 5118298, at *3 (S.D.N.Y. Sept. 20, 2016), *aff'd in relevant part*, 916 F.3d 143 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Christianson*, 486 U.S. at 817). Courts in this Circuit, following a standard first adopted in the Fifth Circuit, have held that "[i]f the motion to transfer is granted and the case is transferred to another district, the transferee-district court should accept the ruling on the transfer as the law of the case and should not

15

retransfer except under the most impelling and unusual circumstances or if the transfer is
manifestly erroneous." *Id.* (quoting *Caribbean Wholesales & Serv. Corp.*, 1996 WL 1402521, at
*4); *see also  Exist, Inc. v. Vt. Country Store, Inc.*, 2019 WL 5310476, at *4 (D. Vt. Oct. 21,
2019) (same); *Repp v. Webber*, 142 F.R.D. 398, 400–01 (S.D.N.Y. 1992) (same); *Krist v.
McGraw-Hill Sch. Educ. Holdings LLC*, 2019 WL 10960491, at *1 (S.D.N.Y. Jan. 4, 2019)
(same).  "Impelling and unusual circumstances arise when 'unanticipable post-transfer events
frustrate the original purpose for transfer.'"  *Caribbean Wholesales & Serv. Corp.*, 1996 WL
140251, at *4 (quoting *In re Cragar*, 706 F.2d at 505).

"This rule of practice promotes the finality and efficiency of the judicial process by
protecting against the agitation of settled issues. . . .  Indeed, the policies supporting the doctrine
apply with even greater force to transfer decisions than to decisions of substantive law; transferee
courts that feel entirely free to revisit transfer decisions of a coordinate court threaten to send
litigants into a vicious circle of litigation."  *Id.* (internal quotation marks omitted) (quoting 1B J.
Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1] (1984) ("Moore's Federal
Practice")); *HSM Holdings, LLC*, 2021 WL 3115486, at *2; *see also AEP Energy Servs. Gas
Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 724 n.11 (2d Cir. 2010) (same).

Plaintiffs have not cited "unanticipable" post-transfer events that would frustrate the
original purpose of the transfer.  Plaintiffs rely on the Court's decision to dismiss with prejudice
all but the avoidance claims in this case.  Plaintiffs thus argue that the avoidance claims are "core
bankruptcy matters," and that the "claims are not inextricably intertwined with non-core matters
because, following the Court's interlocutory dismissal orders, there are no non-core claims
pending in this case." Dkt. No. 89 at 6.  It hardly could have been considered unanticipable at
the time of the initial transfer that this Court would dismiss Plaintiffs' non-core claims.  At the

time that the Georgia court granted the motion to transfer, Defendants' motion to dismiss was pending.  That motion sought to dismiss the complaint in its entirety.  It was not unforeseeable by the Georgia court that Defendants' motion would be granted, at least in part.  In granting the parallel motion to dismiss filed by defendant Goodman, the Georgia court held that the complaint failed to allege the existence of a RICO enterprise or a pattern of racketeering activity, that the claim of RICO conspiracy was based solely on insufficient legal conclusions, and that the Georgia RICO, trade secret, and breach of fiduciary duty allegations all failed to state a claim for relief.  *Wade Park Land Holdings, LLC*, 522 F. Supp. 3d at 1351–57.  The motion in this Court was not an unanticipated event—aside from changing the citations to relevant caselaw from the Second Circuit, it was generally identical to the motion that was pending at the time the case was pending in Georgia and that was transferred when the case was transferred to this Court.  *Compare* Dkt. No. 41 *with Wade Park Land Holdings, LLC et al.*, No. 20-cv-176, Dkt. No. 16-1.  Nor was it unforeseeable that this Court, when confronted with Defendants' motion to dismiss, might grant the requested relief.

This Court's decision to grant the motion would not frustrate the original purpose of the transfer motion.  The Georgia court, as well as the parties, was aware that when the motion to transfer was fully briefed, Defendants had also moved to dismiss both the non-core and the core claims and that this Court might grant that motion, in whole or in part.  The Georgia court explicitly considered the fact that the case contained core as well as non-core claims and the policy in favor of "maintaining the venue of an adversary proceeding where the bankruptcy proceeding is pending."  *Wade Park Land Holdings, LLC*, 522 F. Supp. 3d at 1362 (alterations accepted) (quoting *In re Bavaria Yachts USA*, 575 B.R. at 558)).  It granted the motion to transfer notwithstanding those facts and rejected Plaintiffs' argument that the presence of core

claims was sufficient to keep the case in Georgia—especially when it was Plaintiffs themselves who asked that the matter not be adjudicated in bankruptcy court and that the reference to the bankruptcy court be withdrawn.  *Id.* at 1362–63.  The only thing that has happened since the case was transferred is that the Court granted part of the motion that was fully briefed before the case was transferred.

The same reasons that justified the transfer apply today.  The case still contains non-core claims—*e.g.*, "RICO violations, breach of contract, and various forms of tortious misconduct by Defendants," *id.* at 1363—that are governed by the forum selection clause.  Although those claims have been dismissed by this Court, *see generally* Dkt. No. 58, they have not been dismissed by Plaintiffs who have carefully preserved their right to appeal.  *See* Dkt. No. 69 at 5 n.4 ("Plaintiffs have kept those claims in the PSAC . . . to preserve their arguments for appeal that the Court erred by dismissing Plaintiffs' claims.").  The purpose of Judge Batten's order was that all of Plaintiffs' claims—both core and non-core—would be adjudicated in the same federal forum.  That interest is served by the Court retaining this case in this forum.  Irrespective of which party prevails on the avoidance claims, Plaintiffs would have a right to appeal to the Second Circuit to revisit this Court's order dismissing the non-core claims.

Indeed, it is a transfer back to the Georgia court that would undermine the original purpose of the transfer.  Judge Batten intended that this Court would hear *both* the core and non-core claims.  Denial of the motion to retransfer the case best accords comity to that intent.  As Plaintiffs themselves admit, a transfer of this case could not be limited to the fraudulent conveyance claims.  Section 1404(a) provides for the transfer of an entire case, not just individual claims.  *See* 28 U.S.C. § 1404(a) (allowing for "transfer any civil *action*" (emphasis added)); *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968) ("We agree that this

section authorizes the transfer only of an entire action and not of individual claims.").  Thus were the Court to grant Plaintiffs' motion to transfer venue, it would have to transfer not just the fraudulent conveyance claims but also Plaintiffs' sixteen other claims which the Court has dismissed for failure to state a claim.  And an appeal of this Court's order with respect to those claims would proceed before the Eleventh Circuit, which would apply its own law, notwithstanding the fact that this Court applied Second Circuit law to Plaintiffs' claims as a result of the transfer decision.  *See Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1231 (11th Cir. 2020).  Were that court to agree with Plaintiffs and overturn this Court's order, the case would be remanded to the Northern District of Georgia for that court to address both the fraudulent conveyance claims (assuming that they were still in the case) and the remainder of Plaintiffs' non-fraudulent conveyance claims—all of which the Georgia court deliberately transferred to this Court.  In essence, then, Plaintiffs are asking for a redo—either to have the case as a whole permanently transferred back to the Georgia court contrary to its original order or, at best, to have yet another opportunity to oppose what will inevitably be yet another motion by Defendants to transfer the case back to this Court.

The Supreme Court has held that courts should apply the doctrine of law of the case to transfer decisions of a coordinate court, precisely to avoid "send[ing] litigants into a vicious circle of litigation."  *Christianson*, 486 U.S. at 816.  Applying that dictum, in *U.S. Bank National Association v. Bank of America N.A.*, the Second Circuit affirmed the district court's denial of the motion to retransfer, even though the court "d[id] not affirm the propriety of the original transfer for want of jurisdiction under § 1631."  916 F.3d at 154 (emphasis omitted).  In doing so, the court reasoned that:

> If we were to direct that the case be retransferred to Indiana, eventual review by the Seventh Circuit might well result in a ruling that that circuit, and not ours, is

authoritative on the reach of jurisdiction of the Indiana courts, a reaffirmation of the Indiana district court's original ruling that Bank of America is not subject to personal jurisdiction in Indiana, and a reinstitution of the original transfer to the district court in New York.

*Id*. at 152.  Here, if this case is transferred, eventual review by the Eleventh Circuit may lead to a reversal of this Court's prior dismissal of all claims, the return of this matter to the Northern District of Georgia, and a "reinstitution of the original transfer to" this Court.  *Id.*  The Second Circuit went so far in *United States Bank National Association* as to state that "[a]llowing the case to remain in the Southern District of New York, notwithstanding that the Indiana court's transfer order was based on a mistake of law, is *a far lesser evil* than subjecting the parties to the further expense and delay of a retransfer, with the attendant risk of still further rounds of transfers." *Id.* at 153 (emphasis added).  It follows that here, where the Georgia court committed no error of law, the case should remain in the Southern District of New York.

Even if the Court did not follow law of the case principles and accord comity to the ruling of a coordinate court, the Court would nonetheless deny the motion to transfer venue.  At step two of the transfer of venue analysis, the Court "'balances the private and public interests,' to determine whether transfer is warranted 'for the convenience of parties and witnesses, and in the interest of justice.'"  *Inventel Prods. LLC v. Penn LLC*, 2017 WL 818471, at *2 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.) (alterations accepted) (first quoting *Gross v. British Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004), and then quoting 28 U.S.C. § 1404(a)).  "Among the factors to be considered in determining whether to grant a motion to transfer venue 'are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.'"  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N.*

*Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006)).  The court also considers a forum's familiarity with the governing law and trial efficiency and the interests of justice based on the totality of the circumstances.  *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp*, 457 F. Supp. 2d 474, 477 (S.D.N.Y. 2006).  "[T]he party requesting transfer carries the 'burden of making out a strong case for transfer.'"  *N.Y. Marine & Gen. Ins. Co.*, 599 F.3d at 114 (quoting *Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)); *see also Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2022 WL 17067984, at *5 (S.D.N.Y. Nov. 17, 2022).

At this stage, those factors favor Defendants.  Although Plaintiffs say that they and their witnesses are located in Georgia, *see* Dkt. No. 89 at 18, Defendant Kalikow resides in New York and the principal place of business and the records and employees of the other defendants are all located in New York, *see* Dkt. No. 94 at 25.  WP Land and WPL Holdings are Delaware companies and the avoidance claims concern property located in Texas.  The locus of operative facts is not predominantly in Georgia.  The agreements between the parties reflect that they were negotiated in New York, the loans were made by the lender and accepted by the borrower in New York, and the proceeds of the loans are deemed to have been disbursed from New York. *See id.* at 20–21 (citing, *e.g.*, Dkt. No. 90-2 § 11.5).  The fact that WP Land and WPL Holdings are debtors in cases pending in the Bankruptcy Court in the Northern District of Georgia is of no weight where, as here, the case has been removed from bankruptcy court and will not be proceeding there.  *Cf. In re Dozier Fin., Inc.*, 587 B.R. 637, 649 (Bankr. D.S.C. 2018) (stating that there is a presumption of maintaining venue where the bankruptcy is pending).  Finally, this Court is intimately familiar with the action and judicial efficiency would be disserved by

transfer.  *See* 1 *Moore's Federal Practice & Procedure* § 7.81(3)(h) (2022).  The Court has issued a ninety-page decision on the motion to dismiss, applying the standards in this Circuit.  In that decision, it has considered and analyzed Plaintiffs' avoidance claims.  It has also considered and analyzed Plaintiffs' non-core claims.  It makes no sense for the Court now, this late in the day, to transfer the case to a foreign Court for it to have to educate itself on the legal issues afresh.

   For these reasons, the motion to transfer is denied.

## II. Motion to Dismiss

   Defendants argue that Plaintiffs have still failed to state a claim.  The Court first addresses the materials cognizable on the motion to dismiss and, in particular, whether Plaintiffs can rely upon the entirety of the BBG appraisal report, which they include with their opposition to the motion to dismiss but did not attach to the SAC.  The Court then assesses the motion to dismiss.

### A. Whether the BBG Appraisal Report Is Cognizable on the Motion to Dismiss

   As noted previously, the SAC contains a single-sentence allegation that "[i]n a report issued January 2, 2019, independent appraiser BBG, Inc. appraised the as-is market value of the Wade Park properties as of October 18, 2018, at $565 million," Dkt. No. 75 ¶ 327, and attaches as an exhibit a cover letter from Jay Ramos, a general appraiser at BBG, dated January 2, 2019, concerning a "value opinion" on the Wade Park property, *see* Dkt. No. 75-1.  Plaintiffs now ask the Court to consider the entirety of the BBG appraisal report, which they attach to a declaration of Thomas, averring that the attachment is a true and correct copy.  Dkt No. 87 ¶ 6.  The full report was not attached to the SAC; the SAC does not quote any portions of the full report.  Defendants argue that Plaintiffs' failure to attach the BBG appraisal report to the SAC precludes Plaintiffs from relying upon it in opposition to Defendants' motion to dismiss.  Dkt. No. 92 at 6.

Federal Rule of Civil Procedure 10(c) provides that a party may attach a written instrument to a complaint, in which case it will be treated as "a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c); *see also DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 59 (S.D.N.Y. 2010) ("Pleadings include not just the four corners of the complaint, but also 'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" (quoting *Chambers v. Time Warner*, Inc., 282 F.3d 147, 152 (2d Cir. 2002))). The provision is an exception to the ordinary rule that the plaintiff must plead by stating its claims or defenses in numbered paragraphs.  Fed. R. Civ. P. 10(b).  Rule 10(c) is permissive; a party who otherwise relies upon a document to assert a claim against the defendant ordinarily is required to make allegations about the document sufficient to support the claim and thereby to provide notice to the defendant of the wrong that the defendant is alleged to have committed. Charles Alan Wright & Arthur R. Miller, 5A *Federal Practice and Procedure* § 1327 (4th ed. 2022).

The Federal Rules of Civil Procedure have been interpreted to permit a defendant, in support of a motion to dismiss, to introduce a document that is central to the plaintiff's affirmative case or is referred to in the complaint but not attached to it, as well as documents of which judicial notice may be taken.  *Id.*; *see also Gray v. Wesco Aircraft Holdings, Inc.*, 2020 WL 1700034, at *10–11 (S.D.N.Y. Apr. 7, 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). Despite some broad language in opinions from this District, the reciprocal does not apply.  A plaintiff who has eschewed attaching a document upon which it relies as an exhibit to the complaint, and who has not explicitly incorporated the document by reference and included the relevant allegations about the document in the complaint, is not ordinarily permitted—when it suddenly becomes expedient—to rely upon the document by attaching it to a declaration

submitted in response to a motion to dismiss.  *See*, *e.g.*, *Adams v. Crystal City Marriott Hotel*, 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004) (refusing to consider Certification submitted in opposition to motion to dismiss where plaintiff "did not attach the Certification to the pleadings, nor did she incorporate the Certification to the pleadings by reference").  When asserted by the party moving against a pleading, the doctrine permitting reliance upon a document outside the pleadings serves an important purpose:  It prevents artful pleading.  A plaintiff cannot avoid dismissal by citing only to a portion of a document upon which it relies and which is integral to its complaint, but also prevent a defendant from challenging the reliance upon that document on a motion to dismiss by the expedience of simply not attaching the document to the complaint. *See*, *e.g.*, *Bongiorno v. Baquet*, 2021 WL 4311169, at *10 (S.D.N.Y Sept. 20, 2021).  As long as there is no dispute as to its authenticity or accuracy, a party moving to dismiss may rely upon a document that is integral to the complaint or specifically referenced in it or of which judicial notice may be taken.  *See id.* at *11; *see also Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *21 (S.D.N.Y. Sept. 30, 2022) (holding that the following matters may be offered by a defendant in moving to dismiss "without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are 'integral' to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case" (quoting *LeChase Constr. Servs., LLC v. Escobar Constr., Inc.*, 2019 WL 2743637, at *6 & n.4 (N.D.N.Y. July 1, 2019))).  When asserted by a party in support of a pleading and in opposition to a motion to dismiss, the doctrine would instead *enable* artful pleading and promote litigation by ambush—the pleader would require its opponent to go through the work of filing a motion to

dismiss only to have its adversary surprise it, by springing upon it a document which the pleader possessed and of whose contents only it had knowledge. *See Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 122–23 (S.D.N.Y. 2010) (holding "a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss"); *see also O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."). For that reason, the pleader generally must defend its complaint based on the allegations contained on the face of the document.

The Court concludes that Plaintiffs cannot rely upon the full BBG appraisal report in opposition to the motion to dismiss. The document is not one of which the Court can take judicial notice. Nor is the report a document of which Defendants had notice. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (stating that "[a] finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant since . . . the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered"). The report appears to have been commissioned by Thomas for the benefit of a third party; there is no indication that Defendants ever had a copy of the appraisal report. Moreover, the SAC does not contain a "clear, definite, and substantial" reference to the report. *See*, *e.g.*, *Trump v. Vance*, 977 F.3d 198, 210 (2d Cir. 2020) ("Although the SAC does not cite the specific passage of the article noted above, the SAC nevertheless makes 'a clear, definite and substantial reference to' the article." (quoting *Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 537 (S.D.N.Y. 2018))); *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *23. Although the SAC relies upon the fact that the appraisal was delivered, it contains no allegations about its contents, save for its conclusion.

Plaintiffs' argument for why the Court should consider the full report is unpersuasive. Plaintiffs cite no cases requiring the Court to consider the full report. Plaintiffs state only that they could have attached the report but did not because it is 743 pages long. *See* Dkt. No. 86 at 11. The argument fails for two reasons. Plaintiffs' choice was not between attaching the full report or not attaching it; Plaintiffs had the option, and in fact were required, to allege in their SAC the portions of the report upon which Plaintiffs relied to state a claim. The Second Circuit has held that the instruments that can be attached as exhibits and thereby made a portion of a complaint consist generally of "legal document[s] that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *See Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (citing Black's Law Dictionary (10th ed. 2014)); *see also Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015). The limitation on what may be attached instead of being alleged is an important one. Allowing a party to satisfy its pleading requirements by attaching documents other than instruments to the complaint "would do considerable damage to Rule 8(a)'s notice requirement." *Smith*, 794 F.3d at 255. It would require the defendant to hunt around in voluminous materials to figure out what the plaintiff alleges is relevant and supports its claims and what is extraneous. *Id.* The report does not fall within the categories of attachable instruments. It is a lengthy document that ultimately provides a valuation opinion; it does not define or provide any legal entitlements, like the "legal documents" described in *Lynch*. If Plaintiffs could not avoid the requirement to make allegations about the full appraisal report in the complaint by the expedient of attaching it to the complaint, leaving Defendants to guess as to what is significant or not, it follows necessarily that it cannot avoid that requirement by attaching it to a declaration in opposition to the motion to dismiss.

In any event, Plaintiffs' excuse rings hollow.  Plaintiffs filed their complaint through the Court's Electronic Filing System ("ECF").  Plaintiffs need not have worried about the length of the report (and apparently did not worry when it came time to opposing the motion to dismiss).  The SDNY Electronic Case Filing Rules & Instructions permit the filing of attachments and exhibits; the only restriction is that the filing user must submit "only those excerpts of the referenced documents that are relevant."  SDNY, Electronic Case Filing Rules & Instructions § 5.2 (Nov. 1, 2022).  Had Plaintiffs attached the BBG appraisal report (or at least those portions of the report upon which they now rely), Defendants would have had notice sufficient to enable them to answer and defend themselves.  *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (stating that "the principal function of pleadings under the Federal Rules of Civil Procedure is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").  Permitting Plaintiffs now to rely upon the report, when Defendants did not have any notice of the facts that Plaintiffs would rely upon from the BBG appraisal report until *after* they had filed their motion, would present Defendants with a moving target.  Plaintiffs would have Defendants direct their motion at the factual allegations of the complaint only to be confronted in opposition with a document that does not appear on the face of that pleading.  That would cause prejudice to Defendants.  *See Madu, Edozie & Madu, P.C.*, 265 F.R.D. at 122–23.[6]

---

[6] On the other hand, the Court may consider the Affidavit and Estoppel Certificate, which Defendants rely upon, in connection with the motion to dismiss.  The Affidavit and Estoppel Certificate are part of the DIL Agreement which "is expressly referenced in the Complaint" and thereby incorporated by reference.  Dkt. No. 58 at 85 n.16.  As the Court previously held, Plaintiffs cannot "cherry pick the parts of the DIL Agreement they rely upon" and avoid those portions that undermine their claim.  *Id.*  The Court need not consider whether the Sage appraisal report is incorporated by reference into or is integral to the SAC.  Defendants rely upon the full report to undermine Plaintiffs' abbreviated allegations about that report in the SAC.  However,

B.        **Dismissal of the SAC**

Defendants again move to dismiss the SAC's fraudulent transfer claims.  Dkt. No. 82.

They argue that Plaintiffs do not plausibly allege that the transfers were for other than reasonably

equivalent value, *see* Dkt. No. 85 at 9–20, that Plaintiffs do not plausibly allege that Debtors

were rendered insolvent by the transfers, *see id*. at 20, and that the Trust in any event does not

state a claim for fraudulent transfer, *id*.[7]  Those arguments also apply to the Georgia Uniform

Voidable Transfers Act.  *Id*. at 21.  Defendants further argue, in the alternative, that the claims

should be dismissed against all Defendants except for Wade Park Development Partners LLC.

*Id*.  Plaintiffs dispute all those arguments.  *See* Dkt. No. 86.  For the following reasons, the Court

grants the motion to dismiss the SAC with prejudice.

To state a claim for fraudulent transfer, a plaintiff must allege that (1) "the debtor was

insolvent on the date of the transfer or became insolvent as a result of the transfer" and (2) "the

debtor received less than 'a reasonably equivalent value in exchange for such transfer.'"  *In re*

*Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184, 190 (2d Cir. 2020) (quoting 11 U.S.C.

§ 548(a)(1)(B)).  "The analysis of alleged fraudulent transfers under [Georgia] law and

bankruptcy law is substantially the same."  *In re Think Retail Sols., LLC*, 2019 WL 2912717, at

*11 (Bankr. N.D. Ga. July 5, 2019).  "To determine reasonably equivalent value, courts examine

the totality of the circumstances surrounding the transfer in question."  *In re Waterford*

*Wedgwood USA, Inc*., 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013).  "The 'totality of the

the Court has concluded that the abbreviated allegations are not sufficient to state a claim for
relief.  The Court need not consider Defendants' argument that the entirety of the report further
bolsters that conclusion.

[7] Because the Court concludes that the SAC does not adequately plead a transfer for other than
reasonably equivalent value, the Court need not reach whether the SAC adequately pleads that
Plaintiffs were rendered insolvent by the transfers or whether the Trust states a claim for
fraudulent transfer.

circumstances' inquiry considers three factors: (i) the fair market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and (iii) the good faith of the transferee." *Id.* (citation omitted). "[W]hile the determination of whether reasonably equivalent value was exchanged is 'largely a question of fact,' courts have dismissed constructive fraudulent transfer claims where the complaint does not plausibly allege that the debtor received less than reasonably equivalent value." *In re Trib. Co. Fraudulent Conv. Litig*., 10 F.4th 147, 172 (2d Cir. 2021), *cert. denied sub nom. Kirschner v. FitzSimons*, 142 S. Ct. 1128 (2022) (citation omitted).

The March 2022 Opinion dismissed the fraudulent transfer claims as alleged in the FAC. *See* Dkt. No. 58 at 82–86. The Court concluded that the allegations that the transfers left WP Land and WPL Holdings without assets to satisfy their respective remaining obligations was "wholly conclusory." *Id.* at 82–83. The Court then found that "[e]ven if Plaintiffs had adequately pleaded that they were insolvent at the time of the transfer, the Complaint fails to allege that the transfer was for other than reasonably equivalent value." *Id.* That is because courts have often held that "securing an antecedent debt is not, as a matter of law, a constructive fraudulent conveyance."[8] *Id.* at 84 (quoting *In re Pfeifer*, 2013 WL 3828509, at *3 (Bankr. S.D.N.Y. July 23, 2013)). Further, "to the extent that Plaintiffs make conclusory allegations that the deeds for the Wade Park properties were conveyed for other than reasonable equivalent value, those conclusory allegations are undermined by the more specific statements from the Affidavit and Estoppel Certificate of WP Land and WPL Holdings." *Id.* at 85. Those statements

---

[8] The Court agrees with Plaintiffs that the mere satisfaction of an antecedent debt cannot be presumed to be reasonably equivalent value. *See*, *e.g.*, *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1061 (2d Cir. 1995). The Court nonetheless finds that Plaintiffs have not sufficiently alleged a lack of reasonably equivalent value.

provided that WP Land and WPL Holdings were "solvent" and "had no other creditors whose rights would be prejudiced by the conveyance of the deeds to Gamma Lending Omega." *Id.* (alterations accepted); *see also* Dkt. No. 83-3, Ex. M.

Plaintiffs' pleading fails to cure the defects of the FAC.  Plaintiffs' SAC relies entirely upon the Sage Group appraisal and the BBG appraisal.  Where previously Plaintiffs alleged solely that "[a]ppraisals of the land itself show a value in excess of $550 million," Dkt. No. 5 ¶ 36, Plaintiffs now allege that "[i]n a report issued January 2, 2019, independent appraiser BBG, Inc. appraised the as-is market value of the Wade Park properties as of October 18, 2018, at $565 million," Dkt. No. 75 ¶ 326, that "[i]n November 2016, the Gamma Defendants obtained an independent appraisal from Sage Group . . . of the as-is market value of the Wade Park properties as of November 10, 2016.  Sage Group appraised the Wade Park properties' market value at $466.8 million," *id.* ¶ 338, and that "[b]etween the date of the 2016 Appraisal and the date of the transfer in February 2019, improvements with a market value in excess of $70 million were made to the Wade Park properties," *id.* ¶ 339.

The March 2020 Opinion detailed how, assuming the truth of Plaintiffs' allegations and construing them in favor of Plaintiffs, it was utterly implausible that the transfer was for anything other than reasonably equivalent value.  Taking the allegations as true, Thomas engaged in extensive efforts from the spring of 2017 to April 2019 to obtain financing on the Wade Park properties by which Plaintiffs could repay the bridge loan they had taken from Gamma Real Estate Capital.  *See*, *e.g.*, Dkt. No. 75 ¶¶ 111–15, 142–75.  According to Plaintiffs, Thomas, "one of the most experienced and respected developers of retail and mixed-use properties in the United States," "worked tirelessly to find a financing partner."  *Id.* ¶¶ 3, 45.  Defendants gave Plaintiffs numerous extensions to secure a permanent financing partner.  *Id.* ¶¶ 82, 109, 177–78.

During the entirety of that time, Plaintiffs had the unfettered discretion to refinance the Wade Park properties in a manner that would satisfy Plaintiffs' debt to the Gamma Defendants and take Defendants out of the Wade Park properties. They did not need Defendants' consent to obtain such a refinancing. Plaintiffs also had an interest in doing so—Plaintiffs continually paid fees to Defendants in exchange for each extension of the Gamma Bridge Loan that eventually totaled more than $38 million. *Id.* ¶ 138. Plaintiffs fail to allege facts showing why—if the Wade Park properties were worth in excess of $565 million—Plaintiffs would not have been able to obtain financing on those properties sufficient to pay off their $140 million indebtedness. Nor do Plaintiffs allege facts showing why, if the Wade Park properties were worth what they claim, they could not have found someone to purchase those properties from them for an amount in excess of $140 million.

Even then, after numerous extensions, Defendants gave Plaintiffs the option either to allow Defendants to foreclose on the Wade Park properties—repaying their obligation to Defendants with Plaintiffs enjoying any remainder from the sale for themselves—or to sign over the deeds in exchange for a further extension and ultimate cancellation of the debt. Plaintiffs did not need to sign the DIL Agreement. Plaintiffs were not only sophisticated real estate investors, they also were represented by competent counsel of their own choosing. *See* Dkt. No. 83-3, Ex. J § 9 (the Parties' agreement that the execution of the DIL Agreement occurred under those conditions). It is utterly implausible that Plaintiffs would ever have agreed to the DIL Agreement if Plaintiffs thought in February 2019—at the time of the DIL Agreement—that the January 2019 appraisal of $565 million was entitled any weight. Had the Wade Park properties been worth $565 million on January 2, 2019, as Plaintiffs would have the Court infer, Plaintiffs would not have needed to enter the DIL Agreement at all. They would have been able to obtain

financing on the properties with which to repay Defendants or, failing that, would have been able to dispose of the properties (either on the open market or through a foreclosure sale) for a sum far in excess of what they owed Defendants, repaying the obligation and pocketing the rest. Plaintiffs had every interest in doing so, as they allege that "any excess funds from a foreclosure auction would have had to be returned to the Plaintiffs." Dkt. No. 75 ¶ 363; *see also* Dkt. No. 86 at 16 n.17 (Plaintiffs' opposition brief stating that foreclosure "would have limited Defendants' recovery to the loan amounts and forced Defendants to forego the additional hundreds of millions of dollars in value they received"). The only inference to be drawn is that in 2019, as in the over one year period prior, there was no buyer or lender who would value the property at $565 million, or anywhere close.

Likewise, even after the DIL Agreement was signed, Plaintiffs had alternatives. The DIL Agreement did not prevent Plaintiffs from finding a borrower who would refinance the properties to allow repayment or from selling the properties at a price that would have permitted Plaintiffs to repay Defendants and keep the profit. It expressly contemplated that Plaintiffs would have an additional period of time from February 4, 2019, until March 13, 2019, to find alternative ways to repay Defendants. Plaintiffs were then given more time, until April 15, 2019, through the buy-back agreement, to repurchase the property after the transfer. During that more than two-month period, Plaintiffs had the right to sell or refinance (or during the time period of the buy-back agreement, to purchase) so as to pay back Defendants. Plaintiffs did not do so. There would have been no reason for Plaintiffs not to avail themselves of those opportunities if there was a market for the Wade Park properties at their alleged valuation. Plaintiffs owned the equity in the Wade Park Properties—any proceeds in excess of the indebtedness would have flowed directly to them. Dkt. No. 75 ¶ 363. Again, the only plausible inference is that there was

no market for the Wade Park properties in an amount unreasonably in excess of the debt owed to Defendants.  Defendants took the deeds to the Wade Park properties because its value was sufficient—but not greater than necessary—to compensate Defendants for the amount that was outstanding from Plaintiffs and the additional loss of the time value of money.  In short, the only plausible inference is that Plaintiffs agreed to the DIL Agreement because it represented reasonably equivalent value for Plaintiffs.  In exchange for the deeds, Plaintiffs received an additional six weeks (later extended by the buy-back agreement for another five weeks) to try to find permanent funding to satisfy Defendants' debt, and if Plaintiffs did not succeed, they would be released from any claim with respect to the loans Defendants extended to them.

Moreover, WPL Holdings and WP Land swore in the Estoppel Certificate, dated March 1, 2019, that "at the time of making said Deeds the entities believed, and now believe that the consideration [for the deeds] represents the fair market value of the property so deeded." Dkt. No. 83-3, Ex. M.  They further "irrevocably waive[d] any claim or right they may have to challenge the adequacy of such consideration."  *Id*.  Plaintiffs' contention that they are not bound as debtors-in-possession by the pre-bankruptcy petition agreements misses the mark.  *See* Dkt. No. 86 at 13–14.  The point is not that Plaintiffs are bound by the Estoppel Certificate or legally estopped from asserting new facts.  *Id*. at 15 n.15.  Nor does the Court need to rely on the truth of the matter asserted in the Estoppel Certificate.  Rather, the mere fact that Plaintiffs signed the Estoppel Certificate shows the implausibility of Plaintiff's claimed *value* of the transfer— namely, that the value of Wade Park was in excess of $565 million.  In other words, Plaintiffs would not have signed that Estoppel Certificate if the value was in excess of $565 million.  That

the Estoppel Certificate required Plaintiffs to confirm that they "were not acting under any misapprehension as to the effect thereof" further supports that inference.  Dkt. No. 83-3, Ex. M.[9]

Finally, if Plaintiffs' theory is to be believed, it cannot explain why Defendants would nonetheless offer a buy-back agreement of Wade Park in conjunction with the DIL Agreement for only $150 million or why, with the buy-back agreement, Plaintiffs still could not find an independent buyer for the Wade Park properties.

In the face of those allegations, the appraisal's *opinion* upon which Plaintiffs rely is not sufficient to forestall dismissal or to create a plausible inference that the DIL Agreement was for other than reasonably equivalent value.  It is well established that a plaintiff cannot support the inference that its exchange of property was for less than reasonably equivalent value based on a mere conclusory allegation.  *Cf. Hanna Coal Co. v. I.R.S.*, 218 B.R. 825, 833 (W.D. Va. 1997) ("Hanna has failed to offer anything more than conclusory evidence of the fair market value of its property.  For this reason, the court concludes that the negotiations between Hanna and PSB offer the most concrete values available.").  Were that the case, there would never be any certainty in contracting.  The debtor could always find someone to say that a transfer was for other than reasonably equivalent value and then, based upon that mere say-so, put its adversary to the burden of proving that the transaction was for reasonably equivalent value.  The value of an item of  property is best measured by what it will fetch in the open market, in a transaction

---

[9] To be sure, Plaintiffs newly allege in the SAC that "Defendants . . . knew the statements in the Estoppel Certificate . . .  were false."  Dkt. No. 75 ¶ 342.  But that allegation is not only entirely conclusory, but it is also irrelevant.  It is conclusory because it relies solely on the most remote of inferences: that Defendants knew of the Sage Group appraisal report valuing Wade Park at $467 million in 2016—a report that was issued *more than two years* earlier.  That is far too removed to form any reliable inference about Defendants' knowledge in 2019 whether the Estoppel Certificate was false based on a difference in valuation.  It is also irrelevant because there are no facts alleged explaining why Plaintiffs would have signed such a purportedly false statement.

between willing buyers and sellers, and not on what an idiosyncratic person—who is not in the

market and has not expressed a willingness to purchase the property—concludes that the

property is worth.  *See In re Waterford Wedgwood USA, Inc*., 500 B.R. at 381 ("Courts give

'significant deference' to . . . values reached in the context of 'an arm's length transaction

between a willing buyer and a willing seller.'" (citation omitted)); *see also In re Morris

Communications*, 914 F.2d 458, 467 (4th Cir. 1990) (noting that whether the sale was "an arm's

length transaction between a willing buyer and a willing seller" is another factor of "considerable

importance").  And, in order to state a claim, the plaintiff must allege facts that support the

market value of the asset and not just an idiosyncratic view.  *Mercury Cos., Inc. v. FNF Sec.

Acquisition, Inc. (In re Mercury Cos., Inc.)*, 2015 WL 5920163, at *8 (Bankr. D. Colo. Oct. 9,

2015) (holding that the assessment of reasonably equivalent value must be based on an objective

standard of "fair market value of the benefit received," and "without regard to the subjective

needs of the debtor or transferee"); *In re McMartin*, 599 B.R. 622, 629 (Bankr. D.N.D. 2019)

("Most courts that have considered this issue find that an objective standard is applied to the

reasonably equivalent value analysis under section 548(a)(1)(B)."); *see also Eclectic Properties

E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 (9th Cir. 2014) ("Absent factual support

showing that the true market value was $11.1 million, and taking into account the evidence in

Plaintiffs' own complaint that undermines their allegation that the property was worth only $11.1

million, we decline to accept the conclusory assertions of property values as facts."); *cf. In re

Curtina Int'l*, Inc., 23 B.R. 969, 973 (Bankr. S.D.N.Y. 1982) (finding significantly reduced sales

price paid by defendant to the debtor for perishable goods to be fair consideration and reasonably

equivalent value under the circumstances where defendant was the only buyer, and the perishable

goods took a long time to sell).

The new allegations in the SAC offer little more than such a conclusion, which is insufficient under *Twombly* and *Iqbal*.  Plaintiffs allege in a single paragraph that "[i]n a report issued January 2, 2019, independent appraiser BBG, Inc. appraised the as-is market value of the Wade Park properties as of October 18, 2018, at $565 million."  Dkt. No. 75 ¶ 327.  The letter attached as an Exhibit to the SAC states that the appraisal constitutes a "value *opinion*," "prepared for Churchill Commercial Capital . . . , and *is intended only for its specified use*."  Dkt. No. 75-1 at 1 (emphasis added).  Nothing is said about BBG, who it is, what its qualifications are, why it would know anything about the property in particular or property valuations in general, and why its opinion should have any weight.  Nor is anything alleged about Churchill Commercial Capital or why it sought the appraisal.  The only thing that is clear from the SAC is that whoever Churchill Commercial Capital is, it did not think that the appraisal was sufficiently compelling so as to enter into a transaction with Thomas that would permit the latter to hold onto a property worth more than $500 million rather than forfeit that property in exchange for cancellation of $140 million of indebtedness.  The letter states that BBG's report "sets forth the identification of the property, the assumptions and limiting conditions, pertinent facts about the area and the subject property, comparable market data, the results of the investigation, and the reasoning leading to the conclusions set forth."  *Id.*  But neither the SAC nor the letter states what the assumptions and limiting conditions were or explains BBG's reasoning, much less asserts as a matter of fact that the assumptions and limiting conditions were reasonable and constituted an appropriate and fair basis upon which to value the Wade Park properties.  *Cf. First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770 (2d Cir. 1994) (holding that allegations of a methodologically unreliable appraisal were not sufficient to establish property values as a fact in a RICO complaint).

An appraisal is an opinion, not an assertion of fact.  "[N]either an appraisal nor a judgment that a property's value supports a particular loan amount is a statement of fact.  Each is instead a subjective opinion based on the particular methods and assumptions the appraiser uses."  *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y.); *see also In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010) ("[R]eal estate appraisals are not statements of fact but rather statements of opinion or belief.");  *New Jersey Carpenters Health Fund v. DLJ Mortg. Cap., Inc*., 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010) (same).  They are worth only as much as their models and assumptions are worth.  By their nature, appraisals rely on "financial valuation models [which] depend so heavily on the discretionary choices of the modeler—including choice of method (e.g., discounted cash flow vs. market-based methods), choice of assumptions (such as the proper discount rate or cost of capital for a particular firm or industry), and choice of 'comparables' that the resulting models and their predictions can only fairly be characterized as subjective opinions."  *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005) (Lynch, J.).  If the models and assumptions are worthless, so is the valuation.  It may be that, with appropriate allegations, an appraisal could provide factual support for an allegation that a transfer was not for reasonably equivalent value.  The pleader need not identify a particular willing buyer to establish that the property it received was worth less than what it delivered.  Fraudulent conveyances may be done under the cover of darkness, where because of the parties' conduct, there is no opportunity to offer a market price.  But in a case such as this, in which a sophisticated investor tried for nearly two years to find on the open market persons who would value the property at more than what Defendants were offering in exchange and failed to do so, the appraisal from an appraiser with unknown credentials, based on an unidentified

methodology, relying on undisclosed assumptions—none of which is stated to correspond with the underlying facts of the Wade Park properties—does not amount even to reliance upon an expert's *ipse dixit*.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *cf. DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001) (holding that expert affidavit was not properly attached as an exhibit to the complaint and its allegations were not sufficient to forestall dismissal); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (excluding consideration of an expert's opinion as it, *inter alia*, "might require ruling on the expert's qualifications," and would be "inappropriate at the pleading stage").[10]  Absent additional factual allegations, such "opinions couched as factual allegations are not given a presumption of truthfulness."  *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (citation omitted); *see also In re Ditech Holding Corp.*, 2021 WL 1923357, at *5 (Bankr. S.D.N.Y. May 12, 2021) (same); *Gonzalez v. U.S. Bank Nat'l Ass'n*, 2012 WL 13020331, at *5 (D. Ariz. Mar. 27, 2012) ("[T]he conclusory statements . . . that '[t]he fair market value of the subject property on February 17, 2011, considering all circumstances, including those inherent in a forced sale of the property, was not less than $150,000.00,' is unsubstantiated.").

The SAC's allegations regarding the Sage Group report are further afield.  The only allegation in the SAC is that the "Sage Group appraised the Wade Park properties' market value at $466.8 million" "as of November 10, 2016."  Dkt. No. 75 ¶ 338.  The deeds were transferred on February 21, 2019, *see id.* ¶ 335, which was more than two years after the 2016 Appraisal was

---

[10] *See also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224 (S.D.N.Y. 2018) ("[E]videntiary uncertainty is a primary reason why courts have refused to consider such submissions at the pleadings stage."); *Bros. v. Saag*, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) (considering expert opinions at the pleading stage is inappropriate); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (similarly declining to consider an expert affidavit attached as an exhibit to a complaint).

produced.  It is well established that "reasonably equivalent value is determined by the value of

the consideration exchanged between the parties *at the time of the conveyance or incurrence of*

*debt* which is challenged."  *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th at 172 (quoting *In*

*re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999)) (emphasis in original).

Reliance on the Sage Group report would have the Court determine reasonably equivalent value

based on an appraiser's opinion, rather than facts, during an entirely different market period, and

well before changes to the Wade Park properties were made.  *See* Dkt. No. 75 ¶ 339.

Plaintiffs offer two other responses.  First, they say that the Court should not attribute

significance to the fact that no lenders or purchasers emerged for the Wade Park properties

because Defendants interfered with their ability to raise funding to pay the debt.  *See* Dkt. No.

86 at 3.  They also assert that Defendants' consent was required for such financing.  *See id.* at 9–

10.  In essence, Plaintiffs claim that Defendants interfered and strongarmed the deeds transfer,

suggesting that the deeds have high value and also excusing Plaintiffs' failure to take

economically rational actions showing that high value.  Both arguments are inconsistent with the

pleadings.

As to the former allegation of interference, the Court has already had occasion to analyze

Plaintiffs' pleadings.  The Court concluded that those allegations were insufficient to establish

that Defendants acted with the intention of preventing Plaintiffs from obtaining financing.  Dkt.

No. 58 at 71.  As the Court stated in the March 2022 Opinion:

> [U]nder the Construction Loan Agreement, Plaintiffs did not require Defendants'
> consent to have the loan repaid by another lender, and Defendants would only need
> to negotiate with the other lenders if, for instance, they asked for concessions in
> satisfying the loan.  Further, at the time of the alleged conversations, Gamma
> Lending Omega had an interest in Plaintiffs' ability to obtain financing; the Gamma
> Bridge Loan was in default and Plaintiffs owed Gamma Lending Omega tens of
> millions of dollars.  In addition, Kalikow and the Gamma Defendants had
> purchased other loans pursuant to which Thomas was obligated.  They had a

> "normal economic self-interest" and "legitimate economic self-interest" in the terms under which Bluebell and Columbia Pacific would extend credit and an interest in protecting their own position as lenders to Wade Park.

*Id.* at 71–72.[11]  Moreover, Plaintiffs allege no interference efforts during the more than two months encompassed by the DIL Agreement or the subsequent buy-back agreement.  The timing of any allegations of interference simply do not overlap during that period.  The first period of alleged interference ended in January 2019, before the entry of the DIL Agreement the next month.  Dkt. No. 75 ¶ 171 (describing alleged interference at meeting with Columbia Pacific in "January 2019"); *id.* ¶ 190 (describing how the parties did not enter into the DIL Agreement until February 4, 2019).  There is no other interference alleged during the six-week period contemplated under the DIL Agreement.  There is also no alleged interference during the term of the buy-back agreement.  And while Plaintiffs allege interference with Thomas's potential funding arrangement with Hines, *see id.* ¶¶ 201–03, such interference, if any, occurred *after* the expiration of the written buy-back agreement on April 15, 2019, *id.* ¶ 198.  It is also noteworthy that there was, of course, no interference during the period before Defendants' loan, and during which Plaintiffs *still* were unable to secure funding for the project, including with "Bluebell International, Columbia Pacific, Bank of the Ozarks, Cargill, Triple 5, and Hines."  Dkt. No. 75 ¶ 45.  There was thus no interference attributable to Defendants that would have prevented Plaintiffs from transferring the deeds.

---

[11] The Court also concluded that Plaintiff failed to allege facts to show that the purchase of loans from Synovus Bank and Ardent Bank, pursuant to which Defendants obtained the right to a stream of income, were motivated solely by malice.  *Id.* at 71.  Indeed, while Plaintiffs alleged that Defendants purchased the loans from Synovus and Ardent to prevent Thomas from refinancing those loans, Dkt. No. 45 ¶¶ 147, 155, Plaintiffs do not allege that they ever asked Defendants whether the loans could be refinanced in a manner that would provide additional financing for the Wade Park properties.

Further, Plaintiffs' allegation that consent of Defendants was required is simply inconsistent with the underlying documents upon which they rely.  As the Court previously concluded:

> The Gamma Defendants did not have a consent right with respect to the Thomas's efforts to obtain financing to pay off the loans on the Wade Park properties.  The Gamma Defendants did not need to "let" him borrow.  He had the unilateral right to borrow without their consent.

Dkt. No. 58 at 54; *see also id*. at 71 ("But under the Construction Loan Agreement, Plaintiffs did not require Defendants' consent to have the loan repaid by another lender . . . .").  Even construing the allegations in the most favorable light for Plaintiffs, there is no reasonable basis to infer anything other than that Defendants were simply insisting on being paid for the debt that was owed to them.  Fulfillment of such past debts, in the absence of facts showing that the payment was unreasonable, cannot constitute a fraudulent conveyance.  *In re Trace Int'l Holdings, Inc*., 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003), *vacated on other grounds*, 2009 WL 1810112 (S.D.N.Y. June 25, 2009) ("Past consideration is good consideration.  An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value, and putting aside transfers to insiders, the payment of an existing liability is not fraudulent.").

## C.   Whether to Permit Amendment

Even though the BBG appraisal report is not properly considered on the motion to dismiss, the Court may consider the report in determining whether Plaintiffs should be permitted to replead.  If the body of the BBG appraisal report permitted a plausible inference that Plaintiffs had stated a claim for relief, it would be inconsistent with the liberal amendment policy of Federal Rule of Civil Procedure 15 not to permit Plaintiffs to file another properly pleaded amended complaint.  The underlying BBG appraisal report, however, is not sufficient to state a claim for relief or to make Plaintiffs' allegations plausible.  The statements of value in the BBG

appraisal report are conclusory.  The $565 million valuation is made up of several components and the assumptions or explanations underlying those components are either absent or informed by the developer itself.  There is no indication, as to the most significant of those components, as to the objective facts relied upon for the valuation.  For example, the largest component of the valuation is for excess land, which the report values at approximately $204 million.  But the report provides no facts to support the application of the $40.00 value per square foot it assigns to such "excess land" aside from cursorily mentioning a "discount for economies for scale." Dkt. No. 87-1 at 55.  No other explanation is provided for that figure.  Other components appear to rely primarily on projections from the "developer," Thomas.  For example, the "*estimated* cost to develop" that forms the value of the leases was "provided by the developer."  *Id*. at 58 (emphasis added).  That yielded an additional $99 million in value to the $565 million figure.  *Id*. at 54.  The additional value of tax increment financing also relies on the "economic impact projections of the developer," *id.* at 57, in order to determine an additional value of $71 million, *id*. at 54.  *Cf. SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 281 (D. Conn. 2017) (noting that an expert working on inaccurate data will yield misleading results, *e.g*., "Garbage in; garbage out"). There is no explanation of the "contributory value of cost spent to date," which added $71 million; that figure also appears to conflate *cost* with *value*.  Dkt. No. 87-1 at 54.  The appraisal report also comes with an extensive list of general assumptions regarding its findings, including that "no responsibility is assumed for the accuracy of any information furnished the appraiser either by the client or others," and that the "appraiser reserves the right to alter or change any or all analyses, opinions, or conclusions and/or estimates of value."  *Id*. at 76–77.  No allegation appears that those assumptions, or any of the other ones, are well-founded.

The remaining category is the primary building site, which the report values at $117 million.  *Id*. at 54.  The comparables analysis fails to support, other than in a conclusory manner, the valuation of $45.00 per square foot that leads to primary building site valuation.  It evinces the sort of discretionary decision-making that makes the valuation more of an opinion than a statement of fact.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d at 251–52.  For example, four of the seven comparable transactions did not even constitute sales.  Contracts existed for them but the transactions had not even closed.  Dkt. No. 87-1 at 48.  No basis is asserted to believe that they would close or if they did, that they would close at the values specified.  *Id.*  Most of the comparables were valued at a much lower dollar per square foot, *see id.*, but the report then adjusts those numbers according to explanations that are at times entirely conclusory.  No reasoning is provided for why any rationale justifies an adjustment of 5%, 12%, 16%, or 19% in some instances—as opposed to some other percentage basis.  *Id*. at 51–54.  Moreover, the sources and verifiers for four of the seven comparables rely on confidential or unidentified "brokers."  *See*, *e.g.*, *id*. at 49, 95, 99, 103, 107.  *Cf. Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) ("[C]onfidential sources cannot be used to merely parrot . . . conclusory allegations contained in the complaint." (internal quotation marks omitted)).  The final determination of the value of the primary building site is thus infected by numerous unexplained and conclusory determinations.  Perhaps those assertions might have weight if support by fact, but in the face of the years during which Plaintiffs were not able to find a single permanent source of financing or to sell the property, they do not have sufficient weight to make Plaintiffs' claims plausible.

**CONCLUSION**

For these reasons, the Court DENIES the motion to transfer and GRANTS the motion to dismiss the SAC with prejudice.  The Clerk of Court is respectfully directed to close Dkt. Nos. 82 and 88, and to close the case.


SO ORDERED.

Dated: March 23, 2023
      New York, New York                            LEWIS J. LIMAN
                                         United States District Judge